**Ninth Circuit Case Nos. 23-3731 & 23-4008**

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

CARROLL SHELBY LICENSING, INC., et al.,

*Plaintiffs, Counter-Defendants, Appellees, and Cross-Appellants,*

v.

DENICE SHAKARIAN HALICKI, et al.,

*Defendants, Counter-Claimants, Appellants, and Cross-Appellees.*

_____

On Appeal from the United States District Court
for the Central District of California
Case No. 8:20-cv-01344 MCS(DFMx)
Honorable Mark C. Scarsi

_____

# APPELLANTS' PRINCIPAL BRIEF
# (CROSS-APPEAL FIRST BRIEF)

_____

**CLARK HILL LLP**
David L. Brandon (SBN 105505)
*dbrandon@clarkhill.com*
555 South Flower Street, 24th Floor
Los Angeles, California 90071
Telephone: (213) 891-9100
Facsimile: (213) 487-1156

**GREINES, MARTIN, STEIN &
RICHLAND LLP**
Timothy T. Coates (SBN 110364)
*tcoates@gmsr.com*
Gary J. Wax (SBN 265490)
*gwax@gmsr.com*
Stefan C. Love (SBN 329312)
*slove@gmsr.com*
6420 Wilshire Boulevard, Suite 1100
Los Angeles, California 90048
Telephone: (310) 859-7811
Facsimile: (310) 276-5261

Attorneys for Defendants, Counter-Claimants, Appellants, and
Cross-Appellees *DENICE SHAKARIAN HALICKI, et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES   6

INTRODUCTION   10

JURISDICTIONAL STATEMENT   13

ISSUES PRESENTED   13

STATEMENT OF THE CASE   14

I.   Overview: Starring "Eleanor."   14

II.   The character Eleanor in the *Gone in 60 Seconds* film series.   15

    A.   *Gone in 60 Seconds* (1974 original).   16

    B.   *The Junkman* (1982).   20

    C.   *Deadline Auto Theft* (1983).   21

    D.   *Gone in 60 Seconds* (2000 remake).   21

       1.   Remake Eleanor's scenes.   22

       2.   Physical differences between Remake Eleanor and related cars.   26

III.   The Shelby settlement.   30

    A.   Without obtaining Halicki's permission, Shelby licenses a custom car shop to build the GT500E— "E" for Eleanor—and Halicki sues.   30

    B.   This Court holds that Halicki has standing to pursue copyright infringement claims and suggests that Eleanor is a copyrightable character.   31

# TABLE OF CONTENTS

**Page**

C. Shelby pays Halicki $700,000 to settle, with both sides intending that each would continue only in its respective business.                                    32

IV. The CR license and injunction.                                    33

A. Halicki licenses Classic Recreations (CR) to build replica Eleanors.                                    33

B. The superior court enjoins CR and its principals from harming "Eleanor Licensing, LLC's rights."                                    34

V. The GT500CR and this lawsuit.                                    35

A. Halicki sues Shelby and CR based on the similarity between the GT500CR and Remake Eleanor.                                    36

B. The district court dismisses Halicki's claim that CR violated the injunction.                                    37

C. The district court decides as a matter of law that Eleanor is not entitled to copyright protection.                                    37

D. After a two-day bench trial, the district court rejects all remaining claims and counterclaims.                                    39

1. The court interpreted the Shelby settlement as a matter of law, without considering extrinsic evidence.                                    39

2. The court rejected the claim that CR breached the license.                                    39

3. The court concluded that Halicki did not prove damages.                                    40

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT                                                       42

ARGUMENT                                                                  45

I.     Eleanor is entitled to copyright protection.                       45

    A.   Eleanor satisfies the elements of a copyrightable
           character established by this Court in *DC Comics* and
           *Daniels*.                                            45

         1.   Eleanor is recognizable as the same character
               in all four movies, displaying consistent,
               identifiable traits and attributes.                  47

         2.   Eleanor is especially distinctive and contains
               some unique elements of expression.                  53

         3.   Remake Eleanor also independently qualifies as a
               copyrightable character.                             56

    B.   Because Eleanor is copyrightable, the Court should
           also reverse and remand the copyright-related contract
           claims against Shelby and CR.                            59

         1.   The district court's error on Eleanor's
               copyrightability supported the faulty judgment
               against Halicki on the contract claims.              59

         2.   The district court's additional reasons for
               rejecting the contract claims are invalid.           60

    C.   Because Eleanor is copyrightable, the Court should
           also reverse and remand the declaratory relief claim
           that CR violated the injunction.                         65

# TABLE OF CONTENTS

Page

II.   Independently, the GT500CR breaches the Shelby
      settlement.                                                            67

      A.    The Court interprets the settlement agreement de novo
            because the district court considered no extrinsic
            evidence.                                                        68

      B.    The settlement unambiguously prohibits Shelby from
            making or licensing cars that copy all of Eleanor's
            distinctive features other than the hood and headlights
            —cars like the GT500CR.                                         69

            1.    Paragraph 8 defines "Eleanor."                            69

            2.    Paragraph 4 prohibits copying Eleanor's hood and
                  headlights except in certain circumstances.               72

            3.    Paragraph 17 prohibits copying Eleanor's other
                  distinctive features except in certain
                  circumstances.                                            72

            4.    The settlement's other language.                          77

            5.    The extrinsic evidence.                                   79

      C.    The Court should order entry of judgment for Halicki
            that Shelby breached the settlement, or at the very
            least, order a new trial.                                       80

CONCLUSION AND REQUESTED DISPOSITION                                        82

CERTIFICATE OF COMPLIANCE                                                   84

STATEMENT OF RELATED CASES                                                  85

CERTIFICATE OF SERVICE                                                      86

# TABLE OF AUTHORITIES

**Page(s)**

### <u>Federal Cases</u>

*ASARCO, LLC v. Union Pacific Railroad Co.*
  765 F.3d 999 (9th Cir. 2014) .......................................... 65

*Bach v. Forever Living Products U.S., Inc.*
  473 F. Supp. 2d 1127 (W.D. Wash. 2007) ..................... 55

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*
  329 F.3d 923 (7th Cir. 2003) ........................................ 55

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*
  519 F. Supp. 388 (S.D.N.Y. 1981) ............................... 45

*Claiborne v. Blauser*
  934 F.3d 885 (9th Cir. 2019) ........................................ 65

*Daniels v. Walt Disney Co.*
  958 F.3d 767 (9th Cir. 2020) ............. 38, 42, 45–52, 54–56, 58

*DC Comics v. Towle*
  802 F.3d 1012 (9th Cir. 2015) ........ 11–12, 42–43, 45–48, 50–52, 54

*Foster Poultry Farms, Inc. v. SunTrust Bank*
  377 F. App'x 665 (9th Cir. 2010) ............................. 62, 65

*Guatay Christian Fellowship v. County of San Diego*
  670 F.3d 957 (9th Cir. 2011) ........................................ 46

*Halicki Films, LLC v. Sanderson Sales & Marketing*
  547 F.3d 1214 (9th Cir. 2008) ................................... 31–32

*Halicki v. Carroll Shelby International*
  2009 WL 10669478 (C.D. Cal. Aug. 12, 2009) ............... 32

*In re Allustiarte*
  786 F.2d 910 (9th Cir. 1986) ........................................ 63

# TABLE OF AUTHORITIES

**Page(s)**

*King Features Syndicate v. Fleischer*
    299 F. 533 (2d Cir. 1924)           45

*Litchfield v. Spielberg*
    736 F.2d 1352 (9th Cir. 1984)     16

*Olson v. National Broadcasting Co.*
    855 F.2d 1446 (9th Cir. 1988)     56

*Rice v. Fox Broadcasting Co.*
    330 F.3d 1170 (9th Cir. 2003)     56

*Satava v. Lowry*
    323 F.3d 805 (9th Cir. 2003)     55

*Silvertop Associates Inc. v. Kangaroo Manufacturing Inc.*
    931 F.3d 215 (3d Cir. 2019)     55

*Walt Disney Productions v. Air Pirates*
    581 F.2d 751 (9th Cir. 1978)     45

## State Cases

*Ajaxo Inc. v. E\*Trade Financial Corp.*
    115 Cal. Rptr. 3d 168 (Ct. App. 2010)     60, 62

*Ajaxo Inc. v. E\*Trade Group Inc.*
    37 Cal. Rptr. 3d 221 (Ct. App. 2005)     60–62

*American Alternative Insurance Corp. v. Superior Court*
    37 Cal. Rptr. 3d 918 (Ct. App. 2006)     68–69

*ASP Properties Group, L.P. v. Fard, Inc.*
    35 Cal. Rptr. 3d 343 (Ct. App. 2005)     79

*Carson v. Mercury Ins. Co.*
    148 Cal. Rptr. 3d 518 (Ct. App. 2012)     76

## TABLE OF AUTHORITIES

**Page(s)**

*City of Redlands v. County of San Bernardino*
117 Cal. Rptr. 2d 582 (Ct. App. 2002) .......... 66

*Colgan v. Leatherman Tool Group, Inc.*
38 Cal. Rptr. 3d 36 (Ct. App. 2006) .......... 62

*County of Humboldt v. McKee*
82 Cal. Rptr. 3d 38 (Ct. App. 2008) .......... 75

*Eleanor Licensing LLC v. Classic Recreations LLC*
230 Cal. Rptr. 3d 511 (Ct. App. 2018) .......... 34–35, 64, 66

*Estate of Wilson*,
134 Cal. Rptr. 749 (Ct. App. 1976) .......... 63

*McLear-Gary v. Scott*
235 Cal. Rptr. 3d 443 (Ct. App. 2018) .......... 68

*Parsons v. Bristol Development Co.*
402 P.2d 839 (1965) .......... 68

*VFLA Eventco, LLC v. William Morris Endeavor Entertainment, LLC*
318 Cal. Rptr. 3d 844 (Ct. App. 2024) .......... 79

*Winet v. Price*
6 Cal. Rptr. 2d 554 (Ct. App. 1992) .......... 81–82

### Federal Statutes

28 U.S.C.
§ 1291 .......... 13
§ 1331 .......... 13
§ 1367 .......... 13

# TABLE OF AUTHORITIES

**Page(s)**

## State Statutes

California Civil Code
  Section 1614 .......... 63
  Section 1638 .......... 69
  Section 1641 .......... 68

California Evidence Code,
  Section 622 .......... 63

## Federal Rules

Federal Rules of Civil Procedure,
  Rule 16 .......... 65
  Rule 16(d) .......... 62
  Rule 16(e) .......... 63

Federal Rules of Evidence,
  Rule 302 .......... 63

## Other Authorities

https://en.wikipedia.org/wiki/Gone_in_60_Seconds_(1974_film)
  (last viewed April 26, 2024) .......... 15

# INTRODUCTION

The opening of the 1974 film *Gone in 60 Seconds* credits only one character: "starring ELEANOR."  Eleanor is a car— a customized Ford Fastback Mustang with a distinctive yellow-and-black paint job.  The film's human star spends most of the film trying to steal Eleanor.  And the film lives up to its promise of Eleanor's starring role: she leads a climactic forty-minute police chase culminating in a slow-motion jump.  Eleanor starred in three more films, including the 2000 remake of *Gone in 60 Seconds*, which featured Nicolas Cage as the thief who wants to steal Eleanor.

Eleanor's star power has attracted many fans who eagerly buy her merchandise.  Not just T-shirts and toys: car and movie aficionados regularly buy hand-built, functional Eleanor replicas costing hundreds of thousands of dollars.  The merchandising rights to Eleanor belong to appellant Denice Halicki.  But infringers regularly try to profit from Eleanor's fame—attempt to "steal" Eleanor just like her human co-stars.  Those infringers include appellees Carroll Shelby Licensing and Classic Recreations (CR).

Shelby jumped into the Eleanor business shortly after the 2000 film was released, working with a custom car shop to make

the Shelby GT500E—"E" for Eleanor. The GT500E was a copy of Eleanor from the remake, even though Eleanor is not a Shelby GT500 and Shelby had nothing to do with the film or Eleanor's design. Halicki sued, settling for $700,000 and a promise from Shelby not to build any more Eleanors. Both sides intended a permanent peace under which each would continue in their distinct, respective businesses, with Eleanor reserved for Halicki and the GT500 for Shelby.

But just one year later, Shelby was at it again, this time through appellee CR. The counterfeit Eleanor was renamed the GT500CR. And CR knew what it was doing. It had been building authorized Eleanors under license from Halicki, but it terminated that license right before working with Shelby.

Halicki sued CR and Shelby for copyright infringement and for breach of contract based on the prior settlement with Shelby and on the license agreement with CR. The district court dismissed the copyright claim on summary judgment, concluding that Eleanor was not a copyrightable character. Following a bench trial, the court then rejected both sides' breach of contract claims.

Halicki's appeal raises two issues.

**Copyrightability.** First, Eleanor is a character entitled to copyright protection—no different from the Batmobile, another copyrightable character, according to this Court. *DC Comics v.*

11

*Towle*, 802 F.3d 1012, 1021–23 (9th Cir. 2015). In ruling otherwise, the district court misapplied *DC Comics*, for example by finding that physical damage to Eleanor in the course of a film challenges her "recognizability"—a faulty principle that would render every action hero uncopyrightable, including the Batmobile. This Court should reverse the district court's ruling and reinstate Halicki's copyright-based claims against Shelby and CR, including infringement claims, copyright-based contract claims, and a claim that CR violated an injunction from a prior suit.

***Breach of the settlement agreement.*** Second, regardless of copyright law, the prior settlement between Halicki and Shelby prohibits Shelby from making or licensing copies of Eleanor. This includes cars like the GT500CR that replicate all of Eleanor's distinctive features *other than* the hood and headlights. This is the only reasonable interpretation of the settlement language, and it captures the parties' intent to create a lasting peace. The district court misconstrued the settlement to allow Shelby to copy all features other than the hood and headlights. This interpretation is inconsistent with both the settlement language and the undisputed extrinsic evidence. This Court should reverse and order entry of judgment for Halicki on this contract claim, or at a minimum, a new trial.

12

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' federal claims under 28 U.S.C. § 1331 and over the state law claims under 28 U.S.C. § 1367. 8-ER-2016. This Court has jurisdiction under 28 U.S.C. § 1291 because the appeal is from a final judgment disposing of all parties' claims. *See* 1-ER-2–3. Judgment was entered on October 31, 2023, and defendants timely appealed on November 21, 2023. 8-ER-2078–80.

# ISSUES PRESENTED

1. The *Gone in 60 Seconds* film franchise features a uniquely customized Ford Fastback Mustang named "Eleanor"—a character that is central to the films' plots and possesses a distinct "personality." *Is Eleanor entitled to copyright protection as a character?*

2. The settlement between Halicki and Shelby allows Shelby to complete pending customer contracts to build replica Eleanors, some with all of Eleanor's distinctive features, some with all such features other than the hood and headlights. "Other than as set forth above," Shelby may not "manufacture or sell any Eleanors." *Outside of these pending customer contracts, does the settlement permit Shelby to make and sell cars that copy all of Eleanor's distinctive features not including the hood and headlights?*

13

# STATEMENT OF THE CASE

## I. Overview: Starring "Eleanor."

The custom Ford Fastback Mustang known as Eleanor made her starring debut in the original 1974 version of *Gone in 60 Seconds*. 4-ER-821–26, ¶¶ 11–25. Eleanor also appeared in three subsequent films, including the 2000 remake of *Gone in 60 Seconds* starring Nicolas Cage. 4-ER-830–39, ¶¶ 32–34, 40–60.

Denice Halicki and entities under her control (together, "Halicki") own the intellectual property and merchandising rights to Eleanor. 1-ER-9–10, ¶¶ 10–11. Denice has spent decades building a business marketing and selling Eleanor-related merchandise, from T-shirts and toys to full-scale, functional replicas worth more than $500,000. 4-ER-840–45, ¶¶ 67–81.

Carroll Hall Shelby Trust, its licensing agent Carroll Shelby Licensing (together, "Shelby"), and Classic Recreations (CR) build and sell a custom Mustang called the GT500CR, which resembles Eleanor from the 2000 remake in virtually all respects. 4-ER-893–904, ¶¶ 29–42; 9-ER-2313–15. Halicki sued them for copyright infringement and breach of contract based on agreements each of them has with Halicki regarding Eleanor. 8-ER-2012, 2040–44, 2047–51.

14

Before trial, the district court ruled as a matter of law that Eleanor is not entitled to copyright protection as a character, cutting off Halicki's copyright infringement claims and certain breach of contract theories.  1-ER-57–76.

After a bench trial, the district court concluded that Halicki's 2009 settlement agreement with Shelby allows Shelby to make custom Mustangs that copy all of Eleanor's distinctive features other than the hood and headlights.  1-ER-14.  The court rejected what remained of Halicki's contract claims, and all of Shelby's claims.  1-ER-34–39, 40–45.

## II.  The character Eleanor in the *Gone in 60 Seconds* film series.

Denice Halicki's late husband, H.B. "Toby" Halicki, produced, wrote, directed, and starred in the original 1974 version of *Gone in 60 Seconds*.  1-ER-9, ¶ 8.  The film reportedly grossed $40 million on a $150,000 budget.[1]  Emblematic of Eleanor's central star status, fans at the time could "'win a date' with Eleanor" and revel in her "'measurements.'"  4-ER-827–28.

---

[1] *See* https://en.wikipedia.org/wiki/Gone_in_60_Seconds_(1974_film) (last viewed April 26, 2024).

15

Toby Halicki completed two more films featuring Eleanor, *The Junkman* (1982) and *Deadline: Auto Theft* (1983). 1-ER-9, ¶ 9. Denice obtained the rights to these films. 1-ER-9, ¶ 10.

The 2000 remake of *Gone in 60 Seconds* was produced by Denice Halicki and Hollywood Pictures, a dba name of Disney. 1-ER-9–10; 6-ER-1306; 11-ER-2895, 2905, 2954–55. Denice reserved "[t]he right to manufacture, sell and distribute merchandise utilizing the car known as 'Eleanor' from the Original Picture." 11-ER-2905. Disney has repeatedly disclaimed any right or interest in Eleanor from the remake. 1-ER-9–10, ¶ 11; 6-ER-1302–04, 1306.

On whether Eleanor is entitled to copyright protection as a character, the factual universe consists of the completed "films in which Eleanor appears" to date, 1-ER-59, put to this Court's "independent review," *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir. 1984). We have moved to transmit to this Court the copies of these films lodged in the district court. We summarize the films here, citing specific moments by time-stamp, [H]:[MM]:[SS].

## A. *Gone in 60 Seconds* (1974 original).

The first reference to Eleanor comes in the original film's opening credits: "starring ELEANOR." 0:00:40. No other actor (or car) is credited then.

16

Maindrian Pace (Toby Halicki) and his crew of car thieves have a few days to steal 48 cars for a foreign gangster. 0:07:02. Pace has a day job as an insurance investigator; the crew only steals cars that are insured. 0:15:33.

Pace and his crew will receive $200,000 if they succeed, but will face unspecified dire consequences if they fail. A typed list identifies each car by make, model, address, and a codename— a woman's first name. 0:07:38, 0:15:16. One of the listed cars is Eleanor, a 1973 Ford Fastback Mustang.

The film features four distinct cars named Eleanor, virtually identical in appearance.

***Eleanor No. 1.*** Pace and his crew spot Eleanor No. 1 in the pickup area of LAX, seemingly unattended. 0:12:38. Eleanor is a 1973 Fastback Mustang (actually, a 1971 customized to resemble a '73) equipped with a distinct hood and custom yellow-and-black paint job. 4-ER-887–88, ¶ 17.

Pace tells his crew, "Hold everything, there's Eleanor." 0:13:08. When one of them opens Eleanor's driver-side door to steal her, he awakens a woman sleeping inside. He feigns confusion ("thought it was my car") and retreats. 0:14:12. Pace says not to worry, "I got Eleanor's license number." 0:14:30.

That night, Pace steals Eleanor from a residential driveway. 0:19:41. Eleanor's drunk owner sees her driving away and gives

17

chase in another car. The chase speeds past police officers, who pull over the owner. 0:21:00. He explains, but when the police bring him back to his house, Eleanor is there, and the police arrest the owner, disbelieving his explanation. 0:23:20. Pace had found a business card showing that the owner was an insurance agent he disliked, and Pace hastily returned the car to spite him. 0:24:02.

***Eleanor No. 2.*** After a montage of thefts of other cars, we cut to Pace and a crew member, Stanley, across from a different house. 0:27:00. Eleanor No. 2—an identically customized Mustang—is in the driveway. Pace remarks, "I'm getting tired of stealing this Eleanor car." He steals Eleanor.

A bit later, Pace is driving with Stanley when he spots Eleanor No. 3—another identically customized Mustang:

> Pace: "Another Eleanor."
>
> Stanley: "When you don't need 'em, they're all over the place."
>
> Pace: "Yeah, she's sure been a lot of trouble, right, because she's the last of the Mustangs."
>
> Stanley: "Sure is a pretty color."
>
> Pace: "Yeah, sure is."

0:35:35.

Eleanor No. 3 pulls into a garage, and Pace says, "She lives at the International Towers, we'll have to keep her in mind. Never know when you might need another Eleanor."

18

The next day, Pace learns that Eleanor No. 2 is uninsured, so he returns her. 0:46:20. He says, "I'm going to give Eleanor [No. 2] back but only because of one reason: I know where there's another at the International Towers in Long Beach." 0:47:02.

As he's returning Eleanor No. 2, he says to Stanley, "We go out and we do the impossible, steal 48 cars, get 'em to the [gangster's] warehouse with hours to spare, and only Eleanor gives us all the trouble." 0:47:12. But he takes heart: "[I]f we're lucky, the one we saw yesterday may still be at the International Towers."

*Eleanor No. 3.* Eleanor No. 3 is still at the International Towers. But two police officers are staking out the building based on a tip. 0:51:41, 0:52:47. They hit the siren and pursue Pace as he drives away in Eleanor. 0:55:22. A forty-minute car chase ensues, among the longest in film history, across four cities and involving dozens of police officers in cars and a helicopter.

The chase ends in spectacular fashion when Pace and Eleanor jump over a major car accident using the hood of a smashed car as an improvised ramp. 1:27:00. By then, Eleanor has incurred massive damage, but she keeps going.

*Eleanor No. 4.* Although Pace has evaded the police, Eleanor No. 3 is in bad shape, unsuitable for delivery to the gangster. As Pace drives past a car wash, he sees Eleanor No. 4—another identically customized Mustang. 1:29:35. He tricks her

owner, swaps her license plate with another at the car wash, and drives off as the closing credits roll.

## B. *The Junkman* (1982).

*The Junkman* places a metafictional frame around the original *Gone in 60 Seconds*. Toby Halicki portrays Harland Hollis, a filmmaker who must evade a team of assassins on the way to the premiere of his film *Gone in 60 Seconds*—now a film-within-a-film.

The opening credits are displayed as a series of dioramas of toy cars and other small props. Eleanor thus first appears as a toy car, painted to resemble the damaged Eleanor No. 3 from the end of the original film, and credited as a "Special Guest Appearance." 0:00:50.

We next see the real Eleanor No. 3, inside a building. Brightly painted on her side is "GONE IN 60 SECONDS" and a blurb, "The most hair-raising chase scene ever filmed." Two of Hollis's employees discuss her transportation to the premiere:

> "Brian, why is Eleanor still here, I told you to get her prepped for the premiere."
>
> "Hey boss, she's already painted."
>
> "I understand that, Brian, but she's still here, she's gotta be at the Cinerama Dome on Tuesday; call transportation, get her on a truck—today!"

0:10:42.

20

We see Eleanor No. 3 again when Hollis—at this point presumed dead by the other characters—sneaks into his own large garage, where Eleanor is parked. 1:10:00. An assassin stalks him. He escapes by driving Eleanor straight through a garage door.

Eleanor also appears "in character" incidentally throughout *The Junkman*: within a clip from *Gone in 60 Seconds* shown on the TV news, 0:56:24; on *Gone in 60 Seconds* T-shirts worn by people attending the premiere, 1:28:11; and in clips from the original film interspersed into the closing credits, 1:33:10.

### C. *Deadline Auto Theft* (1983).

*Deadline Auto Theft* is a revised take on the original *Gone in 60 Seconds*. It stitches together most of the original film, a helicopter sequence from *The Junkman*, and some new footage to tell the same basic story as the original, featuring the same four iterations of Eleanor (minus Eleanor No. 1's airport scene).

### D. *Gone in 60 Seconds* (2000 remake).

The remake presents basically the same story as the original. Memphis Raines (Nicolas Cage) and his team of car thieves have four days to steal 50 cars for a foreign gangster. 0:14:03. They will get $200,000 if they succeed; the gangster will kill Raines's brother if they fail. 0:16:28.

21

The remake features two cars named Eleanor, but the second appears only in the final minutes, in a comical coda.

### 1.    Remake Eleanor's scenes.

Eleanor is first mentioned cryptically during a conversation between Raines and his former detective nemesis.  The detective expresses regret that he has been unable to catch Raines.

> Raines: "Well, without disappointment, you can't appreciate victory."
>
> Detective: "Eleanor tell you that?"
>
> Raines: "Well now that's hitting below the belt."

0:22:38.

Raines walks away.  The detective's partner asks, "Who's Eleanor?"  The detective says, "It's a damn car."  0:23:20.

We next hear of Eleanor when Raines and his crew are reviewing the target car list.  0:36:25.  Someone exclaims, "Whoa! 1967 Shelby GT500.  You got Eleanor here?"

(Remake Eleanor *wasn't* built from a Shelby GT500, and she physically differs from a Shelby GT500 in several ways, detailed below.[2]  4-ER-897–99.  But the characters intermittently and erroneously refer to Eleanor as a Shelby GT500.)

---

[2] In a prior suit, the district court ruled that the remake's use of "Shelby" and "GT500" was nominative fair use; Shelby didn't challenge that ruling.  9-ER-2156.

22

Raines and company locate Eleanor in an underground garage, making a plan to steal her that night. 0:47:20. "There she is," Raines says. "Yep, there's Eleanor." Raines approaches, and two crew members hang back:

> Older crew member: "Eleanor is Memphis's unicorn."
>
> Younger crew member: "What's a unicorn?"
>
> Older: "Fabled creature. You know, the horse with the horn, impossible to capture. It's the one car, no matter how many times you try to boost, something always happens."
>
> Raines [to Eleanor]: "We're gonna get through this this time, right? It's gonna be smooth and easy."
>
> Younger crew member: "What's he doing?"
>
> Older: "He's talking to her, man. Trying to get reacquainted. Done had a rough history. She almost got him killed a couple of times."
>
> Raines [to Eleanor]: "I don't want any talking back."
>
> Older: "He flipped one on the Harbor Freeway."
>
> Third crew member: "He went off the Long Beach pier once."
>
> Raines [to Eleanor]: "A smooth, easy ride. We're just gonna glide."

0:47:40.

Later, the police find the list of cars and hatch a plan to stake out Eleanor:

> Detective: "You and I will take this one right here, '67 Shelby Mustang. Can't be but a few of these in town."
>
> Partner: "Yeah. But how do you know he hasn't already stolen it?"
>
> Detective: "Oh, if I know our boy, I believe he'll leave this one 'til last."
>
> Partner: "Why?"
>
> Detective: "He's afraid of it."

1:20:41.

Finally, the chase. 1:27:38. Raines approaches Eleanor, jimmies the door, and gets in. "I know we got a history, Eleanor, and that that history has not been great. But I promise—you take care of me, I'll take care of you." He starts her up and drives out. 1:27:57. As Eleanor pulls out of the garage, the detectives spot her, and the chase is on.

A few minutes into the chase, Raines activates Eleanor's nitrous oxide turbo boosters, outrunning a police helicopter, along with several police cars. 1:32:21.

> Partner: "Man, this guy can drive!"
>
> Detective: "What, what?"
>
> Partner: "It's probably mostly the car."

1:32:40.

Maneuvering to stay out of sight, Raines accidentally knocks off Eleanor's passenger side-view mirror. 1:34:30. "It's just a scratch, Eleanor, it can be fixed," he says. But the engine dies. "No, no, no, no, don't, don't, don't do this to me, don't—don't start with me, don't—no no no, start," he implores, "start, start, come on, come on. I need you, Eleanor, I need you now, now." Eleanor starts again just as the police spot them. The chase resumes. 1:34:58.

They elude the police again. But there's a bad accident on a suspension bridge that Raines needs to cross. 1:38:25. The police are closing in; a conveniently located tow truck has tilted down its flatbed. 1:38:40. Raines accelerates Eleanor, and they use the truck bed as a ramp to jump over the accident and speed down the other side of the bridge. 1:39:13

Raines arrives with Eleanor at the delivery warehouse a few minutes late. 1:41:00. The gangster refuses the late delivery, punches Raines, and tells his henchmen: "Kill him. Shred the car." 1:42:40. Eleanor is shredded for scrap. 1:43:10. Raines watches and says, "Unicorn."

25

Raines escapes the henchmen, kills the gangster and saves the detective's life.  1:45:00.  The detective says, "You've torn this town to shreds with that little escapade of yours.  You and your Eleanor." But he lets Raines go for rescuing him.  1:47:42.

Finally comes the comical coda.  Raines's brother gifts him a new car.  1:49:37.  "It's Eleanor!" says Raines.  This Eleanor is beat-up and filthy, in contrast to the first one.  As Raines pulls away and the film ends, Eleanor's engine sputters and dies— suggesting possible jealousy, because Raines's girlfriend is in the car.  1:51:22.

### 2.    Physical differences between Remake Eleanor and related cars.

Remake Eleanor looks like this:



4-ER-897, ¶ 33.

Car design expert Michael Leone testified on behalf of Halicki without contradiction regarding Eleanor's distinct features and

Eleanor's differences with the Shelby GT500; he used a series of annotated photos to illustrate these points. *See* 4-ER-881–952.

Remake Eleanor is a customized 1967 Ford Fastback Mustang. The stock (non-customized) Fastback Mustang looks like this:



4-ER-891–92, ¶ 26.

The characters in the remake erroneously refer to Eleanor as a 1967 Shelby GT500, but the 1967 GT500 looks like this:



4-ER-893, ¶ 28.

It is undisputed that numerous exterior features distinguish Eleanor from the 1967 Fastback Mustang and 1967 Shelby GT500; these features include but are not limited to the following:

1.  Molded, painted front bumper and painted rear bumper (versus chrome bumpers on stock Fastback and GT500);

2.  Fuel cap located on the driver-side fastback panel (versus between the taillights on stock Fastback and GT500);

3.  Twin exhausts on the vehicle's sides, below and behind the doors (versus in rear on stock Fastback and GT500);

4.  Exaggerated front and rear fenders and wheel wells (versus small fenders and wheel wells on stock Fastback and GT500);

5.  Wine-glass style wheels (versus a different style on stock Fastback and GT500);

6.  Molded round upper and lower air scoops behind side windows and doors (different on stock Fastback and GT500);

7.  Custom grey and black paint (not available on stock Fastback and GT500);

8.  Molded bump on the hood without air intake vents;

9.  Unique headlight arrangement.

28

4-ER-897–99, ¶¶ 33–36; *see also* 11-ER-2784–90. Some of these features are highlighted gray in these pictures:







4-ER-900, ¶ 38b., 901–03, ¶¶ 39–40.

It is undisputed that only Eleanor possesses *all* of these features, and it is undisputed that only Eleanor possesses the subset of these features other than the hood and headlights (especially important to Arg. § II., *infra*). 4-ER-897–99, ¶¶ 33–36; *see also* 11-ER-2784–90 (CR principal Jason Engel emailing Denice that Eleanor possesses numerous features distinctive from the GT500); 4-ER-806–09, ¶¶ 15–27 (Engel not disputing that only Eleanor possesses these combinations of features).

These points pertain to Eleanor's unique *combination* of features, and they therefore remain true even though not every *individual* feature is unique to Eleanor.

## III. The Shelby settlement.

### A. Without obtaining Halicki's permission, Shelby licenses a custom car shop to build the GT500E— "E" for Eleanor—and Halicki sues.

In the early 2000s, shortly after the remake was released, Shelby licensed a custom car shop to build the GT500E. 4-ER-957, ¶¶ 17–18. The "E" stands for Eleanor: the GT500E was designed to look like Remake Eleanor, *id.*, and it copied all of her distinctive features.

The GT500E looks like this:



4-ER-921–22, ¶¶ 84–85; 11-ER-2741.

Halicki sued Shelby and the car shop for copyright infringement and other claims. *Halicki Films, LLC v. Sanderson Sales & Marketing*, 547 F.3d 1214, 1216–17 (9th Cir. 2008).

**B.   This Court holds that Halicki has standing to pursue copyright infringement claims and suggests that Eleanor is a copyrightable character.**

The district court in that case granted summary judgment to defendants based on standing. On appeal, this Court reversed.

*Halicki Films* held that Halicki has standing to sue for copyright infringement of Remake Eleanor because under the agreement with Hollywood Pictures to produce the remake, Halicki retained merchandising and other "rights to Remake Eleanor as well as Original Eleanor." 547 F.3d at 1220–24.

*Halicki Films* also addressed defendants' argument "that the Eleanor character does not qualify for copyright protection." *Id.* at 1224. The Court strongly suggested that Eleanor satisfies this Circuit's test for character copyrightability, but remanded:

> Eleanor "display[s] consistent, widely identifiable traits," and is "especially distinctive." In both films, the thefts of the other cars go largely as planned, but whenever the main human character tries to steal Eleanor, circumstances invariably become complicated. In the Original GSS [Gone in 60 Seconds], the main character says "I'm getting tired of stealing this Eleanor car." And in the Remake GSS, the main character refers to his

31

> history with Eleanor. Nevertheless, this fact-intensive issue must be remanded to the District Court for a finding in the first instance as to whether Eleanor is entitled to copyright protection.

*Id.* at 1225 (citations omitted).

## C. Shelby pays Halicki $700,000 to settle, with both sides intending that each would continue only in its respective business.

On remand, the district court denied Shelby's summary judgment motion on Halicki's copyright infringement claim. *Halicki v. Carroll Shelby International*, 2009 WL 10669478, at *5–11 (C.D. Cal. Aug. 12, 2009). The case then settled, with Shelby paying Halicki $700,000.

Their shared goal: in order "to permanently buy peace between the parties," Shelby would "continue" only in the GT500 business and Halicki would "continue" only in the Eleanor business. 4-ER-954, ¶ 2, 958, ¶ 20–24 (Shelby's attorney); 4-ER-855, ¶ 104 (Denice Halicki); 11-ER-2730–33, ¶¶ 7–8, 12 (settlement specifying what each side will "continue" to do). The settlement uses language and photographs to define Halicki's and Shelby's respective rights to Eleanor and the GT500.

## IV. The CR license and injunction.

### A. Halicki licenses Classic Recreations (CR) to build replica Eleanors.

Halicki licensed another custom car shop, Classic Recreations (CR), to produce Eleanors. The license agreement is between CR and Eleanor Licensing, LLC. 4-ER-784.

The license agreement defines the "Licensed Properties":

> **1.1 Licensed Properties.** Licensor grants Licensee the right to use the following intellectual property rights, trademarks, and copyrightable material relating to "**Gone in 60 Seconds**" and "**Eleanor**" that are controlled by Licensor in connection with a "Gone in 60 Seconds" automobile vehicle based on the "Gone in 60 Seconds" 1974 Original movie and the "Gone in 60 Seconds" 2000 Remake movie and consisting of the star car character "Eleanor" from each movie. ('Licensed Properties')

4-ER-784. The agreement authorizes CR to produce Fastback Mustangs "fitted and detailed to replicate in appearance, to the 'Gone in 60 Seconds' Original 1974 Movie star car character 'Eleanor,'" and "fitted and detailed to replicate in appearance the 'Gone in 60 Seconds' Remake 2000 Movie star car character 'Eleanor.'" *Id.*

Another provision, the main basis for Halicki's breach of contract claim against CR, states:

33

> **17.1 Rights Granted revert to Licensor.**
> After the expiration or other termination of this
> Agreement, all rights granted to Licensee under
> this Agreement revert to Licensor.  Licensee must
> refrain from further use of the Licensed Properties
> or any further reference to it, direct or indirect, in
> connection with the manufacture, sale,
> distribution or promotion of Licensee's products.

4-ER-798.

As the license required, CR delivered to Halicki the first
replica Eleanor it produced, "Eleanor No. 1."  8-ER-2036, ¶ 74.
But CR failed to deliver the title.  *Id.*

Over the two years the license was in effect, CR sold
$2.7 million in Eleanor replicas.  *Eleanor Licensing LLC v.
Classic Recreations LLC*, 230 Cal. Rptr. 3d 511, 515 n.2
(Ct. App. 2018).  CR then terminated the license.  11-ER-2792.

## B.  The superior court enjoins CR and its principals from harming "Eleanor Licensing, LLC's rights."

Falsely claiming that he owned Eleanor No. 1, Jason Engel,
CR's owner, reported the car as stolen to the LAPD, which seized it.
8-ER-2036, ¶¶ 76–77.  Halicki sued Engel and CR in state court
to quiet title in Eleanor No. 1 and for injunctive relief.  8-ER-2036–
37, ¶ 78.

The superior court rejected CR's defense that Halicki "did not
have any intellectual property rights in 'Eleanor.'"  8-ER-1996–98.

34

The court issued an injunction, upheld on appeal, precluding CR and its owners "'from seeking possession of or harming the subject vehicle with [a certain VIN] referred to as "Eleanor No. 1" and/or Eleanor Licensing, LLC's rights and rights in the subject vehicle.'" 8-ER-2010; *see Eleanor Licensing*, 230 Cal. Rptr. 3d at 528.

## V. The GT500CR and this lawsuit.

Two weeks after CR terminated its license with Halicki's Eleanor Licensing, LLC, CR made a license agreement with Shelby. 10-ER-2535; 11-ER-2765–82. Under this agreement, CR produced and sold a custom Fastback Mustang called the GT500CR. 10-ER-2544.[3]

The GT500CR looks like this:



"GT500CR"
(Exhibit 7)

Front Molded Bumper,   Dual Fog Lights,   Front Fender Flares,   Wheels with Spinner Cap,   Side Exhaust with Cover,   Rear Fender Flares,   Wheels with Spinner Cap,   Gas Cap on Fastback Panel

4-ER-937–39, ¶ 131.

---

[3] CR also produced a car virtually identical to the GT500CR called the GT500CR Carbon. We refer to both as "GT500CR."

It is undisputed that the GT500CR copies the distinguishing features of Remake Eleanor *other than* the hood and headlights, *see* pp. 28–29, *supra.* 2-ER-294–97 (Shelby closing brief not disputing this); 4-ER-937–47, ¶¶ 129–42 (Halicki's car expert); 9-ER-2313–15 (same); *see also* 4-ER-963, ¶ 56 (Shelby attorney told CR not to use Eleanor's hood and headlights, doesn't deny copying other features); 11-ER-2864–65 (CR principal testifying that an unlicensed Eleanor copy "is an imitation of" the GT500CR, thus conceding largely identical features); *cf.* 4-ER-811, ¶ 37 (CR principal emphasizing GT500CR's distinct hood and headlights).

## A. Halicki sues Shelby and CR based on the similarity between the GT500CR and Remake Eleanor.

Halicki sued Shelby and CR for a range of claims, including:

1. Copyright infringement against Shelby and CR;

2. Breach of contract against Shelby based on the Shelby settlement;

3. Breach of contract against CR based on the CR license; and

4. Declaratory relief against CR that it violated the injunction.

8-ER-2012, 2040–57.

**B.   The district court dismisses Halicki's claim that CR violated the injunction.**

Halicki sought declaratory relief that building and selling the GT500CR violated the CR injunction by harming "Eleanor Licensing, LLC's rights," which include intellectual property rights. 8-ER-2056, ¶¶ 164–65; *see also* 8-ER-2040–41, ¶ 91, 2049, ¶ 131, 2056, ¶ 164.

The district court dismissed this claim, ruling that the injunction protected only Eleanor No. 1.  1-ER-103–04.  The court disregarded Halicki's allegations and extrinsic evidence that the litigation leading to the injunction adjudicated Halicki's IP rights as well as property rights to Eleanor No. 1.  *Id.*

**C.   The district court decides as a matter of law that Eleanor is not entitled to copyright protection.**

On cross-motions for summary judgment, the district court ruled that Eleanor is not entitled to copyright protection as a character.  1-ER-75.  The court concluded it could "determine the issue as a matter of law given the limited and undisputed universe of works in which a car named Eleanor appears."  1-ER-59–60 n.7.

The court's ruling was based on two legal criteria unsupported by case law: (1) that "a character cannot be afforded independent copyright protection unless there are multiple works in which the character appears," and (2) that Eleanor's copyrightability must

37

depend on "the complete body of works in which Eleanor appears," not any subset. 1-ER-61; 5-ER-1236.

The court invoked the Ninth Circuit's three-part test for "whether a character featured in a work is independently copyrightable." 1-ER-60. First, the character must have "'physical as well as conceptual qualities,'" an element Eleanor indisputably satisfied. *Id.*, *quoting Daniels v. Walt Disney Co.*, 958 F.3d 767, 777 (9th Cir. 2020). But the court concluded that Eleanor was not "'sufficiently delineated to be recognizable as the same character whenever it appears,'" and not "'especially distinctive.'" 1-ER-60, 73–75, *quoting Daniels*, 958 F.3d at 771.

With this ruling disposing of the copyright infringement claims, the court didn't reach the claims' second prong—i.e., substantial similarity between Eleanor and the GT500CR. 1-ER-75–76.

The court concluded that Halicki's claims for breach of contract depended "in part but not in toto" "on the copyright inquiry," so they could proceed on theories independent of Eleanor's copyrightability. 1-ER-82.

### D. After a two-day bench trial, the district court rejects all remaining claims and counterclaims.

The district court held a two-day bench trial.  It then issued a "bench verdict" rejecting all parties' remaining claims. *See* 1-ER-4–52.

### 1. The court interpreted the Shelby settlement as a matter of law, without considering extrinsic evidence.

The court concluded that the Shelby settlement prohibited copying Eleanor's hood and headlights but permitted copying Eleanor in every other respect.

In reaching that conclusion, the court found the settlement agreement "reasonably susceptible to both sides' interpretations" and therefore "ambiguous" on this issue.  1-ER-42.  However, the court disclaimed reliance on the parties' extrinsic evidence, finding it unhelpful, and the court relied exclusively on the Settlement Agreement's text to resolve the purported ambiguity.  1-ER-43.

### 2. The court rejected the claim that CR breached the license.

The court rejected Halicki's argument that CR breached the license's prohibition on using the "Licensed Properties" after termination, because the court couldn't identify any form of intellectual property CR had misused.  1-ER-37.

39

The court further noted that the license was between CR
and Eleanor Licensing, LLC, 1-ER-34, and concluded that Halicki
had presented insufficient proof that Eleanor Licensing, LLC—
as opposed to Denice Halicki personally—controlled the intellectual
property interests in Eleanor, 1-ER-37. CR had never raised
this issue, and the court's final pretrial conference order did not
address it. *See* 4-ER-729–30.

### 3. The court concluded that Halicki did not prove damages.

The district court also ruled that Halicki did not prove contract
damages. 1-ER-37–38, 48.

The uncontroverted evidence showed that CR earned
$18.7 million in revenue from GT500CR sales and paid Shelby
$1.87 million in royalties. 4-ER-963, ¶ 58. CR's principals testified
that before 2017, CR's annual gross revenue (from all vehicle sales)
was about $4.5 million, and its annual net revenue was $400,000 or
$600,000. 4-ER-781, 814. CR couldn't further explain these figures
because shortly after receiving a cease-and-desist letter from
Halicki, its principals destroyed all the "documents, the financial
records, tax returns, profit and loss statements, and balance sheets
of Classic Recreations LLC," and CR had never maintained detailed
records. 3-ER-409; 10-ER-2562.

The court did not reject Halicki's evidence. Instead, citing two unpublished district court decisions, the court concluded that Halicki was not entitled to disgorgement of profits as damages because disgorgement was an equitable remedy, 1-ER-37–38, even though California case law makes clear that disgorgement is both a legal and equitable remedy. The court thus limited Halicki to claiming "direct damages caused by" the breaches, and it found that Halicki had presented no evidence of such damages. 1-ER-38.

## SUMMARY OF ARGUMENT

### I. *Eleanor is entitled to copyright protection.*

Eleanor satisfies all elements of character copyrightability under this Circuit's case law.

Eleanor is "sufficiently delineated to be recognizable as the same character whenever [she] appears." *Daniels*, 958 F.3d at 771; *DC Comics*, 802 F.3d at 1021.  The viewer is never in doubt that Eleanor is Eleanor, in each appearance and reappearance. In concluding otherwise, the district court mechanically tabulated Eleanor's consistencies and inconsistencies, but lost sight of the intuitive, superseding principle of *recognizability*: a viewer of *Gone in 60 Seconds* has no trouble *recognizing* the car called "Eleanor" as the same *character* in each scene, even if not literally the same *car*; a viewer familiar with the original film has no trouble recognizing that the car called "Eleanor" in the remake is the "same character" as the one made famous by the original.

Eleanor is also "especially distinctive," containing "some unique elements of expression."  *Daniels*, 958 F.3d at 773; *DC Comics*, 802 F.3d at 1021.  Her particular physical and abstract traits have no precursor—they are "unique"—even if some of them appear elsewhere in isolation.  The district court mistakenly blended this element with the previous element, focusing on the irrelevant fact that Eleanor's *unique* traits are not perfectly

42

*consistent* from one appearance to another. But that is not the test. If it were, this Court never would have held that the Batmobile is copyrightable, *DC Comics*, 802 F.3d at 1022, because that car has also appeared in multiple, superficially inconsistent versions.

With these elements satisfied, the Court should hold as a matter of law that Eleanor is entitled to copyright protection and should remand for determination of substantial similarity between Eleanor and the GT500CR. The Court should also reinstate Halicki's contract claims to the extent they depended on the copyright claims and reinstate Halicki's claim that CR violated the injunction.

## II. The GT500CR breaches the Shelby settlement.

Regardless of copyright law, Shelby breached the settlement agreement when it licensed CR to make the GT500CR.

The settlement defines "Eleanor" using a photo and a list of distinctive features. It explicitly prohibits Shelby from making or licensing cars that include all those distinctive features, *and* cars that include the distinctive features other than the hood and headlights: cars like the GT500CR.

The settlement expresses the intent that each party *continue* only in its respective business—Halicki with Eleanor, Shelby with the GT500. And the extrinsic evidence shows a shared intent for the settlement to bring about permanent peace. These intentions

43

are irreconcilable with Shelby's interpretation that the settlement allows it to copy every feature of Eleanor other than the hood and headlights.

Based on undisputed facts, the GT500CR breaches the settlement. The Court should reverse and order entry of judgment for Halicki and a new trial on damages; or at a minimum, the Court should hold that the settlement is reasonably susceptible to Halicki's interpretation and reverse and remand for redetermination in light of the extrinsic evidence.

## ARGUMENT

**I.  Eleanor is entitled to copyright protection.**

The district court concluded as a matter of law that Eleanor isn't entitled to copyright protection as a character, never reaching other elements of the copyright infringement claims (e.g., substantial similarity).  1-ER-75–76.  The district court was mistaken.

**A.  Eleanor satisfies the elements of a copyrightable character established by this Court in *DC Comics* and *Daniels*.**

Characters have long been subject to copyright protection independent from the works in which they appear.  *See*, *e.g.*, *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 753–55 (9th Cir. 1978) (Mickey Mouse, Donald Duck, and other Disney characters); *King Features Syndicate v. Fleischer*, 299 F. 533 (2d Cir. 1924) (comic-strip horse "Sparky"); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 519 F. Supp. 388, 391 (S.D.N.Y. 1981), aff'd, 683 F.2d 610 (2d Cir. 1982) (Tarzan).

To be copyrightable, a character:

1.  must possess "'physical as well as conceptual qualities,'"

2.  must be "'sufficiently delineated to be recognizable as the same character whenever it appears' and 'display consistent, identifiable character traits and attributes,'" and

45

3. must be "'especially distinctive' and 'contain some unique elements of expression.'"

*Daniels*, 958 F.3d at 771 (quoting *DC Comics*, 802 F.3d at 1021). The parties agree that Eleanor has physical as well as conceptual qualities—the first element. 1-ER-60–61. Eleanor's copyrightability thus turns on the second and third elements.

The Court decides this issue de novo based on the works in which Eleanor appears. *See DC Comics*, 802 F.3d at 1019. De novo review also applies because the district court decided this question as a matter of law on cross-motions for summary judgment. *See Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011).

*DC Comics* held that the Batmobile is subject to copyright protection as a character. 802 F.3d at 1019–22. As we now explain, *DC Comics* determines the outcome here:

- Like the Batmobile, Eleanor is a car character featured across multiple works.

- Like the Batmobile, Eleanor possesses core, consistent traits, making her recognizable as the same character within and across these works, even as her superficial traits change.

- Like the Batmobile, Eleanor is distinctive and unique, making her worthy of copyright protection.

46

In holding otherwise, the district court misread *DC Comics* in several ways. It also mistakenly analogized this case to *Daniels*, 958 F.3d 767, in which this Court held that a set of characters called the "Moodsters" was not subject to copyright protection. Read and applied correctly, however, *DC Comics* and *Daniels* decisively establish Eleanor's copyrightability.

### 1. Eleanor is recognizable as the same character in all four movies, displaying consistent, identifiable traits and attributes.

Eleanor is recognizable as the same character whenever she appears across her four films. *See* Stmt. I., *supra*.

***Original Eleanor.*** The original *Gone in 60 Seconds* establishes Eleanor's character traits. Eleanor is a modified 1973 Fastback Mustang with a custom paint job, including black racing stripes. She is stolen repeatedly, and each theft but the last goes awry for one reason or another. With the human protagonist at the wheel, she evades the police in spectacular fashion, incurring severe damage and winning the chase with a bone-rattling jump.

Eleanor's character is developed both from what we see of her and from how other characters talk about her: "I sure am tired of stealing this Eleanor car," and so on. There is a tradition of defining important characters in part by how other characters talk about them: for example, Kurtz (*Heart of Darkness / Apocalypse*

*Now*); Jay Gatsby; Godot; and Maris (*Frasier*). This technique does not diminish Eleanor's recognizability; rather, it broadens her impact far beyond what we actually see. It situates her at the story's center.

Four separate cars are called Eleanor in the original film. But the other characters, and the viewer, understand that although they are physically distinct cars, they all represent the *same character*. Thus, Eleanor No. 2 is "this Eleanor car"; Eleanor No. 3 is "another Eleanor"; and Eleanor No. 4's significance is clear from Pace's reaction. Character "doubles" like this—two or more persons understood as both distinct and in some way the same character— also form a tradition. This device appears in *Twelfth Night*; *A Tale of Two Cities*; *Despair* (Vladimir Nabokov); *The Prestige* (Christopher Nolan); and other works. The viewer *recognizes* that "Eleanor," the car with the above traits, improbably recurs within the film's universe. And because the other characters acknowledge Eleanor's improbable recurrence and see it as noteworthy, her duplication enhances rather than undermines her recognizability.

Eleanor No. 3 incurs severe damage during the police chase. But the second element of *Daniels* is *recognizability*—not *perfect consistency*. No one would argue that when the Batmobile incurs damage, or James Bond suffers injury, it jeopardizes their recognizability. *See DC Comics*, 802 F.3d at 1021 (the Batmobile's

48

generally consistent "bat-like appearance" supports copyrightability); *Daniels*, 958 F.3d at 771 (James Bond remains "[c]onsistently recognizable" even though his "physical characteristics may change").  Likewise, when Maindrian Pace lands that final jump and bashes Eleanor's front end, no viewer asks, "Is that the same car?"

The same is true of *The Junkman*.  *See* Stmt. § I.B., *supra*. Eleanor appears as the centerpiece of *Gone in 60 Seconds* (as a film within a film)—the beat-up, flashily repainted Eleanor No. 3—in clips from the original film; and in a toy version—with the notation "Special Guest Appearance" no less.  No one familiar with the original film would see Eleanor in *The Junkman* and think, "I haven't seen *that* car before.  I wonder what this is about." Therefore, any superficial "inconsistency" between Eleanor in *Gone in 60 Seconds* and in *The Junkman* does not negate *recognizability*. Recognizability goes beyond mechanical tabulation of traits to a broader question: whether the character of Eleanor from the original film remains recognizable in *The Junkman*, viewing and interpreting both films as a whole.  The answer is yes.

*Deadline Auto Theft* poses no additional challenge to this analysis, being virtually the same film as the original *Gone in 60 Seconds*.

49

The district court misinterpreted this element and these films. In finding Original Eleanor insufficiently recognizable, the court fixated on superficial inconsistencies in Eleanor's physical appearance and ignored *recognizability* altogether. *See* 1-ER-70 (detailing Eleanor's "physical appearance issue").

The court also thought that "consistency" requires affirmatively displaying *all* traits in *every* scene. The court concluded, for example, that Eleanor is not *consistently* "hard to steal" because sometimes Eleanor "is not subject to pilfering at all." 1-ER-72. But that is not the analytical framework established by this Court's precedents. The Batmobile is not *constantly* "perform[ing] an 'emergency bat turn,'" entering "'Batmissile' mode," or otherwise displaying its agility; yet this Court found that one of the Batmobile's consistent and recognizable traits is an "ability to maneuver that far exceeds that of an ordinary car." *DC Comics*, 802 F.3d at 1022. James Bond does not order a martini "shaken, not stirred" in every scene, yet he is defined in part by this trait. *Daniels*, 958 F.3d at 771.

***Remake Eleanor.*** Like Original Eleanor, Remake Eleanor is a circa 1970 Fastback Mustang customized with black racing stripes. Like Original Eleanor, Remake Eleanor is hard to steal, such that stealing her occupies Raines for most of the film (as it did Pace); for Raines, she is "the one that got away." Like Original

50

Eleanor, Remake Eleanor is defined in part by others' talk about her (and Raines's talk *to* her). Like Original Eleanor, Remake Eleanor engages in a dramatic police chase ending in a spectacular jump. Like Original Eleanor, the damage to Remake Eleanor from her chase poses no threat to her *recognizability*. Because of these "consistent and identifiable character traits and attributes," a viewer familiar with Original Eleanor will find Remake Eleanor "immediately recognizable as *the same character*." *Daniels*, 958 F.3d at 771 (emphasis added). That's the test. Eleanor passes it.

In comparing Original and Remake Eleanor, the district court got bogged down in irrelevant details: 1973 Mustang versus 1967, yellow versus gray paint; Original Eleanor is of recent vintage relative to the 1974 original film, whereas Remake Eleanor is a "classic" in the 2000 remake. *See* 1-ER-70–73.

This was a mistake. To be sure, Original Eleanor and Remake Eleanor are not the same *car*; this is obvious from their superficial physical differences. Nor would anyone confuse the 1966 Batmobile with the 1989 version, because of their obvious differences. *See DC Comics*, 802 F.3d at 1027–28 (showing both versions). But as *DC Comics* states, "a character may be protectable if it has distinctive character traits and attributes, even if the character does not maintain the same physical appearance in every context." *Id.* at 1020. The recognizability analysis focuses on

51

higher-level consistencies. For the Batmobile, this is a "bat-like appearance," maneuverability (the emergency bat turn in 1966, Batmissile mode in 1989), and crime-fighting prowess. *Id.* at 1021–22. For Eleanor, this is being a sportily-painted circa-1970 Fastback Mustang, being hard to steal, being good at evading police, and surviving spectacular jumps.

In their consistency and recognizability, the Batmobile and Eleanor on the one hand contrast sharply with the Moodsters (from *Daniels*) on the other. The Moodsters were totally inconsistent: their appearance changed from insect-like to bear-like, and their personalities also completely transformed—in an early version, each univocally expressed one emotion, while in a later version, all acted as "mood detectives." *Daniels*, 958 F.3d at 772–73. Unlike the Moodsters' total transformation, the superficial inconsistencies between Original and Remake Eleanor do not undermine her recognizability as the same character across the four films.

What about the Remake's coda, in which Raines's brother gifts him a beat-up old car and calls it "Eleanor"? 1:50:00. The characters understand this for what it is: a car of the same model and year as Remake Eleanor, but obviously different from her in most other respects—so different it strikes them as comical. The viewer grasps all this too, "immediately." *Daniels*, 958 F.3d at 771.

This obvious subversion does not threaten Remake Eleanor's *recognizability* as a character.  To the contrary, Eleanor's shoddy appearance in the coda only highlights how shiny and attractive she is "supposed to be," as a character.  And she remains temperamental, breaking down in the final moments—perhaps out of jealousy that Raines is trying to take his girlfriend for a ride.

By contrast, imagine, for example, that partway through the remake, the characters started referring to a 2001 Toyota Corolla as "Eleanor," without explanation.  *That* would undermine recognizability and make Eleanor like the Moodsters.  The effect of coda Eleanor is entirely different.

The district court misinterpreted the recognizability test.  It found that Eleanor was inconsistent because coda Eleanor "is rusty, decrepit, and slow."  1-ER-69–70.  It never situated these details within the film as a whole: it never acknowledged that in context, to a human viewer, these details do not affect Eleanor's *recognizability*.

### 2.  Eleanor is especially distinctive and contains some unique elements of expression.

The character traits and attributes just described also make Eleanor distinctive and unique: circa-1970 Fastback Mustang customized with a black racing stripe; elusive and hard to steal;

capable of outrunning police and landing bone-shaking jumps. By analogy, *DC Comics* held that the Batmobile was sufficiently distinctive because of its bat-like appearance, crime-fighting prowess, advanced technology, maneuverability, and unique name. 802 F.3d at 1021–22. Eleanor boasts a comparable list, and like the Batmobile, she merits copyright protection.

In contrast, *Daniels* found that the Moodsters were "'[l]ightly sketched' characters" lacking any distinctive, identifiable character traits. *Daniels*, 958 F.3d at 772. *Daniels* found that the Moodsters' *sole* distinctive trait was that each represented "a single emotion." *Id.* at 773. In their lack of distinctive traits, they are nothing like the Batmobile or Eleanor.

The district court mistakenly considered only the traits Eleanor affirmatively displayed in every scene, namely, that she is a Ford Mustang named Eleanor. 1-ER-74–75. This would be like considering the Batmobile as merely a "sleek black car," perhaps its only *perfectly* consistent trait, or considering James Bond as merely a "physically fit male." This is the wrong approach to distinctiveness, just as it was the wrong approach to consistency. A trait is relevant to a character's distinctiveness even if not displayed in every scene.

It is also the wrong approach to determine uniqueness one trait at a time. Uniqueness is a product of the whole. For instance,

54

it would be improper to disregard Eleanor's capacity to outrun the police simply because other movie cars have exhibited this trait. "Every expressive work," even the most creative and original, "can be decomposed into elements not themselves copyrightable." *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 929 (7th Cir. 2003). Courts reject the "divide-and-conquer approach," *Silvertop Associates Inc. v. Kangaroo Manufacturing Inc.*, 931 F.3d 215, 221 (3d Cir. 2019), because "[t]he presence of such elements obviously does not forfeit copyright protection of the [character] as a whole …." *Bucklew*, 329 F.3d at 929. Copyrightability can arise from a particular "*combination* of unprotectable elements." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003) (emphasis added); *see also Bach v. Forever Living Products U.S., Inc.*, 473 F. Supp. 2d 1127, 1134–36 (W.D. Wash. 2007) (explicating this point).

Neither the district court nor Shelby identified a precursor for Eleanor's *character*, and we know of none. Eleanor's combination of traits and attributes sets her apart from any other car character before or since. Eleanor possesses sufficient distinctiveness and uniqueness to satisfy the third and final element of *Daniels*, making her a copyrightable character.

### 3. Remake Eleanor also independently qualifies as a copyrightable character.

The Court should also correct the district court's mistaken assumption "that a character cannot be afforded independent copyright protection unless there are multiple works in which the character appears." 1-ER-61.

Multiple decisions of this Court, including *Daniels*, imply that a character copyright *can* rest on a single work. *See Daniels*, 958 F.3d at 771 ("Although a character *that has appeared in multiple productions or iterations* 'need not have a consistent appearance,' it 'must display consistent, identifiable character traits and attributes[.]'") (emphasis added); *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1173 (9th Cir. 2003) (determining character's copyrightability based on one home video); *Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1447–48 (9th Cir. 1988) (determining characters' copyrightability based on TV pilot script and summary "treatment" of series). We've identified no authority taking the contrary position.

The district court's mistaken assumption also defies common sense. Were Darth Vader, R2-D2, and C-3PO not subject to copyright protection until the second *Star Wars* movie was released? Was E.T. (the Extra-Terrestrial) not subject to copyright protection until the film's video-game adaptation came out later

that year? The court's assumption denies protection to even the most recognizable, distinctive characters until they appear in a second work. This cannot be right.

Free of this assumption, the Court should further hold that Remake Eleanor is a copyrightable character on her own—in addition, or as an alternative, to holding that Eleanor across the four films is a copyrightable character.

Below, Halicki argued that a copyrightable character need not appear in multiple works. Halicki argued that Eleanor "has such significant screen time and character development in the Remake that she meets Prong 2 of the test solely based on the Remake"; and Halicki argued that "the Eleanor car character from the Remake is 'especially distinctive' and not simply a stock car," thus satisfying prong 3. *See* 7-ER-1809–11 (capitalization normalized). The district court did not reach these arguments; the court assumed these arguments were unavailable, based on its view that only characters appearing in multiple works can receive copyright protection. 1-ER-61.

Later, denying Halicki's motion for interlocutory appeal, the court incorrectly said the "theory of character copyrightability based upon a single work" was "not presented" at summary judgment. 5-ER-1235. Based on that faulty premise, the court ruled that the theory "could not materially affect the outcome of the

copyrightability analysis here." 5-ER-1236. The court nevertheless called for "guidance from the Ninth Circuit as to whether a character may be copyrightable based on its appearance in a single work." *Id.* This Court should answer that call and confirm that Remake Eleanor has copyright protection even alone.

Remake Eleanor independently passes the *Daniels* test. On the second element, Eleanor maintains a consistent, recognizable appearance and personality throughout the remake. She is a distinctively customized 1967 Fastback Mustang; she is coveted and elusive, powerful (outrunning a police helicopter) but dangerously unpredictable (failing to operate at important moments). The two apparent exceptions to this consistency are (1) the damage she incurs during the police chase—a superficial inconsistency that does not affect her recognizability; and (2) coda Eleanor—whose physical inconsistency with star Eleanor only enriches Eleanor's characterization as a whole, as explained above. *See* pp. 52–53, *supra.* Remake Eleanor therefore satisfies the recognizability requirement.

On the third element, distinctiveness, Eleanor boasts distinctive physical "modifications," such as unique headlights, a unique combination of other exterior features, and a nitrous oxide switch; difficulty in being stolen; skill at evading the police and executing jumps; being an elusive "unicorn" with a "mystique"; and

58

exhibiting "sensitivity and temperament." 1-ER-70–73. These traits distinguish Eleanor from every other car and elevate her to copyrightable-character status.

**B. Because Eleanor is copyrightable, the Court should also reverse and remand the copyright-related contract claims against Shelby and CR.**

**1. The district court's error on Eleanor's copyrightability supported the faulty judgment against Halicki on the contract claims.**

Halicki's contract claims—that Shelby breached the settlement; that CR breached the license agreement—to some extent depended on Eleanor's copyrightability: one theory of breach was that the GT500CR violated the contracts' prohibition on using Halicki's copyright in Eleanor. The district court's faulty conclusion on Eleanor's copyrightability thus led the court to reject Halicki's contract claims to that extent. *See* 1-ER-81–84.

With that faulty conclusion corrected, the judgment on the contract claims must also be reversed and the claims reinstated to that same extent.

### 2. The district court's additional reasons for rejecting the contract claims are invalid.

The bench verdict offered two additional reasons for rejecting Halicki's contract breach claims—reasons that would apply even though Eleanor is copyrightable. Neither reason is valid.

***Damages.*** The district court's first invalid reason to reject the contract claims was that Halicki did not prove "resulting damages." 1-ER-38.

California law recognizes damages and restitution as distinct breach of contract remedies. Damages measure the harm to the injured party; restitution measures the wrongful benefit, or "unjust enrichment," to the breaching party. *Ajaxo Inc. v. E\*Trade Group Inc.*, 37 Cal. Rptr. 3d 221, 248 (Ct. App. 2005) (*Ajaxo I*).

In *Ajaxo I*, the leading California case on this issue, Ajaxo sued E\*Trade for breaching a nondisclosure agreement by misappropriating trade secrets. *See id.* at 224–25. "At trial, Ajaxo relied solely on an unjust enrichment measure of damages." *Ajaxo Inc. v. E\*Trade Financial Corp.*, 115 Cal. Rptr. 3d 168, 174 (Ct. App. 2010) (*Ajaxo II*).

The Court of Appeal upheld the jury's $1.29 million damages award. *See Ajaxo I*, 37 Cal. Rptr. 3d at 224–25. Ajaxo had declared in its opening statement that unjust enrichment would be the measure of its damages. *Id.* at 247 n.32. The theory was valid;

it required proof that the breaching party "received something of value at the plaintiff's hands." *Id.* at 248. And Ajaxo had presented that proof: evidence of the cost E*Trade saved by misappropriating the secrets. *See id.* at 248–49.

Halicki's contract claims, like Ajaxo's, rest on misuse of intellectual property. Halicki pursued the same damages theory. Halicki's opening statement declared that Shelby and CR "were unjustly enriched" through licensing and sale of the GT500CR, and declared that for the contract claims, Halicki is "entitled to a disgorgement of the profits and recover the unjust enrichment" received by each. 5-ER-1219–20, 1225; *see also* 4-ER-707 (memos of fact and law "shall serve as openings"). Halicki presented undisputed testimony that sales of the GT500CR unjustly enriched Shelby by $1.87 million and CR by $16.8 million. 3-ER-411; *see also* 2-ER-120–22, 216–17 (Shelby and CR not disputing the underlying figures). And Shelby and CR "failed to come forth with any evidence of costs associated with this revenue." 5-ER-1220, 1225. Under *Ajaxo I*, this was sufficient to show damages from Shelby's and CR's breaches.

The district court stated, incorrectly, that "disgorgement is generally not available as a remedy for breach of contract." 1-ER-38 (citing two unreported cases that denied disgorgement only on their particular facts). The court mistakenly thought

61

Halicki needed to show the inadequacy of legal remedies to make restitution available as "an equitable remedy." *Id.* But in this case, restitution of unjust enrichment is a *legal* remedy for breach of contract. *See Ajaxo I*, 37 Cal. Rptr. 4th at 248 (explaining restitution as a breach of contract remedy); *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 62 (Ct. App. 2006) (restitution may be equitable or legal).[4]

Halicki presented ample evidence of damages from Shelby and CR's breaches, and the contract claims judgment cannot be affirmed on this ground.

**Eleanor Licensing, LLC.** The district court also rejected Halicki's contract claim against CR because there was supposedly "insufficient proof that Eleanor Licensing," rather than Denice Halicki, owns the rights to Eleanor. 1-ER-37. The ruling is erroneous.

CR never disputed that the LLC controlled these rights, and the final pretrial conference order did not mention the issue. *See* 4-ER-729–30. That order "controls the course of the action unless the court modifies it," Fed. R. Civ. P. 16(d); no such modification

---

[4] The district court, without explanation, dismissed with a "*cf.*" citation this Court's decision in *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x 665, 668 (9th Cir. 2010), which cited *Ajaxo II* and supports our position. 1-ER-38, ¶ 96.

occurred here. Moreover, modification is proper "only to prevent manifest injustice," Fed. R. Civ. P. 16(e); no such injustice is present here to warrant introducing this eleventh-hour issue.

That CR never raised this point is unsurprising. "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest," except for "recitals of consideration." Cal. Evid. Code § 622; *see* Fed. R. Evid. 302 ("[S]tate law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision."). The CR license states, "Licensee [CR] acknowledges Licensor's [Eleanor Licensing's] rights in the Licensed Properties," and "Licensor represents and warrants that it has the right to enter into" the agreement. 11-ER-2753, 2755. These statements bind CR. *See*, *e.g.*, *Estate of Wilson*, 134 Cal. Rptr. 749, 757–58 (Ct. App. 1976) (applying rule).

Even if these statements were "recitals of consideration" not "conclusively presumed to be true," the existence of the CR license is "presumptive evidence of a consideration," Cal. Civ. Code § 1614—in this case, presumptive evidence that Eleanor Licensing controls the rights it licensed to CR as consideration. *See*, *e.g.*, *In re Allustiarte*, 786 F.2d 910, 916 (9th Cir. 1986) (applying rule). Naturally, CR did not even attempt to rebut this presumption, as Eleanor Licensing indisputably *does* control those rights: "Halicki

formed Eleanor Licensing in 2007 and on October 31, 2007 granted the company a nonexclusive license to her intellectual property rights, merchandising rights, trademarks and copyrightable material relating to 'Gone in 60 Seconds' and 'Eleanor.'" *Eleanor Licensing*, 230 Cal. Rptr. 3d at 515.

The record is full of evidence that Denice Halicki authorized the LLC to act on her behalf with respect to her rights. She testified that "[u]nder the 'Eleanor Licensing' banner, I have made deals to build and sell 'Officially Licensed' replicas of Eleanor as she appears in the Remake." 4-ER-842, ¶ 76. As to the CR license, she emphasized that "[a]s the protector of the merchandising and intellectual property rights in Eleanor, in order to make this deal, I required the CR Parties to agree to certain specific terms about those rights." 4-ER-864, ¶ 132. Halicki's consultant, Michael Leone, refers to the "'Halicki Parties,'" which includes Denice Halicki, 4-ER-882, as having licensed CR to make Eleanors— the necessary inference being that Eleanor Licensing was acting with Denice's authorization to license Eleanor merchandise, 4-ER-927, ¶¶ 97–98. There is no contrary evidence.

It was inappropriate for the district court to reject the contract claim against CR based on an issue (1) not raised in the pre-trial order, (2) not disputed or even subject to dispute under state law, and (3) contrary to what the evidence at trial showed. Even

construing the court's action as an implied modification of the final pretrial conference order, this modification, in direct contradiction of Rule 16, *caused* manifest injustice by ambushing Halicki on an undisputed point that Halicki was not even required to establish under state law.

The district court's error is plain, under Rule 16. *See Foster Poultry Farms, Inc.*, 377 F. App'x at 669–70 (reversing district court ruling on laches because the pretrial order failed to give notice that laches would be an issue during trial); *see also Claiborne v. Blauser*, 934 F.3d 885, 893 (9th Cir. 2019) (plain error standard).

The district court's procedurally and factually improper ruling about Eleanor Licensing does not support affirmance. At a minimum, Halicki should have the opportunity to offer additional evidence on this issue on remand, if needed.

## C. Because Eleanor is copyrightable, the Court should also reverse and remand the declaratory relief claim that CR violated the injunction.

The district court dismissed Halicki's request for declaratory judgment that CR's building and selling the GT500CR violated the CR injunction. 8-ER-2056, ¶ 165. This Court reviews that ruling de novo. *See ASARCO, LLC v. Union Pacific Railroad Co.*, 765 F.3d 999, 1004 (9th Cir. 2014).

An injunction must be worded such that the defendant can "determine from the order what he may and may not do…. [T]he language of the injunction must be interpreted in light of the record which discloses the kind of conduct that is sought to be enjoined." *City of Redlands v. County of San Bernardino*, 117 Cal. Rptr. 2d 582, 594 (Ct. App. 2002).

The CR injunction precludes CR "from seeking possession of or harming the subject vehicle with VIN MS67FB070309TW referred to as 'Eleanor No. 1' and/or Eleanor Licensing, LLC's *rights* and *rights in the subject vehicle*." 8-ER-2074, ¶ 6 (emphasis added). The word "and" distinguishes "rights" in general from "rights in the subject vehicle"; the injunction plainly precludes CR from "harming" *both* kinds of "rights." And "Eleanor Licensing, LLC's rights" include intellectual property rights, such as copyright.

The record in the prior proceedings confirms this interpretation. Halicki's suit sought "injunctive relief restraining Classic from interfering with Eleanor Licensing and Halicki's merchandising rights to 'Eleanor.'" *Eleanor Licensing LLC*, 230 Cal. Rptr. 3d at 518. In that suit, CR argued that Halicki had no intellectual property rights to Eleanor, and Halicki opposed. 8-ER-1995–98. The superior court ruled that Halicki has "the legal authority to license all the rights identified" in the CR license, that is, the merchandising rights to Eleanor. *Eleanor Licensing LLC*,

230 Cal. Rptr. at 519. Halicki thus sought and received an injunction against harming both intellectual property rights and rights to Eleanor No. 1.

The district court nevertheless concluded that the injunction is "limited to Eleanor No. 1," and that Halicki's declaratory relief claim sought "relief outside the injunction's scope." 1-ER-103–04. Wrong. Directly contrary to the interpretative rule, the court even "disregard[ed]" the record of the prior proceedings that Halicki attached to oppose dismissal. 1-ER-104.

This Court should reverse and remand this claim. Eleanor is a copyrightable character, and the injunction, properly construed, protects the copyright to Eleanor. Thus, if the GT500CR infringes on the Eleanor copyright—as Halicki will show on remand—then CR has also violated the injunction.

## II. Independently, the GT500CR breaches the Shelby settlement.

Independent of copyright, as a matter of contract law, the Shelby settlement prohibited Shelby from making or licensing cars that copy all of Eleanor's distinctive features, *see* pp. 28–29, *supra*, *and* cars that copy all of Eleanor's distinctive features other than the hood and headlights—that is, cars like the GT500CR.

### A. The Court interprets the settlement agreement de novo because the district court considered no extrinsic evidence.

The district court interpreted the Shelby settlement as a matter of law, based on its language alone. *See* 1-ER-42–47. The court expressly disclaimed reliance on extrinsic evidence: "The Court does not find the extrinsic evidence introduced by the parties at trial persuasive enough to disturb the interpretation this close reading [of the settlement] engenders." 1-ER-46.

As a result, this Court "is *not* bound by [the] trial court's construction," and the Court interprets the settlement de novo. *McLear-Gary v. Scott*, 235 Cal. Rptr. 3d 443, 454 (Ct. App. 2018) (emphasis in original); *see Parsons v. Bristol Development Co.*, 402 P.2d 839, 842–43 (Cal. 1965) ("Since there is no conflict in the extrinsic evidence in the present case we must make an independent determination of the meaning of the contract.").

The Court should "consider the [settlement] contract as a whole and interpret the language in context, rather than interpret a provision in isolation." *American Alternative Insurance Corp. v. Superior Court*, 37 Cal. Rptr. 3d 918, 922 (Ct. App. 2006); *see* Cal. Civ. Code § 1641 (same). "If contractual language is clear and explicit and does not involve an absurdity, the plain meaning

governs." *American Alternative*, 37 Cal. Rptr. 3d at 923; *see*

Cal. Civ. Code § 1638 (same).

**B.   The settlement unambiguously prohibits Shelby from making or licensing cars that copy all of Eleanor's distinctive features other than the hood and headlights—cars like the GT500CR.**

The settlement's plain language prohibits Shelby from making or licensing cars that include all of Eleanor's distinctive features other than the hood and headlights.  The undisputed extrinsic evidence supports this interpretation.  The district court's contrary interpretation was wrong.  *See* 1-ER-42.

### 1.   Paragraph 8 defines "Eleanor."

Paragraph 8 of the settlement defines "Eleanor" and acknowledges Halicki's right to "continue" making Eleanors:

> 8.  Shelby acknowledges that Halicki will continue to manufacture, market, sell and/or license *Eleanors* and other merchandise relating to *Eleanor as depicted in the attached photograph of Eleanor* and the Gone in 60 Seconds Remake (excluding all Shelby badging).

11-ER-2732 (emphasis added, capitalization normalized in this and all quotes from settlement).

Paragraph 8 has a counterpart, paragraph 7, which acknowledges Shelby's right to "continue" making GT500s and

defines the GT500 through an attached photo.  11-ER-2732.  These paragraphs are echoed in paragraph 12, by which the parties agree to a joint press release stating that "Carroll Shelby and Denice Shakarian Halicki have amicably resolved their differences and settled the litigation between them" and that "each will continue in their business ventures."  11-ER-2734.

The parties agreed that the series of photos appended to the settlement are "part and parcel of the Settlement Agreement." 8-ER-1953.  Here is "the attached photograph of Eleanor" marked to correspond to paragraph 8:



11-ER-2741 (photos reproduced right-side up).  One of these images even shows the GT500E ("E" for Eleanor)—the unauthorized

Eleanor replica produced under license from Shelby right after the remake came out. 4-ER-921–22, ¶¶ 84–85. The parties understood the GT500E to be equivalent, for settlement purposes, to Remake Eleanor.

No other settlement provision purports to define "Eleanor." The settlement thus unambiguously defines "Eleanor" as a car resembling the one in these images and possessing the enumerated features.

The diagram does not show that the gas cap is located on the driver-side fastback panel on Eleanor. However, this feature is implied in the schematic diagram: for item "F. Rear Spoiler & Fender Caps," the area between the taillights is solid, whereas in the stock Fastback Mustang and the GT500, the fuel cap is between the taillights, so there would be a gap between the taillights for the fuel cap. 9-ER-2261–62.

The district court found the word "Eleanors" to be "undefined and ambiguous." 1-ER-45. This finding was erroneous. The court claimed that the parties used the word "Eleanor" to denote "a character." *Id.* Wrong. For that, the parties used the unambiguous phrase "the 'Eleanor' car character from the Remake." 11-ER-2731, ¶ 1. The court claimed that the parties used the word "Eleanor" to denote "a trademark." 1-ER-45. Wrong. To unambiguously denote a trademark, the parties placed the word

in quotation marks "… interest to the 'trademarks' in and to the following: 'Eleanor'; 'E'; and 'Gone in 60 Seconds' …."  11-ER-2731, ¶ 2.  The parties consistently and unambiguously used the word "Eleanor" in the way defined by paragraph 8.

### 2. Paragraph 4 prohibits copying Eleanor's hood and headlights except than in certain circumstances.

Paragraph 4 refers to Eleanor's hood and headlights.  The paragraph prohibits copying these features and states an exception to the prohibition:

> 4.  Shelby shall not use, manufacture, license, or copy, the exaggerated, raised hump feature of the Eleanor hood ("Eleanor Hood"), or the specific design of the Eleanor small dual headlights with custom molded 3-inch hole and 2-inch light inset from the main headlight ("Eleanor Inset Lights"), as seen in the Remake Gone in 60 Seconds, unless Ford Motor Company is the one that has manufactured the product.

11-ER-2732; *accord* 1-ER-14, ¶ 30 (bench verdict).

### 3. Paragraph 17 prohibits copying Eleanor's other distinctive features except in certain circumstances.

At the time of the settlement, the custom car shop that had been building GT500Es had filed for bankruptcy without building some customers' cars.  4-ER-925–26, ¶¶ 92–93, 958, ¶ 19.

72

Paragraph 17 permits Shelby to build these customers' cars, but only in certain circumstances. Although Shelby did not build any such cars, the paragraph also resolves the present dispute. 4-ER-926, ¶ 93.

***Reading paragraph 17 as a whole.*** For context, we begin with two important points. First, paragraph 17 requires Shelby to try to convince these customers to redesign their cars not to include the Eleanor hood and headlights—but the paragraph also allows Shelby to complete cars even for customers who refuse. So, the paragraph contemplates that *some* cars built under the paragraph will include all of Eleanor's features, while *other* cars will include only Eleanor's distinctive features other than the hood and headlights.

Second, the paragraph's crucial language is this: "Other than as set forth above, Shelby or any of his licensees shall not manufacture or sell any Eleanors." 11-ER-2736. The district court correctly found that this clause categorically prohibits Shelby, "other than as set forth above," from making or licensing cars that possess *all* of Eleanor's features. 1-ER-45, ¶ 119 (bench verdict). But this clause *also* prohibits Shelby from making or licensing cars that possess all of Eleanor's distinctive features other than the hood and headlights.

73

Here is paragraph 17 in relevant part, with the two important passages emphasized:

> 17. Regarding the Eleanor contracts from customers of Unique Motorcars/Unique Performance ("Unique") (no more than 60 customers), the names of any customers who desire the making of an Eleanor shall be provided to Halicki within 10 days of when Shelby becomes aware of such customer (after the date of this agreement). Any such customer must have entered into a written contract with Unique and placed a deposit with Unique prior to Unique filing for bankruptcy. *Shelby shall use best efforts to convince the customers to choose a different car that doesn't have the Eleanor Hood and Eleanor Inset Lights described in paragraph 4 above.* Shelby shall only complete automobiles for customers that have existing contracts for the automobiles. This provision only applies to contracts with the specific existing customers, not to any assignees of such customers. In no event shall Shelby obtain any direct or indirect ownership interest in any of these automobiles .... *Other than as set forth above, Shelby or any of his licensees shall not manufacture or sell any Eleanors.*

11-ER-2735–36 (emphasis added).

As defined in the last clause, to perform the acts "set forth above" is to "manufacture or sell" Eleanor. These acts include building cars both *with* and *without* the Eleanor hood and

74

headlights. To do *either*, "other than as set forth above," is prohibited.

**The district court's error.** The district court took the opposite position: that this clause limits Shelby only regarding cars with the Eleanor hood and headlights. This interpretation, however, cannot be reconciled with the rest of the paragraph.

Consider the limitation that "[i]n no event shall Shelby obtain any direct or indirect ownership interest *in any of these automobiles*." 11-ER-2736 (emphasis added). The plain intent is to bar Shelby from owning *any* cars completed for past customers, cars with and without the Eleanor hood and headlights.

According to the court, however, if Shelby convinces a customer to deviate from the Eleanor hood and headlights, then the car is no longer governed by this paragraph. Shelby *can* assume ownership. After all, under the district court's faulty interpretation, if a car lacks the hood and headlights, Shelby has total freedom.

But in that case, what did the parties think they were doing with this limitation? By "any of these automobiles," did they mean, "any of these automobiles possessing Eleanor's hood and headlights"? That would be absurd. *See County of Humboldt v. McKee*, 82 Cal. Rptr. 3d 38, 55 (Ct. App. 2008) (court shall avoid contract interpretations that result in an absurdity). Or did they mean that Shelby cannot take ownership of a car lacking Eleanor's

75

hood and headlights *if Shelby has built it for a GT500E customer?* That would also be absurd, because under the district court's interpretation, Shelby can build a car with all Eleanor's *other* distinctive features whenever it wants to, thereby rendering this limitation meaningless. *See Carson v. Mercury Ins. Co.*, 148 Cal. Rptr. 3d 518, 527 (Ct. App. 2012) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable.").

Similar incoherence results from the paragraph's limitation that "*[t]his provision* [i.e., ¶ 17] only applies to contracts with the specific existing customers, not to any assignees of such customers." 11-ER-2735–36. This says that it is only for existing customers, not their assignees, that Shelby may complete *any* cars under "this provision"—whether or not the cars end up having Eleanor's hood and headlights. According to the court, however, if Shelby convinces a customer—or the customer's assignee—to abandon the hood and headlights, then the car and contract are no longer governed by "this provision." Shelby can build the assignee's car: Shelby can build cars like *that* whenever it wants to.

The court's mistaken conclusion springs from a faulty inference: "the requirement that the Shelby parties persuade the customers 'to choose a *different* car *that doesn't have the Eleanor Hood and Eleanor Inset Lights*,'" the court infers, "indicates that

76

a car that does not have those features is 'different' from the 'car' described by the word Eleanor." 1-ER-46 (original emphasis). The court has assumed too much. "To choose a different car" does not mean that the "different car," lacking the distinctive hood and headlights, is *no longer governed by this paragraph*, that is, no longer an "Eleanor." In the context of the whole agreement, the "different car" is "different" only in comparison to the car the customer originally ordered, a GT500E.

And whatever the initial plausibility of the court's position, it cannot overcome its incoherence with the rest of the paragraph. Paragraph 17 makes sense only if, in general, Shelby cannot build or license a car that copies all of Eleanor's distinctive features, and cannot build or license a car that copies all of Eleanor's distinctive features other than the hood and headlights.

### 4.  The settlement's other language.

The settlement's first three paragraphs support this interpretation. There, Shelby transfers to Halicki any and all copyright and trademark interests to Eleanor that Shelby owns, and Shelby is prohibited from all use of those interests:

> 1.  Shelby hereby transfers to Halicki, or any entity designated by her, all right, goodwill, title, intellectual property rights, and interest to the "copyrights" in and to the following: Remake of

"Gone in 60 Seconds", and particularly the
"Eleanor" car character from the Remake.

2. Shelby hereby transfers to Halicki, or any
entity designated by her, all right, goodwill, title,
intellectual property rights, and interest to the
"trademarks" in and to the following: "Eleanor";
"E"; and "Gone in 60 Seconds" from the Original,
Remake, and sequels.

3. Shelby shall not use, or license in any way,
shape or form any of the property rights
transferred to Halicki described herein.

11-ER-2731–32; *see also* 7-ER-1775; 11-ER-2763–64 (public
acknowledgment letter attesting that Shelby "has transferred"
these rights).

These paragraphs also reinforce paragraphs 4, 8, and 17.
Those paragraphs prohibit Shelby from copying Eleanor by force of
contract law. Paragraphs 1, 2, and 3 prohibit Shelby from copying
Eleanor by force of intellectual property law.

And these paragraphs are further reinforced by paragraphs 7,
8, and 12, which express the parties' intent that Halicki alone
would "continue" to build Eleanors; Shelby alone would "continue"
to build GT500s; and "each will continue in their business
ventures." 11-ER-2732–34.

78

### 5.   The extrinsic evidence.

The settlement's plain language compels our construction.  But the parties also offered extrinsic evidence.  Because the district court's interpretation did not depend on extrinsic evidence's credibility, the Court reviews the evidence de novo.  *ASP Properties Group, L.P. v. Fard, Inc.*, 35 Cal. Rptr. 3d 343, 349 (Ct. App. 2005); *see*, *e.g.*, *VFLA Eventco, LLC v. William Morris Endeavor Entertainment, LLC*, 318 Cal. Rptr. 3d 844, 856–61 (Ct. App. 2024) (independently examining extrinsic evidence).

The settlement itself makes clear the shared intent that each side would continue in its respective business venture; complementing this was Halicki's and Shelby's shared intent to create permanent peace.  The lawyer who negotiated the settlement for Shelby testified that Shelby's goal was "to permanently buy peace between the parties."  4-ER-954, ¶ 2, 958, ¶¶ 20–24.  For Denice Halicki, the settlement was intended to "completely resolve the issues of the Shelby Parties using 'Eleanor,' ever again in 'any way, shape or form.'"  4-ER-855, ¶ 104.

This undisputed shared intent supports the interpretation outlined above.  The goal of permanent peace is inconsistent with the interpretation that the settlement allowed Shelby to copy every feature of Eleanor other than the hood and headlights.  Instead, that interpretation is likely to disturb the peace, given the transfer

of copyrights and trademarks in paragraphs 1, 2, and 3, and the delineation of each party's proper sphere in paragraphs 7, 8, and 12—Shelby to the GT500, Halicki to Eleanor.

Other extrinsic evidence is conflicting on other points. *See*, *e.g.*, 4-ER-960, ¶ 37; 9-ER-2181, 2184 (Shelby's lawyer giving contradictory testimony on what the settlement prohibited). However, the Court does not need to resolve these conflicts: none of the extrinsic evidence, conflicting or not, can fix the incoherence of the district court's interpretation. The settlement is not reasonably susceptible to that interpretation.

Instead, there is only one reasonable interpretation. The settlement prohibits Shelby from making or licensing cars with all of Eleanor's features *and* cars with Eleanor's distinctive features other than the hood and headlights.

### C. The Court should order entry of judgment for Halicki that Shelby breached the settlement, or at the very least, order a new trial.

It is undisputed that the GT500CR copies Eleanor's distinctive features other than the hood and headlights. *See* p. 36, *supra*. 2-ER-294–97 (Shelby closing brief not disputing this); 4-ER-937–47, ¶¶ 129–42 (Halicki's car expert); 9-ER-2313–15 (same); *see also* 4-ER-963, ¶ 56 (Shelby attorney told CR not to use Eleanor's hood and headlights, doesn't deny copying other features); 11-ER-2864–

65 (CR principal testifying that an unlicensed Eleanor copy "is an imitation of" the GT500CR, thus conceding largely identical features); *cf.* 4-ER-811, ¶ 37 (CR principal emphasizing GT500CR's distinct hood and headlights). As just explained, the settlement prohibits Shelby from making or licensing a car like that. And Halicki presented evidence of damages from the breach. *See* pp. 60–62, *supra*.

Shelby failed to contest any other element of Halicki's contract claim. *See* 3-ER-609 (elements); 2-ER-294–97 (Shelby's closing brief). Therefore, the Court should order entry of judgment for Halicki that the GT500CR breaches the Shelby settlement and remand to determine damages.

In the alternative, Halicki is entitled, at a minimum, to a new trial on this claim. The district court concluded that its interpretation of the settlement was the only reasonable one. In fact, the district court's interpretation was unreasonable. But at the very least, the analysis above demonstrates that the settlement is "reasonably susceptible" to Halicki's interpretation. *Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Ct. App. 1992). On that basis, the Court should reverse the judgment for Shelby and remand for

reconsideration of the settlement in light of the extrinsic evidence, *see id.*, which the district court previously ignored, *see* 1-ER-46.[5]

## CONCLUSION AND REQUESTED DISPOSITION

The Court should (I) hold as a matter of law that Eleanor is a copyrightable character, then reverse the judgment and (A) remand the copyright infringement claims for determination of substantial similarity; (B) remand for further proceedings the contract claims to the extent they depend on Eleanor's copyrightability; and (C) remand for further proceedings the declaratory relief claim that CR violated the injunction.

Independently, the Court should (II) reverse and order entry of judgment for Halicki on the claim that Shelby breached the settlement, and remand for a new trial of damages; or at a minimum, hold that the settlement is reasonably susceptible to

---

[5] The evidence for Halicki's interpretation of the agreement was abundant and comported with common sense. The settlement agreement included photos as "part and parcel" of the agreement to delineate what each party could do. 8-ER-1953. The GT500 depicted in the photograph—Shelby's business—looks nothing like the photo of Eleanor—Halicki's business. 11-ER-2741. As depicted, the GT500 represents the closest Shelby could come to building a car that resembles Eleanor. 9-ER-2313. And why include a photo depicting Eleanor's unique *combination* of features if the only features encompassed by the agreement were the hood and headlights?

the interpretation we advance, and reverse and remand for reconsideration in light of the extrinsic evidence.

Date: April 29, 2024

        CLARK HILL LLP
          David L. Brandon

        IRWIN IP LLP
          Jason J. Keener

        GREINES, MARTIN, STEIN & RICHLAND LLP
          Timothy T. Coates
          Gary W. Wax
          Stefan C. Love

By:   *s/ Stefan C. Love*
          Stefan C. Love

        Attorneys for Defendants, Counter-Claimants, Appellants, and Cross-Appellees
        DENICE SHAKARIAN HALICKI, et al.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,980 words, including words in inserted images, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced typeface.

Date: April 29, 2024          s/ *Stefan C. Love*

Stefan C. Love

## STATEMENT OF RELATED CASES

Counsel for defendants, counter-claimants, and appellants know of no other appeal before this Court that "raise[s] the same or closely related issues." Cir. R. 28-2.6(b).


Date: April 29, 2024          s/ *Stefan C. Love*
                              Stefan C. Love

## CERTIFICATE OF SERVICE
[23-3731 and 23-4008]

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 6420 Wilshire Boulevard, Suite 1100, Los Angeles, California 90048, and my email address is pherndon@gmsr.com.

I certify that on April 29, 2024, I electronically filed the foregoing **APPELLANT'S FIRST BRIEF ON CROSS-APPEAL** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that each party in the case is represented by counsel who are registered CM/ECF users and will be served by the appellate CM/ECF system.

*Pauletta L. Herndon*
_____
Pauletta L. Herndon