Nos. 23-3731, -4008

IN THE

# United States Court of Appeals for the Ninth Circuit

CARROLL SHELBY LICENSING, INC.;
CARROLL HALL SHELBY TRUST

*Plaintiffs–Counter-Defendants–Appellees,*

v.

DENICE SHAKARIAN HALICKI; ELEANOR LICENSING, LLC; GONE IN 60 SECONDS MOTORSPORTS, LLC,

*Defendants–Counterclaimants–Appellants,*

CLASSIC RECREATIONS, LLC; JASON ENGEL; TONY ENGEL; SPEEDKORE PERFORMANCE GROUP, LLC,

*Counter-Defendants–Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

## BRIEF OF 20 PROFESSORS OF LAW AND PUBLIC KNOWLEDGE AS *AMICI CURIAE* IN SUPPORT OF AFFIRMANCE

CHARLES DUAN
*Counsel of Record*
AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW
4300 Nebraska Avenue NW
Washington, DC 20016
(202) 274-4124
notices.ecf@cduan.com

*Counsel for amici curiae*

Rev. a2c3d292

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* 20 Professors of Law and Public Knowledge state that they have no parent corporation or publicly held corporation that holds 10% or more of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . i
TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . iii
INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . 1
SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . 1
ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. The Cars at Issue Are Not Characters; They Are Props . . . . . . . . . . 4
  A. A Character Has Agency and Personality Traits . . . . . . . . . . . . 4
  B. Props Lack Agency and Personality Traits . . . . . . . . . . . . . . 7
  C. Because the Eleanor Cars Have Neither Agency Nor Unified Personality, They Are Props, Not Characters . . . . . . . . . . . . . . . 10

II. The Test for Copyrightability of Characters Should Be Limited to Characters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
  A. The Prop–Character Distinction Is a Threshold Question That Precedes the *Towle* Test . . . . . . . . . . . . . . . . . . . . . . . 11
  B. Props Are Not Characters Because They Lack "Conceptual Qualities" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  C. Props Still Receive Strong Copyright Protection . . . . . . . . . . . 16

III. Distinguishing Props from Characters Best Serves the Interests of Copyright Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  A. The Distinction Avoids Expanding the Doctrinal Uncertainties of Character Copyright . . . . . . . . . . . . . . . . . . . . . . . . . 19
  B. The Distinction Properly Values the Creative Contributions of Other Authors and Audiences . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
APPENDIX: List of Academic Signatories . . . . . . . . . . . . . . . . . 28
CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## Cases

*16 Casa Duse, LLC v. Merkin*,
791 F.3d 247 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Baker v. Selden*,
101 U.S. 99 (1880) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Brandir International, Inc. v. Cascade Pacific Lumber Co.*,
834 F.2d 1142 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 17

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
683 F.2d 610 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Carroll Shelby Licensing, Inc. v. Halicki*,
643 F. Supp. 3d 1048 (C.D. Cal. 2022) . . . . . . . . . . . . . . . . . . 10, 25

*Daniels v. Walt Disney Co.*,
958 F.3d 767 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) . . . . . . . . . . . . . . . . . 2, 11–13, 15–17, 20

*DC Comics v. Towle*,
989 F. Supp. 2d 948 (C.D. Cal. 2013) . . . . . . . . . . . . . . . . . . . . 15

*Fleischer v. Freundlich*,
73 F.2d 276 (2d Cir. 1936) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gaiman v. McFarlane*,
360 F.3d 644 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) (en banc) . . . . . . . . . . . . . . . . . . . . 22

*Halicki Films v. Sanderson Sales & Marketing*,
547 F.3d 1213 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . 15, 25

*Hayden v. Koons*,
No. 1:21-cv-10249 (S.D.N.Y. July 18, 2022) . . . . . . . . . . . . . . . . . . . 16

*King Features Syndicate v. Fleischer*,
299 F. 533 (2d Cir. 1924) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Leigh v. Warner Bros., Inc.*,
212 F.3d 1210 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 16

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Metro-Goldwyn-Mayer v. American Honda Motor Co.*,
900 F. Supp. 1287 (C.D. Cal. 1995) . . . . . . . . . . . . . . . . . . . . . 6, 14

*Nichols v. Universal Pictures Corp.*,
45 F.2d 119 (2d Cir. 1930) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Olson v. National Broadcasting Co., Inc.*,
855 F.2d 1446 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Schrock v. Learning Curve International, Inc.*,
586 F.3d 513 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Star Athletica, LLC v. Varsity Brands, Inc.*,
137 S. Ct. 1002 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . 17–18

*Toho Co., Ltd. v. William Morrow & Co., Inc.*,
33 F. Supp. 2d 1206 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . 14

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
715 F.2d 1327 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Walker v. Time Life Films, Inc.*,
784 F.2d 44 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Walt Disney Productions v. Air Pirates*,
581 F.2d 751 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . 13–14, 21

*Warner Bros. v. American Broadcasting Companies*,
720 F.2d 231 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . 14, 19, 21

*Warner Bros. Pictures v. Columbia Broadcasting System*,
216 F.2d 945 (9th Cir. 1954) . . . . . . . . . . . . . . . . . . . . . . . 9, 14

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 13

**Constitutional Provision**

U.S. Const. art. I, § 8, cl. 8 . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Statutes**

17 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

—— § 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

—— § 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Scholarly and Other Nonfiction Works**

Sara Ahmed, *Willful Parts: Problem Characters or the Problem of Character*,
42 New Literary Hist. 231 (2011) . . . . . . . . . . . . . . . . . . . . 4, 25

Amanda Anderson et al., *Introduction* to *Character: Three Inquiries in Literary Studies* 1 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . 5–6

Simon Baron-Cohen, *Mindblindness: An Essay on Autism and Theory of Mind* (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Orson Scott Card, *Elements of Fiction Writing: Characters and Viewpoint* (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Character: Three Inquiries in Literary Studies* (2020) . . . . . . . . . . . . . . 5

Jacqueline Lai Chung, Note, *Drawing Idea from Expression: Creating a Legal Space for Culturally Appropriated Literary Characters*, 49 Wm. & Mary L. Rev. 903 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hélène Cixous, *The Character of "Character"*, 5 New Literary Hist. 383 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Dorrit Cohn, *The Distinction of Fiction* (1999) . . . . . . . . . . . . . . . . . . . . 6

*Companion Encyclopedia of Anthropology: Humanity, Culture, and Social Life* (2d ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Carys J. Craig, *Copyright, Communication and Culture: Towards a Relational Theory of Copyright Law* (2011) . . . . . . . . . . . . . . . . . . . . 22

Frederick A. de Armas, *Gyges' Ring: Invisibility in Plato, Tolkien and Lope de Vega*, 3 J. Fantastic 120 (1994) . . . . . . . . . . . . . . . . . . . . 23

Thomas M. Disch, *The Brave Little Toaster*, Mag. Fantasy & Sci. Fiction, Aug. 1980, at 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Jason Dittmer, *Captain America's Empire: Reflections on Identity, Popular Culture, and Post-9/11 Geopolitics*, 95 Annals Ass'n Am. Geographers 626 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Philip Fisher, *The Failure of Habit*, *in Uses of Literature* 3 (Monroe Engel ed., 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Mary LeCron Foster, *Symbolism: The Foundation of Culture*, *in Companion Encyclopedia of Anthropology: Humanity, Culture, and Social Life* 366 (2d ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Timothy Gao, *The Pistol as a Novel Weapon*, 66 Victorian Stud. 34 (2023) . . . 8

Richard J. Gerrig & David W. Allbritton, *The Construction of Literary Character: A View from Cognitive Psychology*, 24 Style 380 (1990) . . . . . 4

Wendy J. Gordon, *Toward a Jurisprudence of Benefits: The Norms of Copyright and the Problem of Private Censorship*, 57 U. Chi. L. Rev. 1009 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Kathleen Hanley, Comment, *Character Copyrightability in Chaos: How Unclear Character Copyrightability Tests Lead to Improper Results*, 71 Am. U. L. Rev. 1145 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Justin Hughes, *Size Matters (or Should) in Copyright Law*, 74 Fordham L. Rev. 575 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Suzanne Keen, *Readers' Temperaments and Fictional Character*, 42 New Literary Hist. 295 (2011) . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

Leslie A. Kurtz, *The Independent Legal Lives of Fictional Characters*, 1986 Wis. L. Rev. 429 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 21

Norris J. Lacy, *Medieval McGuffins: The Arthurian Model*, 15 Arthuriana 53 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Stacey M. Lantagne, *Sherlock Holmes and the Case of the Lucrative Fandom: Recognizing the Economic Power of Fanworks and Reimagining Fair Use in Copyright*, 21 Mich. Telecomms. & Tech. L. Rev. 263 (2015) . . . . . . 26

Thomas M. Leitch, *Narrative as a Way of Knowing: The Example of Alfred Hitchcock*, 30 Centennial Rev. 315 (1986) . . . . . . . . . . . . . . . . . . . . . 7

John Man, *Sword vs. Lightsaber: How the Samurai Warrior Inspired the Jedi Knights*, Salon (Dec. 20, 2015), https://www.salon.com/2015/12/19/sword_vs_lightsaber_how_the_samurai_warrior_inspired_the_jedi_knights/ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Jani McCutcheon, *Works of Fiction: The Misconception of Literary Characters as Copyright Works*, 66 J. Copyright Soc'y USA 115 (2018) . . . . . . 20, 22

John Stuart Mill, *A System of Logic* (London, John W. Parker 1843), https://archive.org/details/asystemlogicrat21millgoog . . . . . . . . . . . 4

Elizabeth L. Rosenblatt, *The Adventure of the Shrinking Public Domain*, 86 U. Colo. L. Rev. 561 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . 24–25

——, *Who Will Speak for the Slender Man? Dialogism and Dilemmas in Character Copyright*, 70 Fla. L. Rev. F. 69 (2018) . . . . . . . . . . . . 22, 26

Alex Ross, *The Ring and the Rings*, New Yorker (Dec. 15, 2003), https://www.newyorker.com/magazine/2003/12/22/the-ring-and-the-rings . . . 23

Zahr K. Said, *Fixing Copyright in Characters: Literary Perspectives on a Legal Problem*, 35 Cardozo L. Rev. 769 (2013) . . . . . . . . . . . . . . . . 19–21

Gregory S. Schienke, *A Reexamination of Copyright Protection and Fictional Characters: How Distinctly Delineated Must the Story Be Told*, 9 Marq. Intell. Prop. L. Rev. 63 (2005) . . . . . . . . . . 19

Brian J. Scholl & Patrice D. Tremoulet, *Perceptual Causality and Animacy*, 4 Trends Cognitive Scis. 298 (2000) . . . . . . . . . . 4

Cathay Y.N. Smith, *Beware the Slender Man: Intellectual Property and Internet Folklore*, 70 Fla. L. Rev. 601 (2018) . . . . . . . . . . 26–27

Marlow Stern, *"Cumberb****es," Rejoice!*, Newsweek (May 15, 2013), https://www.newsweek.com/2013/05/15/benedict-cumberbatch-star-trek-star-wars-cumberbitches-and-more-237386.html . . . . . . . . . . 7

Marjorie Taylor et al., *The Illusion of Independent Agency: Do Adult Fiction Writers Experience Their Characters as Having Minds of Their Own?*, 22 Imagination Cognition & Personality 361 (2003) . . . . . . . . . . 5

*Uses of Literature* (Monroe Engel ed., 1973) . . . . . . . . . . 4

Blakey Vermuele, *Why Do We Care About Fictional Characters?* (2009) . . . 6, 9

**Fictional Works**

*Cars* (Pixar Animation Studios 2006) . . . . . . . . . . 9

*Face/Off* (Paramount Pictures 1997) . . . . . . . . . . 7

*GoldenEye* (United Artists 1995) . . . . . . . . . . 8

Dashiell Hammett, *The Maltese Falcon* (1930) . . . . . . . . . . 8

Herman Melville, *Moby-Dick* (1851), https://hdl.handle.net/2027/dul1.ark:/13960/t3kw6ns1s . . . . . . . . . . 9

*Monty Python and the Holy Grail* (EMI Films 1975) . . . . . . . . . . 8

*Penguin Sets a Trend, in Batman* (20th Century Fox Television Feb. 1, 1967) . . 15

Watty Piper, *The Little Engine That Could* (1930) . . . . . . . . . . 9

*Pulp Fiction* (Miramax Films 1994) . . . . . . . . . . 8

*Star Wars* (Twentieth Century Fox 1977) . . . . . . . . . . . . . . . . . . . . . . 7

*The Love Bug* (Walt Disney Prods. 1968) . . . . . . . . . . . . . . . . . . . . . . 9

*The Matrix* (Warner Bros. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*The Princess Bride* (20th Century Fox 1987) . . . . . . . . . . . . . . . . . . . . 10

## INTEREST OF *AMICI CURIAE*

*Amici curiae*[1] Professors of Law are identified in the Appendix. Their interest is in ensuring the proper development of copyright law.

Public Knowledge is a nonprofit organization that is dedicated to preserving the openness of the Internet and the public's access to knowledge, promoting creativity through balanced intellectual property rights, and upholding and protecting the rights of consumers to use innovative technology lawfully.

Counsel would like to thank Rachel Bamberger of the American University Washington College of Law for contributing to researching and writing this brief.

## SUMMARY OF ARGUMENT

A car that cannot think, feel, communicate, or act on its own is not a character. It is a prop. Characters have volitional agency and personality traits, while props do not. This distinction is not just fundamental to creative literature, but also supported by the cases, logic, and policies of copyright law. Appellants' invitation to conflate props with characters, by contrast, would confuse the doctrine and create unnecessary tension between copyright law and the creative universe.

[1]Pursuant to Federal Rule of Appellate Procedure 29(a), all parties received appropriate notice of and consented to the filing of this brief. Pursuant to Rule 29(c)(5), no counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief.

This Court should hold simply that for a thing to qualify for independent copyright protection as a character, it must actually be a character. The inanimate collection of cars in this case is not that.

1. In fictional works, there are characters and there are props. Characters have *agency*, the power to act volitionally within a work, and *personality traits*, cognitive dispositions that allow characters to connect empathetically with audiences. Even non-human characters, like animals or animate machines, have well-defined personality traits and individual agency.

Props, on the other hand, lack these attributes. Props give characters things to desire, use, or act upon, but do not make choices or act based on mental personality. Lacking agency and personality traits, they do not connect with readers in the same way that readers connect with characters.

2. Copyright doctrine is and should be consistent with this prop–character distinction. Although no court has clearly defined "character," the longstanding assumption in the case law, most recently *DC Comics v. Towle*, is that characters must have "conceptual qualities," namely agency and personality traits that differentiate characters from props. And personality traits and agency have been central to character copyright cases—the heroism of the self-driving Batmobile in *Towle*, for example.

Props are still protected under copyright law as expressive elements of a

larger narrative work. They may also be independent pictorial, graphic, or sculptural works. Either of these provides strong copyright protection for props. They just are not independently copyrightable under the special rules for characters.

3. Distinguishing props from characters best effectuates the underlying objectives of copyright law, for at least two reasons. First, courts and commentators have long critiqued the character copyright rule as uncertain in application, inconsistent with modern literary principles of character development, and disconnected from other concepts of copyright doctrine. Cabining character copyright to characters avoids unnecessarily expanding these doctrinal uncertainties.

Second, the distinction gives due credit to the contributive nature of creative works. All literature is cumulative, as authors build upon the ideas and tropes of prior creators, and audiences inject their own impressions and imaginations that further expand a work's universe. Especially with respect to props that serve symbolic or referential purposes, creative value is the sum total of contributions by not just the author, but also upstream works and downstream audiences.

Copyright law must balance these interests of prior creators, and audiences, rather than allocating all creative control and value to the nominal author of a work. This balance is best struck by ensuring that any special solicitude for characters is limited to characters, and not indiscriminately expanded.

## ARGUMENT

### I. The Cars at Issue Are Not Characters; They Are Props

Props and characters of fictional works are distinct. Characters have *agency*, the ability to act volitionally, and *personality traits*, the cognitive faculties and dispositions that allow characters to relate to audiences. Props lack these. Characters are subjects that act; props are objects that are acted upon. This distinction drives the different roles that props and characters play in fictional works.

### A. A Character Has Agency and Personality Traits

The defining characteristic of a character is its free will. "A character is a completely fashioned will," literary theorists observe, so that "the idea of will is central to modern understandings of character."[2]

To demonstrate free will to the audience, characters in fictional works must have agency, the apparent power to perform volitional acts.[3] The character "is

[2]Sara Ahmed, *Willful Parts: Problem Characters or the Problem of Character*, 42 New Literary Hist. 231, 234 (2011) (quoting 2 John Stuart Mill, *A System of Logic* 489 (London, John W. Parker 1843), *available online* (quoting German philosopher Novalis)). Although Mill and Novalis were referring to "character" in the sense of personal ethics, literary theorists have repurposed the quote to be about fictional characters. *See, e.g., id.*; Philip Fisher, *The Failure of Habit*, *in Uses of Literature* 3, 7 (Monroe Engel ed., 1973). Locations of authorities available online are shown in the Table of Authorities.

[3]*See, e.g.,* Richard J. Gerrig & David W. Allbritton, *The Construction of Literary Character: A View from Cognitive Psychology*, 24 Style 380, 381 (1990); Brian J. Scholl & Patrice D. Tremoulet, *Perceptual Causality and Animacy*, 4 Trends Cognitive Scis. 298 (2000).

the major agent of the work, at the center of a stage that is commanded by is presence, his story, his interest."[4] Authors themselves observe in their characters the "illusion of independent agency," namely that "fictional characters are often experienced by their creators as having their own thoughts, feelings, and actions."[5] Indeed, an empirical study of fiction authors confirms the common view that characters in an author's imagination can take on lives of their own, perhaps even disagreeing with the course of action that the author expected.[6]

But characters do not simply act to make a story work. Characters "establish[] the identification circuit with the reader," enabling audience members to empathize with, feel for, and perhaps even imagine themselves as these characters.[7] That means that characters must have personality traits.

These traits tap directly into human psychology. Any person, presented with description of other entities, will attempt to "mind read by tracking the motions of

[4]Hélène Cixous, *The Character of "Character"*, 5 New Literary Hist. 383, 386 (1974).

[5]Marjorie Taylor et al., *The Illusion of Independent Agency: Do Adult Fiction Writers Experience Their Characters as Having Minds of Their Own?*, 22 Imagination Cognition & Personality 361, 366 (2003).

[6]*See id.* at 376.

[7]Cixous, *supra* note 4, at 385. Certainly, there is debate among literary academics about whether readers *should* connect with characters in this way, but there is little doubt that readers (particularly non-academic ones) *do connect* with fictional characters. *See* Amanda Anderson et al., *Introduction* to *Character: Three Inquiries in Literary Studies* 1, 10–12 (2020).

others and correlating those motions to purposes."[8] Those correlative "purposes" are the character's personality, which the author must reveal in order for the character to be believable. Thus, fiction is "uniquely suited to show us the privacy of a character's consciousness," and especially since the 18th century authors have used characterization of personality "to give people ever more intense doses of this singular experience—the mind-reading experience."[9]

More practically, best-selling author Orson Scott Card advises writers that "readers want to know your characters better than any human being ever knows any other human being."[10] He then explains how to build a character's actions, motives, and backstory—the character's agency and personality traits—to achieve that understanding.[11]

Physical appearance is important, but not solely what makes a character a character.[12] Costumes change, scars are earned, hairs gray without turning a character into someone else.[13] Indeed, a familiar plot device in films is to sepa-

[8] Blakey Vermuele, *Why Do We Care About Fictional Characters?* 34 (2009) (quoting Simon Baron-Cohen, *Mindblindness: An Essay on Autism and Theory of Mind* 34–35 (1995)).

[9] *Id.* at 14 (quoting Dorrit Cohn, *The Distinction of Fiction* 23 (1999)) (internal quotations removed); *see also* Anderson et al., *supra* note 7, at 8–9.

[10] Orson Scott Card, *Elements of Fiction Writing: Characters and Viewpoint* 5 (2010).

[11] *Id.* at 5–8.

[12] *See id.* at 17.

[13] *See, e.g.*, *Metro-Goldwyn-Mayer v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1296 (C.D. Cal. 1995) (noting changes in appearance of James Bond).

rate appearance from character individuality. There is only one Thomas Crown, no matter how many lookalikes in bowler hats may be milling about; John Travolta and Nicolas Cage can literally switch faces without changing their underlying character identities.[14] Actions and personalities define the character, not superficial looks alone.

### B. Props Lack Agency and Personality Traits

Props, by contrast, have no volitional agency or personality traits. Props invite action but do not make intentional choices within the plot. Even the most well-delineated props can pique the audience's interests, but do not connect on the emotional level that characters do. A *Star Wars* fan watching the duel of Jedi masters wants *to be* Darth Vader and *to have* a light saber; no one wants *to be a light saber.*[15]

Consider two common uses of props. The "MacGuffin," as explained by Alfred Hitchcock, is an object of desire to which the characters go to great lengths to obtain.[16] A MacGuffin may lead characters through much trouble, but the prop does not resolve those troubles itself. The holy grail is out there to be found, but

---

[14] *See Face/Off* (Paramount Pictures 1997).

[15] *Star Wars* (Twentieth Century Fox 1977). Except Benedict Cumberbatch. *See* Marlow Stern, *"Cumberb****es," Rejoice!*, Newsweek (May 15, 2013), *available online.*

[16] *See, e.g.*, Thomas M. Leitch, *Narrative as a Way of Knowing: The Example of Alfred Hitchcock*, 30 Centennial Rev. 315, 323 (1986).

it is King Arthur, the character, who must execute on his quest by traveling afar and outwitting opponents on the flight speeds of unladen swallows.[17] Indeed, as Hitchcock observed, as long as the characters *think* it is valuable, the MacGuffin itself is irrelevant.[18] Swap the Maltese falcon[19] for gold bars, paintings, the Ark of the Covenant, perhaps even a mere glow in a suitcase[20]—the heist film still works. Characters are uniquely determinative of a story because their personality traits inform the action; the MacGuffin itself, being not a character, is fungible.

"Chekhov's gun" is another trope of fiction, in which a prop foreshadows later events.[21] When Q hands James Bond the exploding pen, there is certain to be a dramatic pen explosion later.[22] But when that explosion happens is not the intentional choice of the pen: Either Bond, a character, pushes the plunger, or the pen goes off by accident and the characters must deal with the fallout. The pen may be important, even central, to the plot. But because the pen is a prop without its own thoughts or feelings, it does not drive the plot's motion.

Certainly the character/prop distinction is not simply a distinction between human and nonhuman entities. In fiction, cars can talk, a toaster can be brave, the

[17] *See Monty Python and the Holy Grail* (EMI Films 1975); Norris J. Lacy, *Medieval McGuffins: The Arthurian Model*, 15 Arthuriana 53, 61 (2005).

[18] *See* Lacy, *supra* note 17, at 54.

[19] *See* Dashiell Hammett, *The Maltese Falcon* (1930).

[20] *See Pulp Fiction* (Miramax Films 1994).

[21] *See* Timothy Gao, *The Pistol as a Novel Weapon*, 66 Victorian Stud. 34, 38 (2023).

[22] *See GoldenEye* (United Artists 1995).

little engine could.[23] But each of these mechanical devices has agency and personality traits. Herbie the Love Bug can rejoice at winning races or sulk lovelorn among the streets of San Francisco; viewers feel jubilant or dejected along with the car.[24] Humans intuitively personify non-persons, and fiction often exploits this natural tendency.[25]

Nonhuman personality is distinct from projection of personality onto what are otherwise props. The Pequod may be described as "noble" and "most melancholy," but the whaling ship cannot act out of pride or sorrow; it is a mere vessel of *Moby Dick*'s action, driven by Ahab and crushed by the whale.[26]

Inanimate props are quintessentially "only the chessman in the game of telling the story."[27] They are distinct from characters.

[23] *See Cars* (Pixar Animation Studios 2006); Thomas M. Disch, *The Brave Little Toaster*, Mag. Fantasy & Sci. Fiction, Aug. 1980, at 6; Watty Piper, *The Little Engine That Could* (1930).

[24] *See The Love Bug* (Walt Disney Prods. 1968).

[25] *See* Vermuele, *supra* note 8, at 22–23.

[26] Herman Melville, *Moby-Dick* 77 (1851), *available online*. The difficult cases are magical items that are defined to contain a human soul—the ring of Sauron and the horcruxes of *Harry Potter*, for example. Such complexities are not at issue in the present case, but the correct approach is probably to treat these items like James Bond's tuxedo or Dorothy's ruby slippers: props that enrobe a character's being.

[27] *Warner Bros. Pictures v. Columbia Broad. Sys.*, 216 F.2d 945, 950 (9th Cir. 1954).

### C. Because the Eleanor Cars Have Neither Agency Nor Unified Personality, They Are Props, Not Characters

Here, the cars at issue are props, not characters. For one thing, the cars never choose the course of the plot; they are objects—MacGuffins—to be stolen by the characters.[28] While Appellants "assign anthropomorphic characteristics" to the Eleanor cars such as "strength, talent, endurance, and a tendency to always save her leading man," the district court found that these personality traits were merely projected onto the cars and were "more appropriately attributed to the human protagonists that drive the Eleanors."[29]

Furthermore, for an entity to have the personality traits of a character, it must have one identity. Multiple, distinct cars in the films share the name "Eleanor."[30] To the extent that the cars have any personality, each has its own. Mere sharing of a name cannot make multiple characters into one. The loving farmhand Westley was not the same character as the brutal murderer who commandeered Westley's ship, even though both were named the Dread Pirate Roberts.[31] Fictional works involving a character's conscious personality being split across multiple physical

---

[28] *See Carroll Shelby Licensing, Inc. v. Halicki*, 643 F. Supp. 3d 1048, 1056–59 (C.D. Cal. 2022).

[29] *Id.* at 1062.

[30] *See id.* at 1056.

[31] *See The Princess Bride* (20th Century Fox 1987); *cf.* Leslie A. Kurtz, *The Independent Legal Lives of Fictional Characters*, 1986 Wis. L. Rev. 429, 460, 466–67 (noting uncopyrightability of names).

bodies are typically in the realm of philosophical science fiction;[32] *Gone in 60 Seconds* is not that.

## II. The Test for Copyrightability of Characters Should Be Limited to Characters

The distinction between props and characters informs the application of law in this case, because the special rules for character copyright should apply only to characters exhibiting agency and personality traits. Props are still entitled to copyright protection, in the same manner as any other element of a literary work. But the specific doctrines of character copyright, as applied to props, are illogical and unsupported; in any event a fair reading of the character copyright test would exclude props.

### A. The Prop–Character Distinction Is a Threshold Question That Precedes the *Towle* Test

As an initial matter, the case law currently provides no test for whether an object in a work is a "character." *Towle*, the doctrinal focus of this case at the district court, establishes

> a three-part test for determining whether a character in a comic book, television program, or motion picture is entitled to copyright protection. First, the character must generally have physical as well as conceptual qualities. Second, the character must be sufficiently

[32] *See The Matrix* (Warner Bros. 1999).

> delineated to be recognizable as the same character whenever it appears. . . . Third, the character must be especially distinctive and contain some unique elements of expression.[33]

This test determines "whether a character" is protectable as an independent work under copyright law, as opposed to an unprotectable stock character.[34] But it is not a test for whether an object is a character in the first place. The wording of *Towle* is not "a three-part test for determining whether *a thing is a character*"; it is "a three-part test for determining whether *a character . . . is entitled to copyright protection*." The test thus assumes at the outset that the thing in question is a character. The three elements of the test similarly inquire about "the character," not "the object" or some like wording, again revealing that the test assumes characterhood.

As a result, *Towle* does not state a rule for what qualifies as a character. That threshold determination is one for this Court to make here.

[33] *DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015) (internal quotations and citations removed); *accord Daniels v. Walt Disney Co.*, 958 F.3d 767, 771 (9th Cir. 2020).

[34] *See also Towle*, 802 F.3d at 1022.

## B. Props Are Not Characters Because They Lack "Conceptual Qualities"

Although *Towle* does not explicitly decide what a character is, the case provides an important clue. The test requires "conceptual qualities," and those qualities include agency and personality traits.

The first element of the *Towle* test requires that a copyrightable "character must generally have physical *as well as conceptual qualities*."[35] The phrase "conceptual qualities" originated from *Walt Disney Productions v. Air Pirates*, which explained further:

> [M]ost of the cases dealing with cartoon characters have considered the character's personality and other traits in addition to its image. . . . In what appears to be the only two cases that have viewed a character only as an image . . . , the alleged copying was of a doll, which could have only an image and no conceptual character traits; therefore the issue of whether the comic character's depiction included a personality was not raised.[36]

*Air Pirates* thus provides two glosses on the phrase "conceptual qualities." First, the term is used interchangeably with "personality" and "personality and other traits," as distinct from the character's "image."[37] Second, conceptual qualities

[35] *Id.* at 1021 (emphasis added).

[36] *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 757 n.14 (9th Cir. 1978) (citing *King Features Syndicate v. Fleischer*, 299 F. 533 (2d Cir. 1924); *Fleischer v. Freundlich*, 73 F.2d 276 (2d Cir. 1936)).

[37] *See also Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) (going "beyond the superficial similarities in the characters" to consider their motivations, skills, credentials, and relationships).

are lacking in a doll but present in a cartoon character of otherwise identical image. Given that cartoon characters enjoy agency and personality traits, and given that dolls are inanimate props, *Air Pirates* suggests that "conceptual qualities" are those personality traits that props lack.

Subsequent case law is consistent with this interpretation of conceptual qualities as agency and personality traits.[38] The vast majority of cases involve human characters: Sam Spade, James Bond, the A-Team.[39] Adjudicated cartoon characters like Mickey Mouse have been anthropomorphic, and courts have noted that "a cartoon character's image is intertwined with its personality and other traits."[40] Creatures of film have had distinct personality traits; Godzilla could not have switched from evil to good otherwise.[41]

---

[38] *See generally* Kurtz, *supra* note 31, at 445–74 (reviewing cases).

[39] *See Warner Bros. Pictures v. Columbia Broad. Sys.*, 216 F.2d 945, 950–51 (9th Cir. 1954); *Metro-Goldwyn-Mayer v. Am. Honda Motor Co.*, 900 F. Supp. 1287, 1296 (C.D. Cal. 1995); *Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1451–52 (9th Cir. 1988); *see also Gaiman v. McFarlane*, 360 F.3d 644, 660–61 (7th Cir. 2004); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121–22 (2d Cir. 1930); *Burroughs v. Metro-Goldwyn-Mayer, Inc.*, 683 F.2d 610, 627 (2d Cir. 1982).

[40] *See Air Pirates*, 581 F.2d at 757; *see also id.* at 754–55 (citing cases on animated characters); *Warner Bros. v. Am. Broad. Cos.*, 720 F.2d 231, 241 (2d Cir. 1983) (considering "totality of the characters' attributes and traits"); Kurtz, *supra* note 31, at 445–51.

[41] *See Toho Co., Ltd. v. William Morrow & Co., Inc.*, 33 F. Supp. 2d 1206, 1216 (C.D. Cal. 1998); *see also Daniels v. Walt Disney Co.*, 958 F.3d 767, 769 (9th Cir. 2020) ("[A]nthropomorphized characters representing human emotions"); *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984).

Even the cases dealing with character copyright in cars do not contradict this interpretation. In *Halicki Films v. Sanderson Sales & Marketing*, this Court acknowledged that "[t]he District Court did not directly examine the question of whether Eleanor is a character," and so without sufficient facts declined to make that determination.[42] And *Towle* dealt with a car that arguably had the volitional agency and personality attributes of a character. The Court, obviously well-apprised of the Batman franchise, would have known that the Batmobile at issue was an autonomous-driving car with substantial intelligence—for example, politely stopping for passing children while driving itself to rescue Batman and Robin.[43] *Towle* itself calls the Batmobile "swift, cunning, strong and elusive," compares it to "an impatient steed straining at the reins," and quotes Robin complimenting the car.[44] Focusing on these features would have led *Towle* to view the Batmobile as a character with personality traits, akin to the Lone Ranger's horse Silver or Zorro's Tornado.[45]

---

[42] *Halicki Films v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008) (remanding for further factfinding).

[43] *See Penguin Sets a Trend*, *in Batman* (20th Century Fox Television Feb. 1, 1967); *see also DC Comics v. Towle*, 989 F. Supp. 2d 948, 967 (C.D. Cal. 2013) (noting Batmobile's "sidekick" nature), *aff'd*, 802 F.3d 1012 (9th Cir. 2015).

[44] *Towle*, 802 F.3d at 967, 1021 & n.6.

[45] The Court's mention in passing that "[e]ven when a character lacks sentient attributes and does not speak (like a car), it can be a protectable character," *id.* at 1021, must be read in view of this underlying perception that the Batmobile is animate. The vocabulary of that sentence suggests such a perception—the Court did not say "even when an *object* lacks sentient attributes." And "sentient" is

The Eleanor cars in this case lack the personality traits necessary for them to have "conceptual qualities."[46] Accordingly, the cars are not a character, and so the *Towle* test for character copyrightability is inapplicable to them.

## C. Props Still Receive Strong Copyright Protection

Distinguishing props from characters does not exclude props from copyright protection. Instead, props are still elements of the underlying fictional work and protected under the ordinary rules of copyright law.[47] A prop is an element of the larger narrative work that courts can consider in analyzing substantial similarity for copyright infringement; there is no need to deem the prop a "character" to perform that analysis.[48] The fact that ordinary copyright law still applies to protect props obviates concerns (such as those raised by other *amici*) that expansive character copyright protection is necessary for the interests of authors.

Furthermore, a prop may be an independently copyrightable work, particularly if it is depicted as a two- or three-dimensional image.[49] *Towle* recognized

not synonymous with volition or personality. Fiction abounds with robots that are merely programmed automata but nevertheless act with the appearance of agency and personality traits—Hal 9000, Rosie of *The Jetsons*, and WALL-E to name a few.

[46] *See supra* Section I.C.

[47] *See* 17 U.S.C. § 102 (subject matter of copyright); § 501 (infringement).

[48] *See, e.g., Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (considering plants, statutes, and bowls); *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 n.5 (9th Cir. 1983).

[49] *See, e.g., Hayden v. Koons*, No. 1:21-cv-10249, at 2, 9–10 (S.D.N.Y. July 18, 2022).

this much, acknowledging that the Batmobile might be "entitled to copyright protection as a sculptural work."[50] This possibility reveals an important doctrinal concern. Under standard copyright law, a car or other useful article may be protected as a sculptural work—but only to the extent that the design of the article "incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."[51] That test is no accident: Congress and the courts have long applied a higher standard to useful articles and industrial design, to avoid improper monopolies on useful tools and avoid turning copyright protection into a quasi-patent system.[52]

Here, for example, the Appellants (at 58) highlight the Eleanor cars' physical modifications such as "unique headlights, a unique combination of other exterior features, [and] a nitrous oxide switch." These physical attributes contribute functionality to the car, boosting its power and aerodynamics. Even accepting *arguendo* the Appellants' contention that these features are "a unique combination," prohibiting others from using that combination of features could effectively

[50] *Towle*, 802 F.3d at 1018 n.4.

[51] *Star Athletica, LLC v. Varsity Brands, Inc.*, 137 S. Ct. 1002, 1008 (2017) (quoting 17 U.S.C. § 101).

[52] *See Brandir Int'l, Inc. v. Cascade Pac. Lumber Co.*, 834 F.2d 1142, 1143–44 (2d Cir. 1987) (discussing legislative policy behind uncopyrightability of utilitarian designs); *see also Star Athletica*, 137 S. Ct. at 1013 & n.2 (noting limited scope of protection for useful articles); *Baker v. Selden*, 101 U.S. 99, 102 (1880).

give Appellants a quasi-patent on certain fast cars, lasting over four times the duration of a normal patent and without any examination of obviousness. This is why physical attributes of a car are not copyrightable under the useful article doctrine to the extent they are inseparable from functionality.[53]

If useful articles like cars become "characters" simply by receiving names and camera footage, then any creator of a useful article could circumvent this legislative balance of copyright protection. A threshold test that restricts character copyright to characters ensures that other elements of fictional works, in particular props which are frequently useful articles, are subject to the standard rules of copyright law.

## III. Distinguishing Props from Characters Best Serves the Interests of Copyright Law

Distinguishing props from characters under copyright law does not just satisfy doctrinal logic. The distinction also serves the underlying purposes of copyright protection, namely promoting public access to new creative works and information,[54] for two reasons. First, limiting the character copyright rule avoids expanding the many uncertainties of character protection and creating new difficulties that could undermine the stability and foundation of copyright law. Second, limiting character copyright clarifies what exactly is distinctly copyrightable

[53] *See Star Athletica*, 137 S. Ct. at 1016.

[54] *See* U.S. Const. art. I, § 8, cl. 8; *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 524 (1994).

about characters, and better aligns the protection of characters under copyright law with their creative value.

### A. The Distinction Avoids Expanding the Doctrinal Uncertainties of Character Copyright

The line for character copyrightability has long "proved to be especially elusive."[55] The many complexities of the doctrine and its theoretical foundations suggest value in cabining character copyright to its proper scope.

For one thing, the application of the test(s) for protectability of a character is far from clear. The "sufficiently delineated" test relies heavily upon a subjective assessment of delineation and leads to inconsistent results that place the judge in the role of art critic.[56] It can conflate copyright law with trademark protection and allow for protection of otherwise uncopyrightable short phrases.[57] And the elements of the test seem inconsistent with the stated objective of weeding out

---

[55] *Warner Bros. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983); *see* Kathleen Hanley, Comment, *Character Copyrightability in Chaos: How Unclear Character Copyrightability Tests Lead to Improper Results*, 71 Am. U. L. Rev. 1145, 1169–80 (2022); Jacqueline Lai Chung, Note, *Drawing Idea from Expression: Creating a Legal Space for Culturally Appropriated Literary Characters*, 49 Wm. & Mary L. Rev. 903, 922 (2007).

[56] *See* Zahr K. Said, *Fixing Copyright in Characters: Literary Perspectives on a Legal Problem*, 35 Cardozo L. Rev. 769, 814–15 (2013); Gregory S. Schienke, *A Reexamination of Copyright Protection and Fictional Characters: How Distinctly Delineated Must the Story Be Told*, 9 Marq. Intell. Prop. L. Rev. 63, 80 (2005).

[57] *See* Justin Hughes, *Size Matters (or Should) in Copyright Law*, 74 Fordham L. Rev. 575, 584–85 (2005).

stock characters.[58] Modern literary practice favors "rounded" characters that develop and evolve in their personalities through the arc of a story.[59] Yet the *Towle* requirement of "consistent, identifiable character traits and attributes" seems to protect flat, static characters more than rounded ones.[60] Affording such protection to what seem more like stock characters rather than unique expressions of creativity therefore only serves to contribute to the confusion surrounding what defines a copyrightable character.

On a more theoretical level, the very notion of the "character" as a separable entity from the copyrightable work is questionable. Copyright protects only works "fixed in a tangible medium."[61] But an abstract character, however well delineated, cannot be fixed divorced from its underlying work, any more than the quality of blueness can be fixed without an underlying substance.[62] Such inseparability from works fixed "by or under the authority of the author" further adds to the difficulty of distinguishing copyrightable aspects of characters from the rest of the work.[63]

---

[58] *See DC Comics v. Towle*, 802 F.3d 1012, 1021 (9th Cir. 2015).

[59] *See* Said, *supra* note 56, at 792–95.

[60] *Compare Towle*, 802 F.3d at 1021, *with* Said, *supra* note 56, at 813.

[61] 17 U.S.C. § 101.

[62] *See* Jani McCutcheon, *Works of Fiction: The Misconception of Literary Characters as Copyright Works*, 66 J. Copyright Soc'y USA 115, 137 (2018).

[63] *See id.* at 143.

Nor is the infringement determination simple for characters. "[T]he degree of similarity which will be considered substantial is one of the most uncertain questions in copyright."[64] In particular, because characters have both physical and conceptual characteristics, courts have struggled with whether infringement occurs when one, but not both, is copied.[65] Especially "[w]hen the character's appearance is not the copyright owner's creation," say because the character's appearance is that of a well-known actor, does visual similarity suffice for infringement?[66] "Surely Humphrey Bogart, who played the detective Sam Spade in the film *The Maltese Falcon*, could dress in similar street clothes and play a detective in another film" without infringing copyright—and yet the law even on that point is unclear.[67] And if the conceptual qualities of a character change, that is, if the character is well-rounded, then courts may have no reliable or consistent means of determining what aspect of the character is being infringed.[68]

Uncertainty in copyright protection "can deter the creation of new works if authors are fearful that their creations will too readily be found to be substantially similar to preexisting works."[69] Cabining the complexities of character copyright

[64]Kurtz, *supra* note 31, at 472.

[65]*See, e.g., Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 757 (9th Cir. 1978) ("We need not decide which of these views is correct . . . .").

[66]*See* Kurtz, *supra* note 31, at 470.

[67]*Id.* at 470 & n.230.

[68]*See* Said, *supra* note 56, at 819.

[69]*Warner Bros. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983).

to actual characters fosters greater certainty and advances the purposes of copyright protection.

## B. The Distinction Properly Values the Creative Contributions of Other Authors and Audiences

Cabining character protection to characters also serves the purposes of copyright by giving due credit to those other than the author who made creative contributions to a work. All elements of creative works, including characters, are the sum total of "a dialogic process" of multiple contributors that produces "the cumulative nature of cultural creativity."[70] Because copyright law invests protection in only one authorial entity, it necessarily does not credit all contributors. A film is the sum total of creativity and decision-making of numerous actors, costume designers, film directors, and property masters, but each of them does not receive a separate copyright interest.[71] Limiting the scope of copyright protection to what the copyright holder actually created, then, ensures that these third parties' contributions are respected and not unwittingly handed off to another's ownership.

[70] Carys J. Craig, *Copyright, Communication and Culture: Towards a Relational Theory of Copyright Law* 54 (2011); Elizabeth L. Rosenblatt, *Who Will Speak for the Slender Man? Dialogism and Dilemmas in Character Copyright*, 70 Fla. L. Rev. F. 69, 71 (2018).

[71] *See 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 254–57 (2d Cir. 2015); *Garcia v. Google, Inc.*, 786 F.3d 733, 741–42 (9th Cir. 2015) (en banc); McCutcheon, *supra* note 62, at 151.

With respect to props in a fictional work, at least two classes of non-author contributors are significant: prior creators and the audience for that work. Props are, of course, not alone in this respect: Characters are also the sum total of contributions by prior creators and the audience.[72] This only makes expansive copyright protection for characters more complex and questionable, providing further reason not to expand the doctrine to non-character elements.

1. When a creative work incorporates allusions, metaphors, and symbols referencing other works, the work owes its origin in part to prior creators.[73] Props often do this. Sauron's One Ring, with its powers of invisibility and control, falls into a classical tradition including Plato's ring of Gyges and Germanic mythology via Wagner's *Ring Cycle*.[74] While lightsabers are unlike regular swords due to their plasma blade and strong connection to the Force, they share similarities with and were inspired by samurai swords.[75] By styling the lightsaber after a sword symbolizing power and status, *Star Wars* effectively transfers the importance of

---

[72] *See, e.g.,* Suzanne Keen, *Readers' Temperaments and Fictional Character*, 42 New Literary Hist. 295, 299–300 (2011).

[73] *See also* Wendy J. Gordon, *Toward a Jurisprudence of Benefits: The Norms of Copyright and the Problem of Private Censorship*, 57 U. Chi. L. Rev. 1009, 1034–37 (1990).

[74] *See* Alex Ross, *The Ring and the Rings*, New Yorker (Dec. 15, 2003), *available online*; Frederick A. de Armas, *Gyges' Ring: Invisibility in Plato, Tolkien and Lope de Vega*, 3 J. Fantastic 120, 122 (1994). On whether the One Ring is a character, see *supra* note 26.

[75] *See* John Man, *Sword vs. Lightsaber: How the Samurai Warrior Inspired the Jedi Knights*, Salon (Dec. 20, 2015), *available online.*

the samurai sword to the lightsaber. Captain America's shield, with colors and design taken from the American flag, is another prop that owes its status to a pre-existing work that symbolizes patriotism and, particularly for the postwar period when the comic first appeared, "the narrative of America that he embodies defense rather than offense."[76]

Copyright law provides a variety of doctrines, including originality and the idea–expression dichotomy, to separate out the respective contributions of a work's author and the work's precedents.[77] These doctrines can be applied to props.[78]

But treating props as characters risks conferring the symbolic, representational value of those props entirely upon one copyright holder, particularly given the lack of clarity on the standard for copyright infringement of characters.[79] Indeed in the present case, the Shelby GT500 car at issue bears the name of the alleged infringer, referencing by name and appearance the contributions of Car-

[76] *See* Jason Dittmer, *Captain America's Empire: Reflections on Identity, Popular Culture, and Post-9/11 Geopolitics*, 95 Annals Ass'n Am. Geographers 626, 630 (2005).

[77] *See, e.g.*, *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 518 (7th Cir. 2009).

[78] *See, e.g.*, *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986).

[79] *See supra* text accompanying notes 64–68; *see also* Elizabeth L. Rosenblatt, *The Adventure of the Shrinking Public Domain*, 86 U. Colo. L. Rev. 561, 27–28 (2015) (noting difficulties with separating out copyright interests when characters have multiple creators).

roll Shelby's creative car design work.[80] And if the prior contributions are in the public domain, then incautious application of character copyright can stifle downstream uses of creative inputs that ought to be available to anyone.[81] Applying standard copyright law, rather than a specific character rule, best enables courts to sort out and provide due credit to the copyright holder and other prior contributors.

2. The audience for a work is also a creative contributor. The audience draws connections, fills in backstories, and augments the universe of a work in ways that enhance the total creative concept.

An audience does not passively consume fictional works; it actively participates in and contributes to the imagined story. Audience members do so because of the "narrative empathy" they experience with the work.[82] But because any fictional work, no matter how detailed, can only reveal snippets of a character, story, or fictional world, it is up to the audience to fill in the gaps—to turn two-dimensional words or images into three-dimensional imaginings.[83]

How audiences fill in these gaps is just as creative and unpredictable as any other copyrightable work. The prevalence of fanfiction and collaborative works

[80] *See Halicki Films v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1215 (9th Cir. 2008); *Carroll Shelby Licensing, Inc. v. Halicki*, 643 F. Supp. 3d 1048, 1058 n.13 (C.D. Cal. 2022).

[81] *See* Rosenblatt, *supra* note 79, at 584.

[82] *See* Keen, *supra* note 72, at 297; *supra* text accompanying notes 7–11.

[83] *See* Ahmed, *supra* note 2, at 234.

is testament to that creativity.[84] Indeed, audiences may push the trajectory of a creative franchise in ways contrary to an author's original wishes—Sherlock Holmes had to come back to life after 19th century Sherlockians vigorously protested Arthur Conan Doyle's killing off the character.[85]

Props rely on audiences' creativity, due to the symbolic and referential nature of props. In order for props to convey deeper meanings or themes beyond their literal appearance, audience members must inject into a work personal associations, social contexts, and interpretations.[86] The lightsaber, One Ring, and Maltese Falcon have meaning as a chivalrous weapon, a force of evil, and a priceless *object d'art* not merely by the author's literal explanations, but also by the audience explaining these props through their personal, imaginative connections—connections that often go beyond what the author intended.

Character copyright law interacts poorly with this dialogic creativity, investing investing rights in a sole author without acknowledging the value created by prior authors or audiences.[87] Copyright law "does not generally recognize com-

[84] *See, e.g.,* Stacey M. Lantagne, *Sherlock Holmes and the Case of the Lucrative Fandom: Recognizing the Economic Power of Fanworks and Reimagining Fair Use in Copyright*, 21 Mich. Telecomms. & Tech. L. Rev. 263, 278–83 (2015).

[85] *See id.* at 268–69.

[86] *See* Mary LeCron Foster, *Symbolism: The Foundation of Culture*, *in Companion Encyclopedia of Anthropology: Humanity, Culture, and Social Life* 366, 366 (2d ed. 2002).

[87] *See, e.g.,* Cathay Y.N. Smith, *Beware the Slender Man: Intellectual Property and Internet Folklore*, 70 Fla. L. Rev. 601, 643–45 (2018); Rosenblatt, *supra* note 70, at 76–77.

munity rights to a work."[88] Separating props from the character copyright rule better allocates the value of copyright protection in view of the creative contributions of others.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be affirmed.

Respectfully submitted,

Dated: August 19, 2024

*s/Charles Duan*
CHARLES DUAN
*Counsel of Record*
AMERICAN UNIVERSITY WASHINGTON COLLEGE OF LAW
4300 Nebraska Avenue NW
Washington, DC 20016
(202) 274-4124
notices.ecf@cduan.com
*Counsel for amici curiae*

[88] *See* Smith, *supra* note 87, at 624.

# APPENDIX
## List of Academic Signatories

The brief presents the views of the individual signers. Institutions are listed for identification purposes only.

Jasmine Abdel-khalik

*University of Missouri–Kansas City School of Law*

Michael Carrier

*Rutgers Law School*

Michael W. Carroll

*American University Washington College of Law*

Jorge L. Contreras

*University of Utah S.J. Quinney College of Law*

Charles Duan

*American University Washington College of Law*

Brian L. Frye

*University of Kentucky College of Law*

Jim Gibson

*University of Richmond School of Law*

James Grimmelmann

*Cornell Tech & Cornell Law School*

William D. Henslee

*Florida A&M University College of Law*

Robert A. Heverly

*Albany Law School*

Stacey M. Lantagne

*Western New England University School of Law*

Mark Lemley

*Stanford Law School*

Yvette Joy Liebesman

*Saint Louis University School of Law*

Tyler T. Ochoa

*Santa Clara University School of Law*

Aaron Perzanowski

*University of Michigan Law School*

Betsy Rosenblatt

*Case Western Reserve University School of Law*

Pamela Samuelson

*University of California, Berkeley School of Law*

Cathay Y. N. Smith

*Illinois Institute of Technology Chicago-Kent College of Law*

Erik R. Stallman

*University of California, Berkeley School of Law*

Rebecca Tushnet

*Harvard Law School*

## CERTIFICATE OF COMPLIANCE

This document contains **6,516** words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). The brief's type size and typeface comply with Rule 32(a)(5) and (6).

I certify that this brief is an amicus brief and complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5), Ninth Circuit Rule 29-2(c)(2), or Ninth Circuit Rule 29-2(c)(3).

Dated: August 19, 2024

*s/Charles Duan*
Charles Duan
*Counsel for Amici Curiae*