**Ninth Circuit Case Nos. 23-3731 & 23-4008**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

CARROLL SHELBY LICENSING, INC., et al.,
*Plaintiffs, Counter-Defendants, Appellees, and Cross-Appellants,*

v.

DENICE SHAKARIAN HALICKI, et al.,
*Defendants, Counter-Claimants, Appellants, and Cross-Appellees.*

On Appeal from the United States District Court
for the Central District of California
Case No. 8:20-cv-01344 MCS(DFMx)
Honorable Mark C. Scarsi

# APPELLANTS' THIRD BRIEF ON CROSS-APPEAL


**CLARK HILL LLP**
David L. Brandon (SBN 105505)
dbrandon@clarkhill.com
555 South Flower Street, 24th Floor
Los Angeles, California 90071
Telephone: (213) 891-9100
Facsimile: (213) 487-1156

**GREINES, MARTIN, STEIN & RICHLAND LLP**
Timothy T. Coates (SBN 110364)
tcoates@gmsr.com
Gary J. Wax (SBN 265490)
gwax@gmsr.com
Stefan C. Love (SBN 329312)
slove@gmsr.com
6420 Wilshire Boulevard, Suite 1100
Los Angeles, California 90048
Telephone: (310) 859-7811
Facsimile: (310) 276-5261

Attorneys for Defendants, Counter-Claimants, Appellants, and Cross-Appellees *DENICE SHAKARIAN HALICKI, et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES 6

APPELLANTS' REPLY 11

I. Introduction. 11

II. The Court should reverse the judgment and order summary judgment for Halicki that Eleanor is entitled to copyright protection. 12

A. Eleanor is entitled to copyright protection under *DC Comics* and *Daniels*. 12

1. Shelby and CR do not dispute that Eleanor is recognizable as a character whenever she appears. 13

2. Shelby and CR do not dispute that Eleanor possesses a unique, distinctive combination of traits. 22

B. Remake Eleanor also independently qualifies as a copyrightable character. 25

1. Copyright law protects a character that appears in a single work. 26

2. Remake Eleanor satisfies the elements of a copyrightable character. 28

C. The Court should hold that the GT500CR is substantially similar to Eleanor under the extrinsic test, or at the very least remand for a factual finding on this issue. 31

1. The Shelby settlement does not authorize Shelby to copy Remake Eleanor's distinctive features. 32

**TABLE OF CONTENTS**

**Page**


2. The GT500CR is extrinsically similar to Remake Eleanor. 33

3. Intrinsic similarity between the GT500CR and Eleanor remains a triable factual issue. 40

D. The statute of limitations does not support affirmance. 41

III. The Court should reverse the judgment against Halicki on the breach of contract claims against Shelby and CR. 43

A. Because Eleanor is copyrightable, Halicki's copyright-related contract claims against Shelby and CR must be reinstated. 43

1. The Shelby settlement and the CR License prohibit use of the copyright to Eleanor. 43

2. Halicki proved damages. 46

3. The fact that Eleanor Licensing LLC signed the CR License, not Halicki, does not support affirmance. 52

B. Independent of whether Eleanor is copyrightable, the GT500CR breaches the Shelby Settlement. 58

1. The GT500CR violates the settlement's plain terms. 58

a. Paragraph 8 defines Eleanor by reference to all of Eleanor's distinctive features. 59

b. Shelby's interpretation clashes with Paragraph 17. 62

c. Our interpretation is consistent with Paragraph 17. 64

**TABLE OF CONTENTS**


**Page**

2. Halicki and Shelby's post-settlement conduct does not affect whether Shelby breached. 65

C. The statute of limitations does not support affirmance on the contract claims. 66

IV. The Court should reverse the judgment against Halicki on the claim for declaratory judgment that CR violated the injunction. 68

A. The Court should deny CR's motion for judicial notice. 68

B. The injunction prohibits interfering with Halicki's Eleanor copyright. 70

V. Conclusion. 72

CROSS-APPELLEES' ANSWER 74

I. Statement of cross-appeal issue. 74

II. Summary of argument. 74

III. The Court should affirm the denial of declaratory judgment because the record does not establish that the GT500CR infringes on none of Halicki's rights. 75

A. If the Court reverses any part of the judgment for Shelby based on Halicki's appeal, Shelby is not entitled to the requested declaration. 75

B. Even if the Court affirms the judgment, the record does not establish the requested declaration. 76

1. Whether the GT500CR infringes on Halicki's trade dress rights remains unresolved. 76

## TABLE OF CONTENTS

**Page**

2. Whether the GT500CR infringes on Halicki's trademark rights remains unresolved. 78

3. Whether the GT500CR infringes on Halicki's contract rights remains unresolved. 79

4. The district court correctly analyzed this issue. 80

IV. Conclusion. 82

CERTIFICATE OF COMPLIANCE 83

CERTIFICATE OF SERVICE 84

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Bach v. Forever Living Products U.S., Inc.*,
473 F. Supp. 2d 1127 (W.D. Wash. 2007) 19

*CBS, Inc. v. Merrick*,
716 F.2d 1292 (9th Cir. 1983) 47

*Conan Properties International LLC v. Sanchez*,
2018 WL 4522099 (E.D.N.Y. June 8, 2018) 36–37

*Corbello v. Valli*,
974 F.3d 965 (9th Cir. 2020) 24

*Daniels v. Walt Disney Co.*,
958 F.3d 767 (9th Cir. 2020) 12, 15, 17–18, 20, 27

*Day v. GEICO Cas. Co.*,
2023 WL 2250273 (N.D. Cal. Feb. 27, 2023) 48

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) 11–13, 15–18, 20,
25–26, 33–35, 37–38

*Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*,
656 F. Supp. 3d 1073 (C.D. Cal. 2023) 67

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
778 F.3d 1059 (9th Cir. 2015) 48

*Gaiman v. McFarlane*,
360 F.3d 644 (7th Cir. 2004) 27

*Gray v. Hudson*,
28 F.4th 89 (9th Cir. 2022) 31, 39–40

## TABLE OF AUTHORITIES


| | Page(s) |
|---|---|
| *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213 (9th Cir. 2008) | 13 |
| *Halicki v. Carroll Shelby Int'l*, 2009 WL 10669478 (C.D. Cal. Aug. 12, 2009) | 37 |
| *Hanagami v. Epic Games, Inc.*, 85 F.4th 931 (9th Cir. 2023) | 38 |
| *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057 (9th Cir. 2017) | 47–48 |
| *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) | 69 |
| *JB Oxford & Co. v. First Tennessee Bank Nat'l Ass'n*, 427 F. Supp. 2d 784 (M.D. Tenn. 2006) | 38 |
| *Khan v. Holder*, 584 F.3d 773 (9th Cir. 2009) | 41 |
| *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074 (9th Cir. 1988) | 68 |
| *Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140 (9th Cir. 2003) | 24 |
| *Masterson v. Walt Disney Co.*, 821 F. App'x 779 (9th Cir. 2020) | 24 |
| *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*, 900 F. Supp. 1287 (C.D. Cal. 1995) | 36 |
| *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304 (9th Cir. 1992) | 41 |
| *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446 (9th Cir. 1988) | 19, 27 |

## TABLE OF AUTHORITIES

**Page(s)**


*Oracle Corp. v. SAP AG*,
734 F. Supp. 2d 956 (N.D. Cal. 2010) 50–51

*Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State Lands*,
841 F.3d 1069 (9th Cir. 2016) 75

*Powertech Tech., Inc. v. Tessera, Inc.*,
2013 WL 12324116 (N.D. Cal. Apr. 15, 2013) 57

*Satava v. Lowry*,
323 F.3d 805 (9th Cir. 2003) 22, 24, 38

*Shaw v. Lindheim*,
919 F.2d 1353 (9th Cir. 1990) 19

*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020) 19, 24, 40

*Smith v. Washington Sheraton Corp.*,
135 F.3d 779 (D.C. Cir. 1998) 52–53, 56

*Starz Ent., LLC v. MGM Domestic Television Distrib., LLC*,
39 F.4th 1236 (9th Cir. 2022) 41

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000) 40

*Toho Co., Ltd. v. William Morrow & Co., Inc.*,
33 F. Supp. 2d 1206 (C.D. Cal. 1998) 18

*United States v. State of Washington*,
759 F.2d 1353 (9th Cir. 1985) 75

*Walt Disney Productions v. Air Pirates*,
581 F.2d 751 (9th Cir. 1978) 22, 26–27

## TABLE OF AUTHORITIES

**Page(s)**

*Warner Bros. Inc. v. American Broadcasting Cos.*,
720 F.2d 231 (2d Cir. 1983) 38

*Yamada v. Nobel Biocare Holding AG*,
825 F.3d 536 (9th Cir. 2016) 25

**State Cases**

*Adcor Indus. v. Beretta U.S.A. Corp.*,
248 A.3d 1137 (Md. Ct. Spec. App. 2021) 47

*Ajaxo Inc. v. E*Trade Group Inc.*,
37 Cal. Rptr. 3d 221 (Ct. App. 2005) 46–47, 50–51

*American Alternative Ins. Corp. v. Superior Court*,
37 Cal. Rptr. 3d 918 (Ct. App. 2006) 59

*City of Redlands v. County of San Bernardino*,
117 Cal. Rptr. 2d 582 (Ct. App. 2002) 71

*Cleveland v. Internet Specialties West, Inc.*,
88 Cal. Rptr. 3d 892 (Ct. App. 2009) 67

*Crestview Cemetery Association v. Dieden*,
356 P.2d 171 (Cal. 1960) 65–66

*Ctr. for Healthcare Educ. & Research, Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*,
272 Cal. Rptr. 3d 108 (Ct. App. 2020) 48

*Eleanor Licensing LLC v. Classic Recreations LLC*,
230 Cal. Rptr. 3d 511 (Ct. App. 2018) 67, 71

*Lee v. Luxottica Retail N. Am., Inc.*,
280 Cal. Rptr. 3d 230 (Ct. App. 2021) 48

*NBCUniversal Media, LLC v. Superior Court*,
171 Cal. Rptr. 3d 1 (Ct. App. 2014) 66

## TABLE OF AUTHORITIES

**Page(s)**

**<u>Federal Statutes</u>**

17 U.S.C. § 101 37

**<u>State Statutes</u>**

California Civil Code,
Section 622 57
Section 1617 57
Section 3523 51

# APPELLANTS' REPLY

## I. Introduction.

Life imitates art. The human characters of the *Gone in 60 Seconds* film franchise devote extraordinary effort to stealing the star car character Eleanor. The Shelby parties and CR parties (Shelby and CR) have done likewise, especially Remake Eleanor from the 2000 film. The facts and governing law dictate that their efforts must stop here.

Does Eleanor merit copyright protection? The answer begins and ends with *DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015). Just like the Batmobile, Eleanor is a car character appearing in multiple versions across multiple works; her core characteristics make her recognizable even as her surface appearance changes; and she embodies a unique combination of traits. Just like the Batmobile, Eleanor is a copyrightable character.

Through their many arguments, Shelby and CR do not deny that (1) the viewer watching the four films at issue recognizes Eleanor whenever she appears, and that (2) Eleanor possesses a unique combination of character traits. The Court should reverse on the copyright infringement claims and the copyright-based contract claims, along with the claim for declaratory judgment that CR violated an injunction protecting Halicki's rights.

Shelby also does not deny that the GT500CR, the Eleanor lookalike it produced with CR, copies all of Eleanor's distinctive features other than the hood and headlights. Shelby does not deny that the Shelby settlement identifies "Eleanor" by reference to photos, a list and diagram of distinctive features, and the *Gone in 60 Seconds* remake. And Shelby does not deny that the settlement prohibits Shelby from "manufactur[ing] or sell[ing] any Eleanors." Shelby offers a strained, ultimately unreasonable reading of the settlement language. But Shelby cannot escape the conclusion that the GT500CR breaches the settlement—independent of Eleanor's copyrightability. The Court should therefore also reverse the contract claim against Shelby on this basis.

## II. The Court should reverse the judgment and order summary judgment for Halicki that Eleanor is entitled to copyright protection.

### A. Eleanor is entitled to copyright protection under *DC Comics* and *Daniels.*

The parties agree that Eleanor qualifies as a copyrightable character if (1) she "'display[s] consistent, identifiable character traits and attributes' such that [she] is recognizable whenever [she] appears" and (2) she is "'especially distinctive' and 'contain[s] some unique elements of expression.'" *Daniels v. Walt Disney Co.*, 958

F.3d 767, 771 (9th Cir. 2020) (quoting *DC Comics*, 802 F.3d at 1021); *see* 1st Br. 45–46; Shelby 2nd Br. 25; CR 2nd Br. 29.

The Court decides this issue de novo. *DC Comics*, 802 F.3d at 1021–22 (acknowledging "we consider [the district court's] factual findings in analyzing this issue," but reviewing de novo). The Court has, however, considered Eleanor's copyrightability before, and it has summarized in dicta some of her consistent, identifiable, and distinctive traits. *See Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1220–25 (9th Cir. 2008) (analyzing Halicki's copyright in Eleanor as one of Halicki's "merchandising rights"). *Contra* CR 2nd Br. 15 n.1 (mistakenly suggesting that *Halicki Films* did not address copyright).

### 1. Shelby and CR do not dispute that Eleanor is recognizable as a character whenever she appears.

Our first brief explained why a viewer would recognize the character of Eleanor whenever she appears across the four films at issue. *See* 1st Br. 47–53.[1] Despite surface changes to her

[1] We agree with Shelby that "only the perceivable contents of the films are relevant to determining copyrightability." Shelby 2nd Br. 26 (capitalization normalized); *accord* 1st Br. 16. But unlike Shelby, we recognize the opening credits of the original *Gone in 60 Seconds* as part of those contents. The "Court can perceive [this] from its own independent review of the Films." Shelby 2nd Br. 26. The credits display over footage of the main human character

[*Footnote Continues On Next Page*]

appearance, her playful duplication, and the meta-narrative of *The Junkman*, no viewer is ever left wondering about Eleanor, "What's *that* car?"

Shelby and CR do not dispute this bottom-line conclusion: They do not deny that Eleanor is recognizable in this way. Eleanor thus satisfies the first element of the test: recognizability.

Because Shelby and CR cannot credibly deny that Eleanor is recognizable, they devote their briefs to discussing additional "requirements" to character copyrightability, none of which are supported by case law.

***Consistency is not an independent requirement.*** Shelby and CR presume that even when a character is recognizable,

---

driving to an accident scene. 1st Br. 16. Immediately after the film's title, the viewer sees "starring ELEANOR"—the *only* opening credit. 1st Br. 16. Although viewers do not yet know who Eleanor is, this single-name credit would stand out to them as unusual. In this film, therefore, even the credits contribute to Eleanor's distinct characterization.

As for "real-world technical specifications" and "licensing and marketing efforts," Shelby 2nd Br. 26, Eleanor's *visible* physical features are relevant to Halicki's copyright and contract claims. *See* 1st Br. 26–29, 47–58, 67–79. Halicki's licensing and marketing efforts provide context; the way Eleanor is promoted reflects the perception of Eleanor that her fans form from her films. *See*, *e.g.*, 4-ER-826–31 (discussing marketing efforts, including that fans of the original *Gone in 60 Seconds* could "win a date" with Eleanor; filmmaker Toby Halicki "promoted her highly modified parts and attributes as her 'measurements'").

copyright protection also requires some absolute level of "consistency." *See* Shelby 2nd Br. 28–30; CR 2nd Br. 30–43.

But "consistency" matters only insofar as it makes a character recognizable. As *Daniels* explains, a character "'must display consistent, identifiable character traits and attributes' *such that* it is recognizable whenever it appears." 958 F.3d at 771 (quoting *DC Comics*, 802 F.3d at 1021) (emphasis added). "[A] character that lacks a core set of consistent and identifiable character traits is not protectable, *because* that character is not immediately recognizable as the same character whenever it appears." *Id.* (emphasis added). The Moodsters in *Daniels*, unlike Eleanor, had almost no consistent traits and were *therefore* unrecognizable. *See id.* at 771–73. In contrast, no case has ever denied copyright protection to a *recognizable* character solely for lacking *consistency* whenever the character appears.

CR misreads *DC Comics* as establishing "this Court's mandate" that "persistence" of traits is "key" to character copyrightability. 2nd Br. 15. There is no such mandate. In context, *DC Comics* string-cited three district court cases, then said, "In each instance [i.e., each of those cases], courts have deemed the persistence of a character's traits and attributes to be key to determining whether the character qualified for copyright protection." *DC Comics*, 802 F.3d at 1020. But the decision stated

the "test" only in the next paragraph, stating that "the character must be 'sufficiently delineated' *to be recognizable as the same character whenever it appears*." *Id.* at 1021 (emphasis added).

CR also claims that Eleanor "needs help" to be recognized in a way the Batmobile does not. 2nd Br. 13; *see also id.* at 35–37, 43. But both Eleanor and the Batmobile are recognized with the "help" of all other aspects of the works in which they appear. That is how characterization works. CR gives no reason why copyright law would not protect the consistent, recognizable trait of being a circa-1970 customized Fastback Mustang—coupled with Eleanor's other traits—when copyright law does protect the trait of possessing a "bat-like appearance," coupled with the Batmobile's other traits. *DC Comics*, 802 F.3d at 1021.

CR similarly says "a reasonable viewer would not recognize the Remake-Eleanor *as the* Original-Eleanor when it first comes onscreen." CR 2nd Br. 33 (emphasis added). But "recognizability" doesn't require a character to "have a consistent appearance" from one version to another. *DC Comics*, 802 F.3d at 1021. The 1989 Batmobile is not specifically recognized as the 1966 Batmobile, but as a "physically distinct," *different* version of the same character, *DC Comics*, 802 F.3d at 1017; and Pierce Brosnan is not recognized

"as" Sean Connery when portraying James Bond.[2] The only requirement is for the *character* to remain recognizable from one version to the next based on certain traits and attributes, notwithstanding other changes. *See DC Comics*, 802 F.3d at 1021 (character "must display consistent, identifiable *character traits and attributes*," even if lacking "a consistent *appearance*") (emphasis added).

Shelby accuses us of applying a "subjective standard," 2nd Br. 29, because we follow *DC Comics* and *Daniels* in prioritizing the "intuitive" and "superseding principle of *recognizability*." 1st Br. 42 (emphasis in original). But our brief applied the settled test of copyrightability, systematically explaining how Eleanor's traits

[2] CR misstates the record to say that Halicki's "expert witness could not" "distinguish[] between various models of the same vehicle" "on the spot without further research." CR 2nd Br. 35–36. In truth, Halicki's expert witness merely declined to conclude from a photo whether a Mustang displaying Shelby decals was an authentic licensed Shelby. 9-ER-2317. As the expert also explained, "Anyone can purchase Shelby badging (such as a GT500 badge, or other badging) and put them on their car, regardless of whether it has anything to do with Shelby (such as a stock Mustang)." 4-ER-908.

In a related irrelevancy, CR asserts that there is "no logical reason" "tied to [Eleanor's] claimed character" for the physical differences between Original and Remake Eleanor. CR 2nd Br. 40 n.13. There is likewise no reason tied to the Batmobile's character for the 1989 Batmobile to look different from the 1966 Batmobile; the outcome of *DC Comics* shows that copyright protection does not require that.

make her *recognizable* across the films. *Compare* 1st Br. 47–53, *with DC Comics*, 802 F.3d at 1021–22.

***"Traits" are not categorically limited.*** A trait contributes to recognizability if it is "consistent" and "identifiable." *Daniels*, 958 F.3d at 771. Beyond that, the law imposes no categorical limits on "traits." So Shelby and CR make some up.

First, Shelby and CR disregard Eleanor's being difficult to steal, unpredictable, and good at driving, because these traits emerge from her circumstances, not the character itself. *See* Shelby 2nd Br. 32–33, 48–49; CR 2nd Br. 25. The law does not make that distinction. For example, in *DC Comics*, this Court describes one of Godzilla's traits as being "alive and well in the modern world," a trait necessarily arising from Godzilla's setting rather than from within the character. 802 F.3d at 1020 (quoting with approval *Toho Co., Ltd. v. William Morrow & Co., Inc.*, 33 F. Supp. 2d 1206, 1216 (C.D. Cal. 1998)). Similarly, movie characters are commonly described as "lucky" even if their luck emerges from outside events. Traits can help define a character even if they emerge from circumstances.

Second, Shelby and CR argue that what other characters say about Eleanor can't delineate her traits, *see* Shelby 2nd Br. 36–38; CR 2nd Br. 41–43, and deny that her duplicate versions can contribute to characterization, *see* Shelby 2nd Br. 36–38; CR 2nd

Br. 34. Shelby and CR thus fail to understand narrative craft. It is a widespread and effective storytelling device to delay the first appearance of an important character (e.g., Remake Eleanor) while other characters discuss the character within the film's dialogue and thereby bring her traits to light. *See* 1st Br. 21–23, 47–48; *cf. Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452 (9th Cir. 1988) (characters' copyrightability depends in part on "whatever insight into their characters may be derived from their dialogue"). The phenomenon of character duplication, and the resulting play with identity, is less common, but no less effective. *See* 1st Br. 48. Courts applying copyright law are interested in literary traditions and tropes, even if Shelby and CR are not. *See*, *e.g.*, *Shaw v. Lindheim*, 919 F.2d 1353, 1362–64 (9th Cir. 1990), *overruled on other grounds by Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) (analyzing theme, plot, story, mood, setting, pace, characters, and dialogue of movie scripts, with reference to historical and contemporary comparable works); *see also Bach v. Forever Living Products U.S., Inc.*, 473 F. Supp. 2d 1127, 1134 (W.D. Wash. 2007).

Third, Shelby and CR invent an absolute frequency requirement, minimizing Eleanor's traits because they don't recur often enough to satisfy some imagined standard. *See* Shelby 2nd Br. 32–34; CR 2nd Br. 49 n.21. But as already explained, Eleanor's

traits contribute to her recognizability because they are "consistent" and "recognizable," regardless of the *frequency* with which each is displayed. *Daniels*, 958 F.3d at 771; *see* 1st Br. 50. "Consistent" means that a given trait—when expressed—does not *change* from one appearance to another; "consistent" does not mean *pervasive*. *See*, *e.g.*, *Daniels*, 958 F.3d at 772–73 (holding characters' traits *not* consistent when one version of a certain Moodster has "a smile on his face and a friendly attitude" and another version does not, and when in one version, each Moodster expresses a certain emotion, while in another, all Moodsters "are 'mood detectives'").

Next, Shelby and CR nit-pick:

- Shelby says Eleanor's stripes are not strictly "custom" because we do not know they are "tailored to a specific customer's preferences." Shelby 2nd Br. 32–33. But what matters is only the stripes' consistency and identifiability, not their origin story. *See Daniels*, 958 F.3d at 771; *cf. DC Comics*, 802 F.3d at 1021 (referring to the Batmobile's consistent "bat-like appearance").
- Shelby and CR observe that Eleanor is a relatively modern car within the original *Gone in 60 Seconds*, but a vintage car within the 2000 remake. Shelby 2nd Br. 9, 38–40; CR 2nd Br. 25, 34, 36 n.12, 40–41. That's irrelevant. The trait of

*being a customized, circa-1970 Fastback Mustang* is consistent and identifiable. And Shelby and CR's argument also implies an impossible standard: If Remake Eleanor had been updated to be relatively modern within the world of the 2000 film, Shelby and CR would argue that the *update* made Eleanor inconsistent in the converse way.

- Shelby points out that various other cars in the films have female codenames and are spoken to by human characters. *See* 2nd Br. 36–37. But whether other cars might *also* be copyrightable does not affect whether *Eleanor* is. Moreover, Eleanor merits copyright protection based on the *combination* of all her traits, not just these two.
- CR says, "Remake-Eleanor cannot be repeatedly stolen because it is rare." 2nd Br. 41. CR is simply wrong. Remake Eleanor *is* repeatedly stolen—a point the characters discuss in multiple scenes addressing her "rough history" with Nicolas Cage's character. *See* 1st Br. 22–24.

Finally, and most tellingly, Shelby and CR get tied in knots over *The Junkman*—in which Eleanor is "never" the "target[] of theft," is "a battered prop car," and does not evade the police or perform a jump. Shelby 2nd Br. 33, 41; CR 2nd Br. 38, 40 n.13. But *The Junkman* illustrates why recognizability matters more than strict consistency. As we explained, no viewer "familiar with

the original [*Gone in 60 Seconds*] would see *Eleanor* in *The Junkman* and think, 'I haven't seen *that* car before. I wonder what this is about,'" 1st Br. 49 (emphasis in original)—not even Shelby's or CR's counsel claim to have had that reaction. When a work places a character in a new context as *The Junkman* does to Eleanor, but the character remains *recognizable*, viewers—and copyright law—still identify it as the same character. *See Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 753–58 (9th Cir. 1978) (Disney character copyrights were infringed by works depicting characters "as active members of a free thinking, promiscuous, drug ingesting counterculture").

#### 2. Shelby and CR do not dispute that Eleanor possesses a unique, distinctive combination of traits.

Our first brief explained that copyrightability may arise from a protectable "combination of unprotectable elements," and that Eleanor possesses a distinctive, unique combination of traits and attributes. 1st Br. 53–55 (emphasis omitted) (quoting *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003)). The brief also observed that the district court, Shelby, and CR have not identified any precursor to Eleanor's particular combination of traits. 1st Br. 55.

Shelby and CR accept that a character embodying a unique combination of unprotectable individual elements may merit

copyright protection, and they make no attempt to identify a precursor to Eleanor's combination of traits. *See* Shelby 2nd Br. 41–44; CR 2nd Br. 44–53. They have implicitly conceded that Eleanor satisfies the second element at issue, possessing a distinctive, unique combination of traits.

Shelby and CR oppose this conclusion by merely reiterating that Eleanor's various individual traits are not protectable. *See* Shelby 2nd Br. 42–44 (arguing that feminine-named cars, daring car chases, and stunts are not original to *Gone in 60 Seconds* or Eleanor); CR 2nd Br. 46–50 (same). Even assuming Shelby and CR's examples are valid, this argument doesn't dispute that Eleanor's *combination* of traits is unique.

Shelby additionally argues that Eleanor doesn't actually possess various traits. *See* Shelby 2nd Br. 42–43. This argument reprises Shelby's failed arguments that Eleanor is not recognizable, and it fails again for the reasons it did above. *See* pp. 14–22, *supra*.

Meanwhile, CR argues that "[e]ven crediting each of the five claimed traits" of Eleanor, five is an insufficient number of unprotectable individual traits to constitute a protectable combination. CR 2nd Br. 51–52. But no case has ever established

some minimum number of traits necessary to a copyrightable combination; CR cites none.[3]

What matters is that Eleanor's particular combination of traits—being a coveted, customized circa-1970 Fastback Mustang; being hard to steal; and elaborately outmaneuvering the police, including with a spectacular jump—is sufficiently distinctive and unique to entitle her to copyright protection as a character.[4]

[3] In three of the cases CR cites for this point, the plaintiff failed to show that the defendant's work was *substantially similar* to the plaintiff's—a different aspect of copyright infringement. *See Skidmore*, 952 F.3d at 1074 ("five musical components"); *Corbello v. Valli*, 974 F.3d 965, 974 n.2 (9th Cir. 2020) (twelve alleged similarities); *Masterson v. Walt Disney Co.*, 821 F. App'x 779, 782 (9th Cir. 2020) (five literary elements). In two cases, the plaintiff failed to show that its work was sufficiently original to merit copyright protection. *See Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1147 (9th Cir. 2003) (holding that lamp embodying a combination of five preexisting features was not protected as a "useful article"); *Satava*, 323 F.3d at 811–12 (sculpture with six features).

[4] For details of Eleanor's customizations, *see* 4-ER-887–88 (Original Eleanor); 889–90, 897–903 (Remake Eleanor).

The amici who write in support of Shelby and CR disagree that this test determines Eleanor's copyrightability. *See* Brief of 20 Professors of Law, ECF No. 46.1. They propose a new, threshold test—unsupported by a single case or legal authority—for distinguishing "props" from "characters." *See id.* at 4–9. They say that a character must be depicted as possessing genuine "free will" and "agency," *id.* at 4–5; but this Court has stated that "[e]ven when a character lacks sentient attributes and does not speak (like a car), it can be a protectable character if it" satisfies the Circuit's

*[Footnote Continues On Next Page]*

Finally, despite CR's contrary implication, no case has ever suggested that fame is relevant to copyrightability. *See* CR 2nd Br. 28 ("Eleanor here is neither Mickey Mouse nor Tarzan"). At any rate, Eleanor commands a large and devoted set of fans, some willing to pay half a million dollars for a functional replica. *See* 4-ER-906–07, 935. If fame were the test, Eleanor would pass it.

### B. Remake Eleanor also independently qualifies as a copyrightable character.

Our opening brief explained that Eleanor is not only a copyrightable character across all four films, Remake Eleanor alone is also independently entitled to copyright protection as a character. 1st Br. 56–59.[5]

Against this, Shelby and CR argue that Remake Eleanor is categorically disqualified from copyright protection, and that even

---

test. *DC Comics*, 802 F.3d at 1021. In other words, "free will"—a "sentient attribute[]"—is not necessary to character copyrightability. Amici's wishful thinking does not change the law.

[5] CR claims that Halicki did not make this argument below. *See* CR 2nd Br. 53 n.24. As our first brief explained, however, Halicki expressly argued to the district court that Remake Eleanor alone satisfies both elements at issue, *see* 1st Br. 57–58, thus raising this argument "sufficiently for the trial court to rule on it" and preserving it for appeal, *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 543 (9th Cir. 2016) (internal quotation marks and citations omitted).

if Remake Eleanor could be protected, she doesn't satisfy the copyright elements. They are wrong on both points.

#### 1. Copyright law protects a character that appears in a single work.

Shelby and CR claim that copyright law *never* protects a character based on a single work. *See* Shelby 2nd Br. 45–47; CR 2nd Br. 53–57. They positively insist that "courts have consistently *required* [a character's] appearance in multiple works" to receive copyright protection. CR 2nd Br. 54 (emphasis in original); *see* Shelby 2nd Br. 46. But CR cites *not a single case*, from any jurisdiction, imposing this requirement, neither does Shelby, and we have also identified none. *See* 1st Br. 56.[6]

---

[6] The district court, denying Shelby and CR's request for attorney fees on Halicki's copyright infringement claims, said its copyright "analysis might be materially different if the Court were to examine a different universe of works—for example, the original and remake *Gone in 60 Seconds* but not *The Junkman* and *Deadline Auto Theft*. The Court anticipates that the Halicki Parties' appeal could clarify the test and confirm or reject the Court's approach." FER-7.

CR suggests that the purported multi-work requirement arose with the 1976 amendment to the Copyright Act. *See* 2nd Br. 56, n.25. It's true that "the old statute expressly afforded separate protection to characters," *id.*, but the case law does not indicate that the amendment changed the test for character copyright. The opposite is true: This Court applied "the old Copyright Act" in deciding the 1978 case *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 754, but it remains a leading case. *See DC Comics*, 802 F.3d at

[*Footnote Continues On Next Page*]

Moreover, other courts have held that a character appearing in a single work is protected by copyright. *See*, *e.g.*, *Gaiman v. McFarlane*, 360 F.3d 644, 657–61 (7th Cir. 2004) ("Count Cogliostro" is copyrighted character based on appearance in a single issue of a comic book). This Court has not reached this specific issue, but no decision of this Court precludes it. *See*, *e.g.*, *Daniels*, 958 F.3d at 771 ("a character *that has appeared in multiple productions*" must "display consistent, identifiable character traits and attributes") (emphasis added). As further support, this Court has an alternative test for character copyrightability for characters who "constitute 'the story being told' in a work"—presumably a *single* work. *Id.* at 773–74.

As our first brief explained, Shelby and CR's multi-work requirement would also lead to absurd consequences, 1st Br. 56–57, consequences Shelby and CR do not deny. Under Shelby and CR's rule, a character might be utterly unique, highly original in every respect—but if the character appears in only a single work, then other authors can freely copy the character into their own works

1019, 1021, 1023 (relying on *Air Pirates* without qualification); *Daniels*, 958 F.3d at 771 (citing *Air Pirates* alongside a post-amendment case, *Olson*, 855 F.2d 1446 (9th Cir. 1988), as part of "a long history of extending copyright protection to graphically-depicted characters").

without fear of an infringement claim, as the character would be unprotected. This is not, and should not be, the law.

#### 2. Remake Eleanor satisfies the elements of a copyrightable character.

Shelby and CR also argue that Remake Eleanor fails to satisfy the requirements of recognizability and distinctiveness. *See* Shelby 2nd Br. 47–49; CR 2nd Br. 57–58. These arguments also fail.[7]

Shelby and CR insist that coda Eleanor—the beat-up iteration providing comic relief in the film's final minutes, *see* 1st Br. 26—undermines Remake Eleanor's consistency. *See* Shelby 2nd Br. 48; CR 2nd Br. 57–58. They approach this question like scientists examining specimens in a lab rather than viewers watching a film. Within the whole film, the significance of coda Eleanor is clear; fundamentally an ironic gesture, she thus amplifies rather than obscures Remake Eleanor's traits. *See* 1st Br. 50–53. Shelby and

[7] The district court did *not* "start[] the trial by confessing it still had no idea 'what we're talking about' when 'we use the term "Eleanor."'" CR 2nd Br. 13. Rather, partway through a witness's testimony regarding the Shelby settlement, the court interjected, "I just want to get some clarification because I think there are some issues when we use the term 'Eleanor,' what we're talking about." 9-ER-2184. Thus, counter to CR's characterization, the court was only requesting evidence of the meaning of "Eleanor" as a defined term within the Shelby settlement.

CR willfully ignore this point, remaining fixated upon mechanical tabulation of traits. Copyright law is not so narrow.

Shelby and CR also repeat their faulty attacks on individual claimed traits. But as explained above, Remake Eleanor is hard to steal, she's unpredictable, and she readily evades the police, among other things, even though these traits emerge from her circumstances. *See* p. 18, *supra*. *Contra* Shelby 2nd Br. 48–49; CR 2nd Br. 58.

Remake Eleanor also possesses numerous physical features distinguishing her from a stock 1967 Fastback Mustang and a GT500. *See* 1st Br. 26–30; *accord* CR 2nd Br. 19–21. Although some characters in the remake erroneously refer to Eleanor as a GT500, *see* 1st Br. 22, Shelby is incorrect to say that Eleanor is visibly "portrayed" as a GT500, Shelby 2nd Br. 9 n.3; *see also id.* at 10, 33, 41 (incorrectly referring to Eleanor as a GT500). Remake Eleanor is not a Shelby GT500, she is not based on or built from a Shelby GT500, and she does not look like a Shelby GT500. *See* 4-ER-897–99; 9-ER-2155–56, 2179. Remake Eleanor's distinctive physical features also contribute to her character. *See* 1st Br. 26–27, 58. *Contra* Shelby 2nd Br. 48.

Indeed, Shelby knows this: Only because Eleanor is *not* a GT500, Halicki and Shelby could agree in the Shelby settlement that Halicki "will continue to manufacture, market, sell, and/or

license Eleanors and other merchandise relating to Eleanor as depicted in the attached photograph of Eleanor and the *Gone in 60 Seconds* remake," and that Shelby "will continue to manufacture, market, sell, and/or license GT-500s and other merchandise related to the GT-500 as depicted in the attached photograph of the GT-500." 11-ER-2732 (capitalization normalized in all quotations from settlement). Such an agreement would be meaningless and impossible if Eleanor were a GT500. And these are not invisible technical differences. The settlement itself defines "Eleanor" as the car "*depicted* in the attached photograph of Eleanor *and the Gone in 60 Seconds remake*." 11-ER-2732 (emphasis added).[8]

Because Remake Eleanor independently satisfies both copyrightability elements at issue, she is entitled to copyright protection as a character independent of the copyright protection to which Eleanor is entitled as a character spanning all four films.

---

[8] In like fashion, Original Eleanor is not a stock Fastback Mustang. We know this in part because CR entered into the CR License to copy her distinctive physical features and produce Original Eleanors. *See* 4-ER-784 ("[CR] wishes to use the Licensed Properties in connection with manufacturing, sale, and/or distribution of '300 units' of the 'Gone in 60 Seconds' 1974 Original star car character 'Eleanor[.]'"). No such license would be needed to produce stock Mustangs. *See also* 4-ER-887–88 (describing how Original Eleanor differs from a stock Fastback Mustang).

### C. The Court should hold that the GT500CR is substantially similar to Eleanor under the extrinsic test, or at the very least remand for a factual finding on this issue.

Shelby and CR argue that the Court should affirm summary judgment on the alternative ground that the GT500CR is not substantially similar to Eleanor—the second element of Halicki's copyright infringement claims. *See* Shelby 2nd Br. 52–56; CR 2nd Br. 59–63.

Copyright claimants must demonstrate substantial similarity through both "intrinsic" and "extrinsic" tests. *See Gray v. Hudson*, 28 F.4th 89, 96–97 (9th Cir. 2022). The intrinsic test is for the factfinder; but the Court in some cases can determine the extrinsic test as a matter of law by deciding whether the "objective similarities the evidence establishes between two works are legally sufficient to serve as the basis of a copyright infringement claim." *Id.* The district court never reached substantial similarity here. *See* 1-ER-75–76 (denying summary judgment on substantial similarity as moot). Nevertheless, Shelby and CR seek affirmance based on the extrinsic test for substantial similarity.

As we now discuss, if the Court reaches this issue, it should hold that Halicki's claims pass the extrinsic test as a matter of law. Indeed, Shelby and CR admit that the GT500CR copies *all* of Remake Eleanor's features except for the hood and headlights, and

CR principal Jason Engel testified in another proceeding that an unlicensed Remake Eleanor copy was "an imitation of" the GT500CR. 11-ER-2864–65. At a minimum, extrinsic substantial similarity poses an issue of fact, which, along with intrinsic substantial similarity, must be resolved by a trier of fact below.

### 1. The Shelby settlement does not authorize Shelby to copy Remake Eleanor's distinctive features.

Before getting into substantial similarity, we address a threshold argument from CR.

Contrary to CR's claim, nothing in the Shelby settlement comes close to affirmatively "authoriz[ing]" Shelby to copy Remake Eleanor's distinctive features. CR 2nd Br. 60–61. Indeed, CR cites no language in the settlement supporting this mistaken claim.[9] It's true that Shelby argues the extent to which the settlement *prohibits* Shelby from copying various features. *Compare* 1st Br. 69–79 *with* Shelby 2nd Br. 56–63. But that is a different question from affirmative authorization; the settlement is not a license agreement, and not even Shelby says that it is.

[9] CR quotes only the bench verdict addressing what the settlement prohibits, 1-ER-46–47, and testimony regarding the extent to which the settlement prohibits copying Remake Eleanor's features, 9-ER-2161, 2164–65, 2167–68, 2184–85.

Because the settlement cannot be read to affirmatively *permit* production of the GT500CR, the outcome of the breach of contract claim against Shelby doesn't determine the outcome of the copyright infringement claims, despite CR's argument. *See* CR 2nd Br. 61.

### 2. The GT500CR is extrinsically similar to Remake Eleanor.

It is undisputed that the GT500CR copies all but two of Remake Eleanor's distinctive physical features. *See* 1st Br. 26–29 (Remake Eleanor's distinctive features), 35–36 (what GT500CR copies); Shelby 2nd Br. 3–22, 56–65 (not disputing this); CR 2nd Br. 17–26, 61–62 (not disputing this). The GT500CR is equivalent to making a replica James Bond that incorporates not only his "blue speedo," CR 2nd Br. 62, but also his haircut, facial features, and so on—nearly every aspect of his appearance.

Nevertheless, Shelby and CR deny that the GT500CR is extrinsically similar to Eleanor. Their arguments misunderstand the law.

***What matters are physical similarities between the GT500CR and Remake Eleanor.*** In two important respects, *DC Comics* guides the assessment of substantial similarity between Eleanor and the GT500CR. First, although the Batmobile is a

character, its copyright was infringed by an actual, functional replica. *See DC Comics*, 802 F.3d at 1017. So when testing for substantial similarity, *DC Comics* considered only physical appearance—not whether the replica also copied the Batmobile's crime-fighting prowess, advanced weaponry and technology, or extraordinary maneuverability, even though these other traits established the Batmobile's threshold *copyrightability* more than its physical appearance. *See id.* at 1021–22, 1026.

Second, the defendant in *DC Comics* admitted that the replicas specifically copied the 1966 and the 1989 versions of the Batmobile. *Id.* at 1017, 1026. The replicas did not copy the Batmobile's generalized "bat-like appearance." *Id.* at 1021. The Court held that the replicas' substantial similarity to each individual version of the Batmobile "infringed DC's exclusive right to produce derivative works of this character." *Id.* at 1026.

Our facts are the same. First, the GT500CR is a functional replica. Substantial similarity therefore depends on its physical appearance compared to Eleanor—not whether the GT500CR embodies Eleanor's personality traits, such as being hard to steal and highly coveted, among other things. Second, the GT00CR copies *Remake* Eleanor—not Eleanor's generalized appearance as a customized circa-1970 Fastback Mustang. This copying of a specific version satisfies extrinsic similarity, as a step towards

showing infringement of Halicki's "exclusive right to produce derivative works" based on Eleanor. *DC Comics*, 802 F.3d at 1026.

Shelby and CR think substantial similarity can arise only from copying traits common to *all* versions of Eleanor, and that copying nearly every physical feature of *one* version does not show substantial similarity. *See* Shelby 2nd Br. 54; CR 2nd Br. 62. As just explained, this view contradicts *DC Comics*. This view also makes no sense.

Suppose a character exists in two versions, *physically* very different from each other, but bearing consistent, identifiable, distinctive, and unique character traits sufficient to constitute a single protected character. (Imagine a character portrayed by a young actor in one film and an older actor in a sequel set decades later.) Under Shelby and CR's approach, it is not infringement for a toymaker to make a figure that copies the appearance of *one* of the versions, because the figure does not copy the character's personality traits, or copy some physical midpoint or common denominator of the character's distinct versions. This can't be right: If the toy obviously resembles one of the versions, it is extrinsically similar under any reasonable test.

Shelby cites two cases that purportedly support its approach. *See* Shelby 2nd Br. 53–54. But neither case applies the rule Shelby and CR want: that when a copyright-protected character exists in

multiple versions, there is no infringement from copying the physical features of one version.

One of Shelby's cases, *Conan Properties International LLC v. Sanchez*, 2018 WL 4522099 (E.D.N.Y. June 8, 2018), supports our position, not Shelby's. The court there held that three literary characters were copyrightable, each based on a combination of his physical and abstract characteristics; the characters' abstract characteristics included being "quick with a gun," being "associated with the Middle East," being "from Atlantis" and "the 'King of Valusia,'" being "associated with tigers," and being "a Puritanical do-gooder." *See id.* at *16–17. The court then held that the defendant's *figurines* were substantially similar to the protected characters, based *only* on their physical characteristics. *See id.* at *23. This Court should make the equivalent holding regarding Eleanor's copyrightability, and regarding the GT500CR's similarity to Remake Eleanor.

In the other case, *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.*, 900 F. Supp. 1287 (C.D. Cal. 1995), the infringing work was a commercial featuring a character that possessed the distinctive traits of James Bond. *See id.* at 1296–99. Because the infringing commercial presented a *character* that copied James Bond, substantial similarity depended on abstract character traits as well as appearance. *See id.* at 1298. In

contrast, in our case, as in *DC Comics* and *Conan*, the infringing work is a derivative replica or figurine, so abstract character traits are less important than appearance.

Shelby also thinks that because the GT500CR copies only Remake Eleanor's physical appearance, the "law on useful articles" has some relevance here; Shelby quotes the rules for when "'a feature incorporated into the design of a useful article' is unprotectable." Shelby 2nd Br. 55. But *DC Comics* cuts off Shelby's argument. The relevant facts there are identical to here: The protected work, the Batmobile, is a car character depicted in film or television; the infringing work is a real-life, functional replica. *See DC Comics*, 802 F.3d at 1015–17. *DC Comics* treats the Batmobile as a character only, not a useful article. *See id.* at 1019–23. Eleanor is likewise not a useful article—"an article having an intrinsic utilitarian function," 17 U.S.C. § 101—Eleanor is a character.

Indeed, the district court already rejected this argument: "*D.C. Comics* and related precedent make clear that Eleanor should be treated as a character and not a reproduction of 'a normal, functioning vehicle,'" that is, a useful article. FER-52. And that was the *second* time a district court rejected this argument. *See Halicki v. Carroll Shelby Int'l*, 2009 WL 10669478, at *6–7 (C.D. Cal. Aug. 12, 2009) ("[T]he Court does not believe that the

'Eleanor' character, a vehicle pictured in a motion picture, is a 'pictorial, graphic, [or] sculptural work,'" "an essential pre-requisite to the application of the 'useful article' exception.").

Eleanor, like the Batmobile, is a character, not a useful article. The GT500CR, like the replicas in *DC Comics*, is a derivative work based on a character. The rules about useful articles do not apply.

***Copyright law protects Remake Eleanor's unique combination of individual features.*** In assessing substantial similarity, "a combination of unprotectable elements may qualify for copyright protection." *Satava*, 323 F.3d at 811 (emphasis omitted). When a work consists of individual elements that would not "receive 'copyright protection when viewed in isolation,'" this Court "employ[s] a 'selection and arrangement' approach to assess substantial similarity," systematically comparing the works' particular selection and arrangement of unprotected elements. *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 942 (9th Cir. 2023). As a result, even unprotectable elements are relevant to substantial similarity, because one work can infringe another's protectable *combination* of unprotectable elements. *See also Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 243 (2d Cir. 1983) (copyright protects "the expressive aspect of the combination" of individually unprotectable character traits); *JB Oxford & Co. v. First Tennessee Bank Nat'l Ass'n*, 427 F. Supp.

2d 784, 800 (M.D. Tenn. 2006) ("[T]he Court finds that the 'totality' of Bill's attributes and traits create a sufficiently developed character.").

Shelby and CR do not deny that the GT500CR copies all the physical features that distinguish Remake Eleanor from a stock Fastback Mustang, other than the hood and headlights. *See* 1st Br. 26–29 (Remake Eleanor's distinctive features), 35–36 (what GT500CR copies); Shelby 2nd Br. 3–22, 56–65 (not disputing this); CR 2nd Br. 17–26, 61–62 (not disputing this). Shelby and CR also do not deny that no car before Remake Eleanor possessed *all* these features. Remake Eleanor's combination of features is unique and original.

CR misses this point when it asserts that because "none of [Eleanor's] claimed six features is unique in itself," that is, without precedent, "they cannot form a sufficiently numerous combination supporting infringement." CR 2nd Br. 62. Despite CR's view, the "copying of six public domain elements" (i.e., individually unprotected elements) can, and does, make the GT500CR "substantially similar" to Eleanor. CR 2nd Br. 63.

The resulting "objective similarities" between the GT500CR and Remake Eleanor "are legally sufficient to serve as the basis of a copyright infringement claim." *Gray*, 28 F.4th at 97. The Court

should therefore hold that Halicki's claims pass the extrinsic test as a matter of law.

At a minimum, the Court should reject Shelby and CR's argument that Halicki's claim fails the extrinsic test as a matter of law, and instead remand this issue to the factfinder. Potential "factual determinations regarding the extrinsic test" include, for example, whether an infringing work copies a protected "combination of unprotectible elements" "because the over-all impact and effect indicate substantial appropriation." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (internal quotation marks omitted).

### 3. Intrinsic similarity between the GT500CR and Eleanor remains a triable factual issue.

Distinct from the extrinsic test, "[t]he intrinsic test" of substantial similarity "focuses on 'similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance.'" *Gray*, 28 F.4th at 96. It is "uniquely suited for determination by the trier of fact" and seldom or never resolved as a matter of law. *Id.* at 97.

Shelby and CR make no argument on intrinsic similarity. The Court should therefore remand for the factfinder to determine the intrinsic similarity between the GT500CR and Remake Eleanor.

**D. The statute of limitations does not support affirmance.**

CR also argues that the statute of limitations bars Halicki's copyright infringement claims. This issue depends on when Halicki "should have known" about Shelby's and CR's copyright infringement. *Starz Ent., LLC v. MGM Domestic Television Distrib., LLC*, 39 F.4th 1236, 1244 (9th Cir. 2022). What a reasonable person should have known presents a mixed question of fact and law. *Khan v. Holder*, 584 F.3d 773, 780 (9th Cir. 2009). Here, this question turns mainly on the factual issue of what information was reasonably available to Halicki, and when. *See* CR 2nd Br. 80–81.

Because the district court declined to reach this issue, 1-ER-52, CR is asking this Court to resolve it as a matter of law in the first instance on appeal. This Court can do so only if "uncontroverted evidence irrefutably demonstrates [Halicki] discovered or should have discovered" the infringement. *Nevada Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992). The evidence falls far short of this standard.

CR's brief proclaims, "the world knew of the CR-Shelby as of November 2009, and at all times thereafter." CR 2nd Br. 80–81. This overstates the record. Here is CR's evidence—in its entirety:

- CR showed the GT500CR at SEMA, an auto show, in 2010–2016. 10-ER-2580–81.
- In November 2009, CR put out a press release about the GT500CR, and in November 2009 and November 2011, bloggers published posts about it, and CR gave many interviews about it. 10-ER-2587–89; 1-CRSER-121, 125–26.
- Halicki knew that CR had been selling unauthorized Eleanor replicas under a different name before November 2007. 4-ER-864.

This evidence does not demonstrate that Halicki should have discovered the infringement. Contrary evidence shows that Halicki and her associate, Michael Leone, did not attend SEMA from 2010 to 2016. 3-ER-415–16. As for the press release and blog posts, no evidence shows that Halicki read or heard about them. 3-ER-416–17. And Halicki and Leone testified that they did not hear about the GT500CR until 2018. 3-ER-416.

On this thin, disputed record, the Court should not decide this factual issue in the first instance as CR requests. The statute of limitations does not support affirmance.

## III. The Court should reverse the judgment against Halicki on the breach of contract claims against Shelby and CR.

Some of Halicki's contract claims require a copyright in Eleanor; others do not. The Court should reverse the judgment on all of them.

### A. Because Eleanor is copyrightable, Halicki's copyright-related contract claims against Shelby and CR must be reinstated.

The Shelby settlement and the CR License prohibited unauthorized use of Halicki's copyrights. Because Eleanor is protected by copyright, *see* § II.A.–B., *supra*, the GT500CR breached these contracts just as it infringed that copyright.

#### 1. The Shelby settlement and the CR License prohibit use of the copyright to Eleanor.

***Shelby settlement.*** Under the Shelby settlement, Shelby transferred to Halicki "all right, goodwill, title, intellectual property rights, and interest to the 'copyrights' in and to" Remake Eleanor, and Shelby agreed that "Shelby shall not use, or license in any way, shape or form any of the property rights transferred to Halicki described herein." 11-ER-2731–32.

Shelby does not dispute that these provisions prohibit it from using Halicki's copyright to Eleanor. *See* 1st Br. 59, 77–78; Shelby 2nd Br. 56–57. Shelby thus concedes that if Eleanor is

copyrightable, then the GT500CR violates these provisions just as it infringes on the Eleanor copyright.

***CR License.*** Upon termination of the CR License, "all rights granted to [CR] under this Agreement revert[ed] to [Halicki]." 4-ER-798. Since then, CR has been prohibited "from further use of the Licensed Properties or any further reference to it, direct or indirect," including the "intellectual property rights, trademarks, and copyrightable material relating to" "the star car character 'Eleanor' from" the original and remake *Gone in 60 Seconds*. 4-ER-784, 798. This provision likewise prohibits CR from using Halicki's copyright to Eleanor: Infringing the Eleanor copyright also breaches the CR License.

CR is mistaken that the district court made any contrary finding in the bench verdict. *See* CR 2nd Br. 64–65. Rather, the bench verdict began from the court's prior decision, at summary judgment, that Eleanor isn't entitled to copyright protection. *See* 1-ER-36–37. From that erroneous premise, the court found that Halicki also had identified no *other* "species of intellectual property" right addressed in the CR License that protects Eleanor's appearance. *Id.* These findings are consistent with our view that the CR License prohibits CR from using Halicki's copyright to Eleanor, making any infringement of the copyright also a breach of the contract. As a result, the district court's finding regarding the

CR License does not impede the Court from reversing "judgment on the contract claims" against CR if the Court reverses the district court's "holding on copyrightability." *Cf.* CR 2nd Br. 65 (arguing to the contrary).

CR also argues that even if the Court reverses judgment on the contract claims against CR, it should affirm the judgment in favor of CR's principles Jason and Tony Engel. *See* CR 2nd Br. 64. But that is not an issue for this Court to decide; it's a matter for the district court to address on remand.

The bench trial addressed *other* theories of contract liability, but the *copyright-based* contract claims for breach of the CR License did not go to trial; these claims fell at summary judgment based on the court's copyrightability ruling. *See* 1-ER-84 (court at summary judgment limits contract claims against CR to non-copyright theories). These claims should be reinstated as they were when they were mistakenly dismissed: pretrial, and against both CR and the Engels. The record does not authorize the Court to alter that posture and dismiss the copyright-based contract claims against the Engels when those claims were never tried.

CR highlights the finding below that the Engels were not "liable for the claimed breach," CR 2nd Br. 64, but "the claimed breach" referred to in the finding below was *not* the copyright-based

theory of breach. CR offers no reason or argument for extending this finding to other theories.

### 2. Halicki proved damages.

Our first brief explained the district court's error in finding that Halicki failed to prove damages: The district court did not realize that California law recognizes restitution as a *legal* remedy for breach of contract (not only equitable), and Halicki proved restitution as contract damages. *See* 1st Br. 60–62.

Shelby and CR try several arguments against this. All fail.

***Restitution is a remedy for breach of contract.*** Shelby and CR mischaracterize the leading case on this issue, *Ajaxo Inc. v. E*Trade Group Inc.*, 37 Cal. Rptr. 3d 221 (Ct. App. 2005). It's true that the contract in *Ajaxo* did "allow[] for an equitable remedy." *Id.* at 248 n.33; *see* Shelby 2nd Br. 64; CR 2nd Br. 66 n.28. But this fact was immaterial to the result. Before *Ajaxo* even mentioned this fact, it had laid out its reasoning and stated its conclusion that the principle of "restitution require[d] the return to Ajaxo of 'value' or 'benefit' that E*Trade received." *Ajaxo*, 37 Cal. Rptr. 3d at 248. Its only mention of this fact was dictum, found in a one-sentence

footnote, without any indication the fact mattered to the result. Shelby and CR have misread the case.[10]

Other case law confirms that restitution is a valid contract remedy even when the contract does not expressly provide for equitable remedies. *See CBS, Inc. v. Merrick*, 716 F.2d 1292, 1294–96 (9th Cir. 1983) (affirming award of restitution for breach of contract though contract did not provide for equitable remedies); *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1064–66 (9th Cir. 2017) (plaintiff pleaded entitlement to restitution for breach of contract without any allegation that contract provided for equitable remedies).

***Restitution as contract remedy does not depend on inadequacy of compensatory damages.*** Courts readily award restitution for breach of contract without first finding that compensatory damages would be inadequate, contrary to CR's view, *see* CR 2nd Br. 66. *See*, *e.g.*, *Ajaxo*, 37 Cal. Rptr. 3d at 247–49 (finding "substantial evidence" to support jury restitution award without discussing adequacy of compensatory damages); *CBS, Inc.*,

---

[10] In support of their reading, Shelby and CR cite a Maryland case applying Maryland law. *See Adcor Indus. v. Beretta U.S.A. Corp.*, 248 A.3d 1137, 1150 (Md. Ct. Spec. App. 2021) (concluding that "the unjust enrichment measure of damages that [*Ajaxo*] was grounded in the parties' contract"). They are mistaken, and the case is mistaken.

716 F.2d at 1295–96 (affirming award of restitution without any finding on adequacy of compensatory damages); *Hickcox-Huffman*, 855 F.3d at 1064–65 (plaintiff pleaded entitlement to restitution for breach of contract without any allegation regarding adequacy of compensatory damages).[11]

***Shelby and CR took and misused Eleanor's design.*** Last, Shelby and CR attack Halicki's theory of recovery, arguing that in proper cases of restitution, the profits from the breach of contract represent something "*taken from* plaintiffs" the "misuse of which deprived plaintiffs of its value." CR 2nd Br. 67 (emphasis in original). They argue that their profits from selling the GT500CR

[11] CR cites four *non-contract* cases in which restitution or disgorgement was treated as an equitable remedy. *See* CR 2nd Br. 66 n.28, 67; *Lee v. Luxottica Retail N. Am., Inc.*, 280 Cal. Rptr. 3d 230, 235 (Ct. App. 2021) ("[N]onrestitutionary disgorgement of profits—that is, profits that are neither money a defendant took from the plaintiff nor funds in which the plaintiff has an ownership interest—is not an authorized remedy under the [California] UCL."); *Day v. GEICO Cas. Co.*, 2023 WL 2250273, at *3 (N.D. Cal. Feb. 27, 2023) (restitution under UCL is equitable, weighing against right to a jury trial); *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1075 (9th Cir. 2015) ("A claim for disgorgement of profits under [trademark infringement statute] is equitable, not legal."); *Ctr. for Healthcare Educ. & Research, Inc. v. Int'l Cong. for Joint Reconstruction, Inc.*, 272 Cal. Rptr. 3d 108, 120 (Ct. App. 2020) ("disgorgement of secret profits" is "equitable remedy" for breach of fiduciary duty).

are not like that. *Id.*; *see also* Shelby 2nd Br. 65 ("one cannot misuse something nonexistent"). They are mistaken.

Shelby and CR breached their contracts by exploiting copyrights to Eleanor to which they were not contractually entitled; and independent of copyright, Shelby also breached by making a car that copied Eleanor's distinctive features when contractually prohibited from doing so. *See* 1st Br. 59–65, 67–79; pp. 58–64, *infra*. To use their words, the thing "taken from" Halicki was Eleanor's design, and the contracts expressly defined this taking as "misuse." This misuse wrongly deprived Halicki of the value of Eleanor's design because Shelby and CR earned profits from Eleanor's design to which they were not entitled, and to which Halicki was and is entitled, per the terms of the contracts and as owner of the Eleanor copyright and merchandising rights.

In this respect, our case is just like *Ajaxo*. The *Ajaxo* defendant wrongly "gave the plaintiff's trade secrets to one of plaintiff's competitors" such that "restitution required [defendant] to return to the plaintiff the value or benefit that it received from the plaintiff's competitor." CR 2nd Br. 68–69. Like the trade secrets there, Eleanor's design here was wrongly exploited for a profit, and restitution requires this profit be given to Halicki.

The *Ajaxo* defendant "benefited by breaching" the contract and exploiting the plaintiff's trade secrets, and had to give that benefit

to the plaintiff. *Ajaxo*, 37 Cal. Rptr. 3d at 248. Likewise here, Shelby and CR benefited by breaching their contracts with Halicki and exploiting Eleanor's design; they must give that benefit to Halicki.

CR argues that Halicki "'retained [the] right to use, distribute, license, and profit from the … materials at issue,'" citing *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 969–70 (N.D. Cal. 2010), in which, CR claims, this fact supported denial of restitution. CR 2nd Br. 68–69. But CR misreads *Oracle*. The quoted passage holds only that a plaintiff who retains rights to the materials at issue cannot recover "saved development costs" as the *measure* of restitution or unjust enrichment. *Oracle*, 734 F. Supp. 2d at 970. The court did not mean that a plaintiff who retains rights to the materials at issue cannot pursue restitution *at all*. We know this because *Oracle* made this holding only as to plaintiffs' "unjust enrichment claim," not as to the plaintiffs' contract claim, *id.* at 969–70—and for an unjust enrichment claim, the only possible remedy is restitution, by some measure. The holding is intelligible, therefore, only if read to limit a certain *measure* of unjust enrichment.

Moreover, if *Oracle* meant what CR thinks, this purported distinction—retaining the right to the materials at issue—would not explain why *Oracle* denied restitution while *Ajaxo* affirmed it:

The plaintiff in *Ajaxo*, like the plaintiffs in *Oracle*, "retained [the] right to use, distribute, license, and profit from" the "materials at issue." *Oracle*, 734 F. Supp. 2d at 970. The "materials at issue" in *Ajaxo* were "trade secrets, patents, patent applications, copyrights, know-how, processes, ideas," and more, 37 Cal. Rptr. 3d at 226, the kinds of materials the plaintiff did not *lose* by sharing them with the defendant. So the fact that a plaintiff retains rights to the materials at issue cannot cut off restitution as a contract remedy.

CR further argues that Shelby and CR's breach "did nothing to prevent [Halicki] from extracting value from" Eleanor's design. CR 2nd Br. 69. But again, that cannot be a basis for denying restitution. In exactly the same way, the *Ajaxo* defendant's breach did not literally "prevent" the plaintiff from also extracting value from the materials. And in both *Ajaxo* and our case, the breach did *indirectly* prevent the injured party from extracting value, because the breaching party gave something to a third party that was only the injured party's to give.

"For every wrong there is a remedy." Cal. Civ. Code § 3523, *quoted in Ajaxo*, 37 Cal. Rptr. 3d at 248. To remedy Shelby and CR's wrong, restitution requires that they give Halicki their profits from the GT500CR.

### 3. The fact that Eleanor Licensing LLC signed the CR License, not Halicki, does not support affirmance.

Our first brief explained that whether Eleanor Licensing, LLC controlled the rights at issue in the CR License, rather than only Denice Halicki, was not raised in the final pretrial conference order and was not disputed at or before trial. *See* 1st Br. 62–63. We explained that the district court therefore erred in rejecting the contract claims against CR on that basis. *See id.*

CR asserts that since damages are an essential element of a contract claim, Halicki had to prove that Eleanor Licensing owned or controlled rights that were damaged by CR's conduct, even if CR never raised this issue. CR is incorrect, for procedural and factual reasons.

***Procedurally***, consider the similar case of *Smith v. Washington Sheraton Corp.*, 135 F.3d 779 (D.C. Cir. 1998), a premises liability action. An element of premises liability is that "the defendant owned or controlled the property." *Id.* at 784. The plaintiff's pretrial statement had described the defendants as "either owners, operators, or parent corporations" of the property, and the defendants' pretrial statement, "consistent with" the defendants' other representations, had not disputed this point. *Id.*

at 783–84. The final pretrial conference order in *Smith* thus did not raise this as a disputed point. *Id* at 784.

The D.C. Circuit held that "the pretrial order had relieved [plaintiff] from the burden of proving" ownership or control of the property, so the district court erred in granting judgment to the defendants for "fail[ure] to prove ownership or control." *Id.* Defendants "can waive a potential defense by failing to ensure that the issue is clearly preserved in the pretrial order," and "[e]ven a prima facie element of the plaintiff's case may be removed from dispute in this manner." *Id.* Therefore, "a defendant waives any objection" regarding its ownership or control of property "if the defendant fails to raise lack of ownership or control as a defense in the face of the plaintiff's pretrial statement clearly asserting to the contrary." *Id.*

Here, despite many opportunities, CR never argued below that only Denice Halicki, not Eleanor Licensing, controls the intellectual property rights relevant to the CR License—the basis of the district court's erroneous ruling. *See* 1-ER-37. To the contrary, both sides consistently treated it as immaterial that Eleanor Licensing was the named party in the CR License rather than Denice Halicki, and this took the issue out of the case, along with the related issue of which entities control which rights.

Halicki's pretrial memorandum stated that in the CR License, CR and "the Halicki Parties" (Denice Halicki, Eleanor Licensing, and Gone in 60 Seconds Motorsports) agreed that the Halicki Parties "had the rights to the 'Licensed Properties' which are defined to include the 'intellectual property, trademarks, and copyrights'" to Eleanor. 5-ER-1117, 1130.

Shortly before trial, CR proposed findings of fact that "The Halicki Parties [defined as above] and the CR Parties entered into" the CR License and "[t]he Halicki Parties terminated the CR License." 4-ER-973–74. CR's proposed conclusions of law likewise did not distinguish between Denice Halicki and Eleanor Licensing, and CR never raised the issue of control of the relevant rights. *See* 4-ER-976–77. A bit later, CR's Amended Memorandum of Contentions of Fact and Law did not raise this issue either, instead raising only "the lack of evidence of any use by the CR Parties of any of the Halicki Parties' trademarks." 3-ER-661.

This culminated in CR's fatal failure to raise this argument in the final pretrial conference order. Instead, CR's sole argument negating the elements of Halicki's contract claim was that the relevant provisions of the CR License were no longer valid or enforceable after the contract's 2009 termination. *See* 3-ER-605.[12]

---

[12] Here was the "CR Parties' Position" on the contract claim:

[*Footnote Continues On Next Page*]

And although Halicki "listed the elements of the claim in the FPCO," confirming she "intended to prove them," CR 2nd Br. 70, the listed elements did *not* include that Eleanor Licensing controlled the rights at issue; Halicki stated her intent to prove "[t]hat *the Halicki Parties* and the CR Parties entered into a contract." 3-ER-604–05 (emphasis added).

CR also failed to make this argument at trial, or in post-trial proposed findings of fact. *See* 1st Br. 62; CR 2nd Br. 70–71

---

> The CR Parties dispute that there currently exists a validly enforceable contract as it was terminated on October 16, 2009.... The License Agreement at issue, dated November 1, 2007, terminated on October 16, 2009. The License Agreement stated only one survival provision pertaining exclusively to Paragraph 13.3. Accordingly, the Halicki Parties must prove that damages arose out of a valid and enforceable contract. Since the Parties to the License Agreement only expressed survivability of Paragraph 13.3, it is reasonable to find that by their silence they did not intend to make any of the other provisions of the License Agreement survivable after termination of the Agreement. In cases of uncertainty, ambiguities in a contract are construed against the maker, which in this case is the Halicki Parties.

3-ER-605. (Though not relevant here, "Paragraph 13.3" should probably read "Paragraph 13.2": Paragraph 13.2(b) says, "This provision shall survive any expiration or termination of this Agreement"; Paragraph 13.3 does not expressly discuss survivability. 4-ER-795.)

CR also raised various affirmative defenses not at issue here. *See* 3-ER-628–29.

(implicitly conceding this argument not raised at trial); 2-ER-263–64, 266–67, 269–71 (post-trial proposed findings stating that the CR License was between "the Halicki Parties" and CR, and raising "control" only to propose the (mistaken) finding that Hollywood Pictures Corporation controlled the rights at issue).

As in *Smith*, this course of proceedings "relieved" Halicki of "the burden of proving" that Eleanor Licensing controlled the relevant rights. 135 F.3d at 784. CR "waive[d] a potential defense" based on this issue, even though this issue implicated "a prima facie element of" Halicki's case. *Id.*

Nor is Eleanor Licensing's control "an unwaivable issue of subject matter jurisdiction." CR 2nd Br. at 71. CR mischaracterizes the court's ruling. The court recognized the "unity of interests" of Denice Halicki and Eleanor Licensing; the court limited its ruling to whether "the latter controls rights owned by the former," 1-ER-37, making no finding on whether Eleanor Licensing was "*uninjured* by the breach" and no mention of standing or subject matter jurisdiction. CR 2nd Br. at 71 (emphasis in original).

Procedurally, therefore, it was blatant error for the district court to reject Halicki's contract claims based on an issue never raised or disputed before or during trial.

***Factually,*** as we explained, under California Civil Code sections 622 and 1617, the recitations in the CR License regarding Eleanor Licensing's rights in Eleanor are either binding on CR, or, at a minimum, created a presumption of their truth, a presumption that CR never attempted to rebut. 1st Br. 63–64. These factual statements concerning ownership are governed by these statutes; they are not "legal conclusions." CR 2nd Br. 72 n.33. And we rely on them for their "stated facts"—the ownership or control of rights by Eleanor Licensing sufficient to enter the CR License—rather than for anything to do with "future conduct," as CR mistakenly suggests. *Id.* (quoting *Powertech Tech., Inc. v. Tessera, Inc.*, 2013 WL 12324116, at *10 (N.D. Cal. Apr. 15, 2013) (holding that certain recitals in a contract did not alter the "express operative terms")).

CR *still* doesn't dispute the fact that Eleanor Licensing controls the Eleanor intellectual property rights. *See* CR 2nd Br. 70–74 (only characterizing the evidence at trial). Indeed, CR acknowledges Halicki's evidence that Denice Halicki authorized Eleanor Licensing to act on her behalf with respect to the rights at issue. *See* CR 2nd Br. 72–73; 1st Br. 64. This authorization gave Eleanor Licensing sufficient control of those rights to agree to the CR License. Any shortcoming in Halicki's evidentiary showing at trial arose from CR's decision not to dispute this fact. As explained, one party need not prove what the other party has never disputed.

The district court's error is not a ground for affirmance. CR long ago forfeited the argument that Eleanor Licensing did not control the rights at issue. And even if the issue is not forfeited, any question on this point should be resolved on remand, alongside other outstanding issues.

### B. Independent of whether Eleanor is copyrightable, the GT500CR breaches the Shelby Settlement.

The Shelby settlement also prohibited Shelby from making a car like the GT500CR regardless of Eleanor's copyrightability. Shelby thus breached the settlement as a matter of law.

#### 1. The GT500CR violates the settlement's plain terms.

Shelby does not dispute that the GT500CR copies all of Eleanor's distinctive features other than the hood and headlights, but Shelby denies that the GT500CR breaches the settlement. *See* 1st Br. 26–29 (Remake Eleanor's distinctive features), 35–36 (what GT500CR copies); Shelby 2nd Br. 3–22, 56–65 (not disputing the copying).

Our first brief highlighted this clause from the Shelby settlement: "Other than as set forth above, Shelby or any of his licensees *shall not manufacture or sell any Eleanors*." *See* 1st Br. 69–77 (emphasis added). The GT500CR's breach of the settlement

depends on the definition of "Eleanor" in this clause. Shelby mistakenly asserts that for a car to be an "Eleanor," it must copy *all* of Eleanor's distinctive features, including the hood and headlights, so the GT500CR is not an "Eleanor." *See* Shelby 2nd Br. 59.

Shelby is mistaken. As we explained in our first brief and reiterate here, a car copying all of Remake Eleanor's features other than the hood and headlights—as the GT500CR does—is an "Eleanor." Our interpretation is reasonable and consistent with the settlement as a whole, as the law requires. *See American Alternative Ins. Corp. v. Superior Court*, 37 Cal. Rptr. 3d 918, 922 (Ct. App. 2006) (courts must interpret a "contract as a whole and interpret the language in context"). Shelby's interpretation is neither.

The GT500CR therefore breaches the settlement.

#### a. Paragraph 8 defines Eleanor by reference to all of Eleanor's distinctive features.

Shelby is wrong to say that "'Eleanor' is *not* a defined term with a consistent meaning," or is "used differently in different paragraphs." Shelby 2nd Br. 59 (emphasis in original). Within the settlement, the word "Eleanor," used on its own, has a specific and consistent meaning.

In Paragraph 8, "Shelby acknowledges that Halicki will continue to manufacture, market, sell and/or license *Eleanors* and other merchandise relating to *Eleanor* as depicted in the attached *photograph of Eleanor* and the Gone in 60 Seconds remake (excluding all Shelby badging)." 11-ER-2732 (emphasis added).[13] The attached photograph lists and depicts Eleanor's distinctive features. 11-ER-2741. This paragraph, these images, and the *Gone in 60 Seconds* remake operate to define "Eleanor."

This acknowledgment has a counterpart in Paragraph 12, where the settlement authorizes a "side letter" to third parties stating that "Shelby cannot sue Halicki or her licensees for licensing, using, manufacturing or selling *Eleanors* from the Remake." 11-ER-2733 (emphasis added). Paragraph 8 and this passage of Paragraph 12 are the *only* passages of the settlement—other than Paragraph 17—that use the word "Eleanors" or "Eleanor" on its own. "Eleanor" therefore does have a consistent meaning: a car resembling that in the photos, diagram, and film referred to in Paragraph 8.

---

[13] By this reference, the settlement incorporates the *Gone in 60 Seconds* remake—the film itself—into the definition of "Eleanor." Remake Eleanor's distinctive fuel cap is express, not "implied," in the film, and thus into the settlement's definition of "Eleanor." *Contra* Shelby 2nd Br. 60–61

The settlement's other uses of the word "Eleanor" place it within a phrase with its own, distinct meaning. Here they are, quoted verbatim and *not* each set off by external quotation marks:

- THE "ELEANOR" CAR CHARACTER FROM THE REMAKE …;
- … THE "TRADEMARKS" IN AND TO THE FOLLOWING: "ELEANOR"; …
- … THE EXAGGERATED, RAISED HUMP FEATURE OF THE ELEANOR HOOD ("ELEANOR HOOD"), OR THE SPECIFIC DESIGN OF THE ELEANOR SMALL DUAL HEADLIGHTS WITH CUSTOM MOLDED 3-INCH HOLE AND 2-INCH INSET LIGHTS FROM THE MAIN HEADLIGHT ("ELEANOR INSET LIGHTS") …
- … THE "ELEANOR" MARK …
- … THE COPYRIGHT TO THE CHARACTER ELEANOR FROM THE REMAKE …
- … THE TRADEMARKS "ELEANOR" … THE TRADE DRESS OF "ELEANOR."

11-ER-2731–37.

There is no inconsistency. "Eleanor" refers to a car with the appearance and enumerated features defined in Paragraph 8 and the referenced images and film.

"Eleanor" also refers to a car with all those features other than the hood and headlights. This is clear from Paragraph 17.

#### b. Shelby's interpretation clashes with Paragraph 17.

As our first brief explained, Paragraph 17 outlines two ways in which Shelby may complete certain customers' outstanding "Eleanor contracts": with the Eleanor hood and headlights, if the customer will not agree to remove them; or without the Eleanor hood and headlights, if the customer agrees. *See* 1st Br. 73–75.

After outlining these two courses of action, Paragraph 17 presents its critical clause: "*Other than as set forth above*," that is, other than through these two courses of action, "Shelby or any of his licensees shall not manufacture or sell any Eleanors." 11-ER-2735–36 (emphasis added). This clause tells us what it is to "manufacture or sell any Eleanors": It is to do what is "set forth above," that is, to build a car resembling Eleanor—with or without the Eleanor hood and headlights.

Shelby reads the critical clause to refer only to building a car *with* the Eleanor hood and headlights, just *one* of the two courses of action "set forth above." Shelby thus believes the settlement imposes no limits on it with respect to cars lacking the Eleanor hood and headlights. Shelby believes it is free to manufacture,

license, and otherwise do as it likes with cars like the GT500CR that copy only all *other* distinctive features.

Shelby's view contradicts other language of Paragraph 17. In addition to the critical clause—"Shelby or any of his licensees shall not manufacture or sell any Eleanors"—the paragraph limits Shelby's conduct in other ways, and does so using language that clearly takes in cars both with *and* without the Eleanor hood and headlights.

- "Shelby shall only complete *automobiles* for customers that have existing contracts for the *automobiles*." 11-ER-2735 (emphasis added). The broad term "automobiles" makes clear that Shelby cannot "complete" cars with *or* without the Eleanor hood and headlights, other than for existing customers.
- "This provision [Paragraph 17] only applies to contracts with the specific existing customers, not to any assignees of such customers. In no event shall Shelby obtain any direct or indirect ownership interest in any of these automobiles." 11-ER-2735–36. The broad terms "[t]his provision" and "automobiles" make clear that Shelby cannot complete cars for existing customers' assignees

> with *or* without the Eleanor hood and headlights, and cannot take any ownership interest in the cars.

Thus, the settlement clearly *does* limit Shelby's conduct with respect to cars copying all of Eleanor's features other than the hood and headlights. And it can do so only because Shelby is *otherwise* prohibited from making or selling these cars—that is, only because "Shelby or any of his licensees shall not manufacture or sell any Eleanors," with "Eleanor" referring to cars both with and without the Eleanor hood and headlights. *See* 1st Br. 75–77.

#### c. Our interpretation is consistent with Paragraph 17.

Our interpretation is consistent with the sentence, "Shelby shall use best efforts to convince the customers to choose a different car that doesn't have the Eleanor Hood and Eleanor Inset Lights described in paragraph 4 above." 11-ER-2735. The phrase "different car" means a car different *from what the customer ordered*—but the car is still an "Eleanor." *See* 1st Br. 76–77. *Contra* Shelby 2nd Br. 61.

Shelby argues that "different car" in this sentence *could* mean "different from an 'Eleanor,'" Shelby 2nd Br. 59, 61, but this is true only if one reads the sentence in isolation; Shelby's reading mangles the interpretation of the whole paragraph.

### 2. Halicki and Shelby's post-settlement conduct does not affect whether Shelby breached.

Shelby also argues that the "practical construction placed by the parties upon the instrument" shows there was no breach. Shelby 2nd Br. 63. As a threshold matter, this is a rehash of the factually disputed statute of limitations argument not reached by the district court, the argument that the Halicki parties somehow knew of and acquiesced in the manufacture of GT500CRs. *See* Shelby 2nd Br. 63 n.15; § II.D., *supra*.

In any event, Shelby misconstrues the authority it cites in invoking this principle of contract interpretation, *Crestview Cemetery Association v. Dieden*, 356 P.2d 171 (Cal. 1960). *Crestview* explains that "this doctrine of practical construction can only be applied when the contract is ambiguous, and cannot be used when the contract is unambiguous." 356 P.2d at 177. Shelby never argues or even suggests that the settlement is ambiguous, so the doctrine doesn't apply here.

Shelby also misunderstands what the doctrine is about. In *Crestview*, a contract was ambiguous regarding whether a developers' attorney earned his fee by getting certain land rezoned or by some later project milestone. *See id.* at 173–74. After the land was rezoned, the developers had repeatedly congratulated the attorney and promised him his fee; later,

however, they began to say that he had not fully performed, and they sued. *See id.* at 174–75. The court sided with the attorney's interpretation, finding that after rezoning, both sides "believed and demonstrated by their actions to a certainty that they believed that [the attorney] had successfully completed the work called for by the contract." *Id.* at 178. The parties' "practical construction" thus consisted of the parties' own dealings after execution of an ambiguous contract but before the dispute arose. *See id.* at 177–78.

As noted, Shelby's argument is based on Halicki's supposed inaction after Shelby and CR began producing the GT500CR, *see* Shelby 2nd Br. 63, not any course of dealings between Halicki and Shelby from after the settlement was executed. The argument fails.

### C. The statute of limitations does not support affirmance on the contract claims.

CR also argues that the statute of limitations bars Halicki's contract claims. *See* CR 2nd Br. 80–81.

At trial, Halicki offered evidence on "(1) the time and manner of discovery" of Shelby's and CR's breaches of contract (through production of the GT500CR) and on "(2) the inability to have made earlier discovery despite reasonable diligence." *NBCUniversal Media, LLC v. Superior Court*, 171 Cal. Rptr. 3d 1, 8–9 (Ct. App.

2014); *see* 3-ER-414–18. This evidence supports the finding that the Halicki parties' contract claims were timely relative to when they reasonably could have been expected to discover the breach.

This is a factual issue that the district court declined to reach. *See Diamond Resorts U.S. Collection Dev., LLC v. Pandora Mktg., LLC*, 656 F. Supp. 3d 1073, 1087–88 (C.D. Cal. 2023) (whether "discovery rule" applies is question of fact); *Cleveland v. Internet Specialties West, Inc.*, 88 Cal. Rptr. 3d 892, 897–98 (Ct. App. 2009); 1-ER-52. So CR asks the Court to resolve this factual issue as a matter of law in the first instance on appeal.

But in support, CR offers only the same flimsy evidence outlined above. *See* p. 42, *supra*. As above, on this disputed record, the Court should also decline to reach this issue.[14] The statute of limitations does not support affirmance of the judgment on the contract claims.

---

[14] Despite CR's contrary argument, "[t]he prior litigation between" Halicki and CR has nothing to do with whether the discovery rule applies in this case. CR 2nd Br. 80 n.40. That prior suit concerned only Halicki's "breach of contract claim relating to [CR's] failure to transfer title" to a certain car. *Eleanor Licensing LLC v. Classic Recreations LLC*, 230 Cal. Rptr. 3d 511, 521–22 (Ct. App. 2018). The evidence in that suit concerned whether Halicki should have known CR's intent regarding the title to the car, *see id.*; such evidence is not relevant to whether Halicki should have known that CR was manufacturing unauthorized copies of Eleanor.

## IV. The Court should reverse the judgment against Halicki on the claim for declaratory judgment that CR violated the injunction.

CR produced the GT500CR while under an injunction against "seeking possession of or harming [a certain car known as] 'Eleanor No. 1' and/or Eleanor Licensing, LLC's rights and rights in the subject vehicle." 1st Br. 66 (emphasis omitted). As we established in our first brief, the district court erred in dismissing Halicki's claim for declaratory judgment that the GT500CR violated the injunction. *See* 1-ER-103–04 (dismissal); 8-ER-2056 (claim); 1st Br. 65–67.

CR argues that the word "rights" within the phrase "Eleanor Licensing, LLC's *rights* and rights in the subject vehicle" carries no independent meaning. *See* CR 2nd Br. 75–78 (not proposing any meaning for "rights"). CR is wrong, "rights" means "rights," and the GT500CR violates the injunction.

### A. The Court should deny CR's motion for judicial notice.

The Court reviews the dismissal based only on "the record before the trial judge *when his decision was made*." *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074, 1077 (9th Cir. 1988) (emphasis in original).

To support its position, CR seeks judicial notice of Halicki's complaint from the prior action that led to the injunction at issue. CR's Mot. Jud. Not., ECF No. 40-1; *see* CR 2nd Br. 76, n.37 (citing the complaint). But this complaint was not before the district court when it ruled on CR's motion to dismiss. "The proper place to call attention" to the complaint "was in front of the district court" at the time CR moved to dismiss—not now, on appeal. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386 n.1 (9th Cir. 2010) (denying judicial notice). Not being part of the record, the complaint is irrelevant to Halicki's appeal from the district court's dismissal.[15]

To be sure, "the relief sought in the complaint" might help construe the injunction at issue. CR's Mot. Jud. Not. 2–3. But so might a great many other documents and evidence. Halicki's

---

[15] CR accuses our first brief of "mischaracterization of the record" regarding the prior action. CR 2nd Br. 76 n.37. But as explained in the body text, "the record" that matters is the record before the district court at the time it dismissed Halicki's claim. CR cites no specific mischaracterization of the record, because we have not made any.

Shelby and CR also point to other supposed exaggerations or misstatements by Halicki of Eleanor's character attributes; these are confined to matters in the proceedings below, and they are unfounded. *Compare* Shelby 2nd Br. 12–13, 16, 19–20, *and* CR 2nd Br. 14–15, *with* FER-24–34 (rebutting these attacks below). These attacks do not and cannot rebut the character traits set out in the appellate briefing, which are based on objective observations of what the films depict.

appeal is not the forum for CR to commence building a would-be summary judgment record with new documents. When this Court reinstates the declaratory relief claim at the pleading stage, where it was dismissed, CR will then have ample opportunity to add the complaint and anything else to the record—and Halicki will have the same opportunity.

This Court must review the district court's dismissal based on the record at that time, not on the record as CR would like it to have been. The Court should deny the request for judicial notice.

### B. The injunction prohibits interfering with Halicki's Eleanor copyright.

To construe the injunction's phrase "Eleanor Licensing, LLC's rights and rights in the subject vehicle," the Court considers "the kind of conduct that is sought to be enjoined" in light of the state court proceedings that led to the injunction. 1st Br. 66.

Here, before those prior proceedings began, CR claimed by letter that Eleanor Licensing "did not have the rights it claimed to have had relative to the automobiles that were manufactured by [CR] under the terms of the" CR License, and demanded return of Eleanor No. 1, FER-70–71; and Halicki claimed in response that these "claims are frivolous and without any foundation whatsoever," FER-72–73. During those prior proceedings, CR's

principal declared that he reached out to Halicki in 2007 "to secure licensing rights" to Eleanor; that Eleanor No. 1 is rightly titled in the name of CR; and that "[h]ad I been aware [Halicki] did not own the 'ELEANOR' trademark, I would have never executed the" CR License. FER-77; *see also City of Redlands v. County of San Bernardino*, 117 Cal. Rptr. 2d 582, 584–85, 594 (Ct. App. 2002) (upholding injunction as "reasonably tailored" in light of record).

These record items—which were before the district court when it dismissed the declaratory relief claim—demonstrate that before and during the prior state court proceedings, the parties viewed the intellectual property rights to the car character Eleanor as intertwined with the rights to Eleanor No. 1. In an appeal from that prior proceeding, the California Court of Appeal, whose decision was also before the district court, reached the same view. *See Eleanor Licensing LLC*, 230 Cal. Rptr. 3d at 518–19 (stating that proceedings below addressed "Halicki's merchandising rights"); FER-87; FER-117 (trial court order issued after remand, summarizing the Court of Appeal's decision as having "confirmed that the plaintiffs [Eleanor Licensing and Denice Halicki] own the copyrights and trademarks in 'Gone in 60 Seconds' and the Star Car Character 'Eleanor'").

In this light, the injunction's reference to "Eleanor Licensing, LLC's rights and rights in the subject vehicle" is not at all

"puzzling," CR 2nd Br. 77; it is tailored to address all the rights contested in the proceedings, including the Eleanor copyright.

The district court openly "disregard[ed]" this record and dismissed the declaratory relief claim based only on its reading of the injunction itself. 1-ER-103–04. That was error. The injunction protects Halicki's Eleanor copyright, and, as Halicki alleged, 8-ER-2017, 2025–27, and has established on appeal, Eleanor is a protected character to which Halicki owns the copyright.

Finally, CR argues that our interpretation renders the injunction "partially unenforceable" because "state courts have no jurisdiction to" determine whether copyright infringement has occurred. CR 2nd Br. 77–78. But the injunction prohibits injury to *all* "rights" of Eleanor Licensing. State courts have jurisdiction to determine many of these. Federal courts, like this one (and the district court below), have jurisdiction to determine the rest. CR cites no authority saying that a state court injunction must be construed so that it is entirely enforceable by a state court. Our interpretation poses no problem to enforcing the injunction.

## V. Conclusion.

For the reasons stated above, the Court should reverse the judgment on the copyright infringement claims and remand for determination of substantial similarity.

The Court should also reverse the judgment on the copyright-dependent and -independent contract claims. On remand, the copyright-dependent contract claims should be tried in conjunction with the copyright infringement claims. On the copyright-independent contract claims, the Court should hold that the GT500CR breaches the Shelby settlement as a matter of law.[16]

Finally, the Court should reverse the judgment for CR on the declaratory judgment claim.

[16] Because further proceedings are necessary, it is unnecessary and premature for this Court to reach factual issues concerning differences between the "GT500CR" and the "GT500CR Carbon," as CR requests. *See* CR 2nd Br. 79–80; *see also* 1st Br. 35 n.3 (discussing the GT500CR Carbon).

## CROSS-APPELLEES' ANSWER

### I. Statement of cross-appeal issue.

Does the record below establish as a matter of law that the GT500CR infringes on *none* of Halicki's rights, such that Shelby is entitled to a declaration to that effect?

### II. Summary of argument.

If the Court reverses any part of the judgment for Shelby based on Halicki's appeal, then Shelby is not entitled to the requested declaratory relief because the GT500CR's infringement of Halicki's rights will be determined on remand.

Even if the Court affirms the judgment, Shelby isn't entitled to the requested declaratory relief. The proceedings below did not determine whether the GT500CR infringes on Halicki's trade dress rights because the parties did not litigate that issue. The proceedings below did not determine whether the GT500CR infringes on Halicki's trademark rights because Halicki voluntarily withdrew her trademark infringement claims, so potential trademark infringement was never adjudicated. And the proceedings below did not determine whether the GT500CR infringes on Halicki's contract rights because those rights overlap in part with her trademark rights.

## III. The Court should affirm the denial of declaratory judgment because the record does not establish that the GT500CR infringes on none of Halicki's rights.

Shelby requested a declaration that "Shelby GT500CR vehicles do not infringe on any of the Halicki Parties' rights," including all intellectual property rights and contract rights. 1-ER-31. The district court denied the request. *Id.* This ruling is reviewed de novo. *See Oregon Coast Scenic R.R., LLC v. Oregon Dep't of State Lands*, 841 F.3d 1069, 1072 (9th Cir. 2016).

This Court should affirm the denial of declaratory relief because "the state of the record is inadequate to support the extent of relief sought." *United States v. State of Washington*, 759 F.2d 1353, 1356 (9th Cir. 1985). The record does not establish as a matter of law that the GT500CR infringes on none of Halicki's rights.

### A. If the Court reverses any part of the judgment for Shelby based on Halicki's appeal, Shelby is not entitled to the requested declaration.

Halicki's appeal argues that the GT500CR infringes the copyright to Eleanor and breaches the Shelby settlement.

If the Court agrees and reverses any part of the judgment on Halicki's copyright infringement claims or contract claims against Shelby, then Shelby isn't entitled to the requested declaration.

The extent to which the GT500CR infringes on Halicki's rights will be decided on remand.

### B. Even if the Court affirms the judgment, the record does not establish the requested declaration.

Even if the judgment below stands, the record does not support a declaration that the GT500CR infringes on none of Halicki's rights. It remains unresolved whether the GT500CR infringes on Halicki's trade dress rights, trademark rights, and contract rights.

Shelby's appeal conflates substantive legal rights with procedural rights. For Shelby to be entitled to this declaration, the record would need to determine the true state of all relevant trade dress rights, trademark rights, and contract rights—not just Halicki's procedural rights to assert various causes of action or theories of liability. The record does not go as far as Shelby needs it to. The district court was correct to deny the request for declaratory judgment.

#### 1. Whether the GT500CR infringes on Halicki's trade dress rights remains unresolved.

Whether the GT500CR infringes Halicki's trade dress rights was not at issue at trial. *See* 1-ER-19–21, 30, 44–45.[17] Shelby

---

[17] The cited passages of the bench verdict are the only mentions of trade dress rights; the court is discussing *Shelby's* trade dress

[*Footnote Continues On Next Page*]

therefore misstates the record when it says that it "established at trial that the GT500CR did not infringe [Halicki's] trade dress rights." Shelby 2nd Br. 66 (failing to cite anything in the record supporting this statement). Shelby did not establish this.

Shelby also argues that Halicki "affirmatively waived any trade dress allegations in sworn discovery responses." Shelby 2nd Br. 68. As Shelby's record citations show, in response to interrogatories, the Halicki parties stated that they were not "asserting any infringement of any trade dress rights" and "not asserting any claims based on trade dress." 2-SSER-412, 417–18, 423, 429–30, 437. By this waiver, Halicki could no longer have affirmatively raised the theory within this action that the GT500CR infringed upon trade dress rights.

But this waiver creates only a procedural bar for Halicki's affirmative claims. It doesn't at all answer the substantive question as to whether the GT500CR actually infringes upon Halicki's trade dress rights. Nor does anything else in the record answer this question, including Shelby's record citations.

As a result, the record completely lacks support for the finding that the GT500CR does not infringe on Halicki's trade dress rights.

---

rights, or Halicki's trade dress rights *in the Eleanor hood and headlights*, which were not at issue.

#### 2. Whether the GT500CR infringes on Halicki's trademark rights remains unresolved.

The case is the same for Halicki's trademark rights: The record cannot answer the substantive question whether the GT500CR infringes them. Here is a short history of this issue.

***First,*** Halicki pleaded trademark infringement claims against Shelby and CR. *See* 8-ER-2056–66.

***Second,*** Shelby moved for summary judgment on these claims. In response, Halicki said that "efforts to prove this breach have been frustrated" by certain actions of Shelby, so "the Halicki parties are willing to narrow the case against the Shelby parties and withdraw the trademark infringement allegations against the Shelby parties …." 8-ER-1921.

***Last,*** in its order resolving Shelby's motion, the district court said, "The Halicki Parties state that they are 'willing to narrow the case against the Shelby [P]arties and withdraw the trademark infringement allegations' against the Shelby Parties. The Court grants summary judgment in favor of the Shelby Parties as to the Halicki Parties' trademark infringement claim." FER-56–57 (citation omitted).

In short, Halicki withdrew the trademark infringement claims—voluntarily and unopposed—but made no concession whatsoever regarding their substance. As a result, the district

court never adjudicated or even purported to adjudicate the substantive question whether the GT500CR actually infringes Halicki's trademark rights. The court merely accepted Halicki's withdrawal, entering summary judgment solely on that basis. Shelby misstates the record to say that Shelby "established at summary judgment that the GT500CR did not infringe [Halicki's] … trademarks." Shelby 2nd Br. 65–66. Shelby established no such thing, as the court's order makes clear. The *substantive* question remains unanswered.

The requested finding that the GT500CR does not infringe on Halicki's trademark rights thus lacks any record support.

### 3. Whether the GT500CR infringes on Halicki's contract rights remains unresolved.

Finally, the record also does not establish as a matter of law that the GT500CR infringes on none of Halicki's contract rights under the Shelby settlement.

As just explained, the record fails to establish that the GT500CR doesn't infringe on Halicki's *trademark* rights.

As for *contract* rights, Shelby agreed in the settlement that it "shall not use, or license in any way, shape or form any of the property rights transferred to Halicki described herein," which

include all *trademark* rights to "Eleanor," "E," and "Gone in 60 Seconds." 11-ER-2731–32.

The record thus fails to establish that the GT500CR does not infringe on Halicki's *trademark-related contract rights*.

#### 4. The district court correctly analyzed this issue.

Assuming for argument's sake that the existing judgment stands, it already says all that could be said, on this record, regarding the GT500CR's infringement of Halicki's rights: Per the judgment, the GT500CR does not infringe the Eleanor copyright; it does not breach the Shelby settlement in the ways Halicki argued; and that is all.

Shelby's cross-appeal asks the Court to enlarge the district court's ruling to add the legal conclusion that the GT500CR does not infringe on *any* of Halicki's substantive rights. Doing so would require this Court to issue a holding vastly beyond what the record can possibly show.

The district court understood the record's limitations. The district court found that the requested declaration was not "warranted upon the disposition of the Halicki Parties'" claims alone: The record "do[es] not satisfy the Shelby Parties' *affirmative* burden to prove entitlement to declaratory relief," that is, the

burden to show that the GT500CR does not infringe *any* of Halicki's rights. 1-ER-33 n.21 (emphasis in original).

On "the noninfringement of all other applicable IP rights" besides copyright, Shelby is incorrect that this issue was "addressed at summary judgment and in numerous trial filings." Shelby 2nd Br. 68. The *substance* of these rights was never addressed. Aside from copyright, the district court never purported to determine "the extent of the Halicki Parties' intellectual property rights, including their interests in the Eleanor car." 1-ER-33. Indeed, Shelby "presented no argument to support a judicial declaration that the GT500CR and GT500E do not infringe the Halicki Parties' intellectual property rights." *Id.* And Halicki's strategic decision not to pursue trademark or trade dress claims within this lawsuit cannot support a substantive declaration that the GT500CR does not actually infringe on those rights.

Shelby also argues that the district court misunderstood the contractual rights at issue in the requested declaration. *See* Shelby 2nd Br. 66–68. Even if true, this would be irrelevant. This Court determines de novo whether the GT500CR infringes any of Halicki's contract rights—a question that the record does not resolve, as explained above, pp. 79–80, *supra*, and regardless of the district court's reasoning.

## IV. Conclusion.

The Court should therefore affirm the judgment denying Shelby the requested declaratory relief.

Date: November 12, 2024

CLARK HILL LLP
David L. Brandon

GREINES, MARTIN, STEIN & RICHLAND LLP
Timothy T. Coates
Gary W. Wax
Stefan C. Love

By: s/ *Stefan C. Love*
Stefan C. Love

Attorneys for Defendants, Counter-Claimants, Appellants, and Cross-Appellees
DENICE SHAKARIAN HALICKI, et al.

## CERTIFICATE OF COMPLIANCE

(Rule 32-2(b)

1. Appellants' Third Brief On Cross-Appeal complies with the type-volume limitation of Fed. R. App. P. 32-2(b) because this brief contains 15,236 words, including words in inserted images, and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally spaced typeface.

Date: November 12, 2024 s/ *Stefan C. Love*
Stefan C. Love

## CERTIFICATE OF SERVICE

[23-3731 and 23-4008]

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 6420 Wilshire Boulevard, Suite 1100, Los Angeles, California 90048, and my email address is pherndon@gmsr.com.

I certify that on November 12, 2024, I electronically filed the foregoing **APPELLANTS' THIRD BRIEF ON CROSS-APPEAL** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that each party in the case is represented by counsel who are registered CM/ECF users and will be served by the appellate CM/ECF system.

*Pauletta L. Herndon*

Pauletta L. Herndon